# CONSIGNMENT AGREEMENT

THIS CONSIGNMENT AGREEMENT (*"Agreement"*) made as of the 30th day of June, 2000, by and between ABN AMRO BANK N.V., a bank organized under the laws of the Netherlands acting through its New York branch with its office at 500 Park Avenue, New York, New York 10022 (*"Consignor"*) and ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation with its principal office at 735 Allens Avenue, Providence, Rhode Island 02905 (the *"Consignee"*).

The Consignee has requested Consignor to deliver precious metals on consignment for sale to Consignee and Consignor is able and willing to make those deliveries and sales on the terms and conditions of this Consignment Agreement. To effectuate this arrangement, Consignor and Consignee agree as follows:

*Section 1.* *Definitions.* For the purposes of this Agreement:

*"Base Rate"* on any date shall mean the rate of interest announced by Consignor as being its *"prime rate"* of interest for U.S. dollar loans for that day and as from time to time in effect.

*"Borrowing Base"* shall mean the sum of (1) with respect to Precious Metal that is gold, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor plus (2) with respect to Precious Metal that is silver, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor.

*"Business Day"* shall mean any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Providence, Rhode Island and New York, New York.

*"Consignee's Counsel"* shall mean Tillinghast, Licht, Perkins, Smith & Cohen, LLP or such other counsel as Consignee may retain.

*"Consignment Limit"* shall mean the amount equal to (x) with respect to Consigned Precious Metal which is gold, the lesser of (1) 7,200 troy ounces of fine gold and (2) such Consigned Precious Metal with a Fair Market Value equal to $2,700,000 plus (y) with respect to Consigned Precious Metal which is silver, the lesser of (1) 220,000 ounces of silver and (2) such Consigned Precious Metal with a Fair Market Value equal to $1,300,000 minus (z) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note in excess of $2,300,000 outstanding under the Loan Agreement between Consignor and Consignee of even date herewith.

*"Consigned Precious Metal"* shall mean Precious Metal which Consignor has consigned to Consignee pursuant to the terms of this Agreement for which full payment has not been received or which has not been Redelivered to Consignor.

*"Current Assets"* shall mean all assets of Consignee that would, in accordance with generally accepted accounting principles consistently applied, be classified as current assets.

*"Current Liabilities"* shall mean all liabilities of Consignee that would, in accordance with generally accepted accounting principles consistently applied, be classified as current liabilities.

*"Daily Consignment Fee"* shall mean, for each day, (x) the fee mutually agreed on by Consignor and Consignee for that day, or, such other amount as Consignor shall determine in its discretion on seven (7) days prior Notice to Consignee or, (y) for Deliveries of Precious Metal having a Maturity Date, as hereinafter defined, of more than one day, the fee quoted by Consignor for such period. The parties hereto acknowledge and agree that, subject to subsequent adjustments as provided for herein, on the date hereof the initial Daily Consignment Fee shall be the sum of 4% per annum (in the case of Consigned Precious Metal which is gold) or 4.5% per annum (in the case of Consigned Precious Metal which is silver)

*"Delivery"* shall mean, as determined by Consignor, either actual receipt by Consignee or Consignor's crediting Precious Metal to the account of Consignee with one or more third parties when no physical movement thereof is contemplated by the parties, such Delivery to be confirmed via facsimile by the Consignor to the Consignee on the date such transaction takes place.

*"Duly Authorized Officer"* shall mean the Chief Executive Officer and Corporate Comptroller of Consignee or Consignor, or other officer or employee of either party who is authorized in writing by the party's Board of Directors or an executive committee of such Board of Directors.

*"Event of Default"* shall mean an event of default under Section 13 of this Agreement.

*"Fair Market Value"* on any day shall mean (i) in the case of gold, the Second London Gold Fixing for that day and (ii) in the case of silver, the value for silver based on the Handy & Harman noon price for that day. If no such price is available for a particular day, the price shall be fixed at the level for the next previous day for which a price is available.

*"Financial Statements"* shall mean the balance sheet of Consignee or Kunzmann, income statements of Consignee or Kunzmann, and retained earnings statements of Consignee or Kunzmann for the year or other period then ended, together with supporting

schedules, prepared in accordance with generally accepted accounting principles consistently applied.

*"Kunzmann"* shall mean The Kunzmann Chain Division of Erwin Pearl, Inc.

*"Loan Agreement"* shall mean the Loan Agreement between the Consignor and Consignee of even date herewith.

*"Merger"* means the merger between Kunzmann and the Consignee pursuant to which the Consignee is the surviving entity.

*"Notice"* or *"Notices"* shall mean all requests, demands and other communications, in writing (including telegraphic communications), mailed by registered or certified mail, return receipt requested, telegraphed, or hand-delivered to a Duly Authorized Officer of the other party at that party's Principal Office.

*"Precious Metal"* shall mean gold having a fineness of not less than .9995 or silver having a fineness of not less than .9990, without regard to whether such gold or silver is alloyed or unalloyed, is in bullion form or is contained in or processed into other materials which contain elements other than gold or silver.

*"Principal Office"* shall mean:

For Consignor:

ABN AMRO Bank N.V.
New York Branch
500 Park Avenue
New York, New York 10022
Attention: Mr. Jeffrey Sarfaty, Vice President

For Consignee:

Armbrust International Ltd.
735 Allens Avenue
Providence, Rhode Island 02905
Attention: Mr. Thomas Baker

*"Purchase Price"* shall mean a price to which both parties' Duly Authorized Officers agree and shall be stated in dollars per troy ounce (in the case of gold) or dollars per ounce (in the case of silver) of Precious Metal content; *provided, however,* that the Purchase Price shall not be less than the Fair Market Value of the applicable Precious Metal plus a market premium as determined in the Consignor's sole discretion.

*"Redeliver"* or *"Redelivery"* shall mean that Consignee deliver as directed by Consignor, at Consignee's sole risk and expense, Precious Metal of a fineness equal to

the fineness specified for that Precious Metal and of a type and quality and in a form reasonably acceptable to Consignor.

*"Senior Liabilities"* shall mean all liabilities of the Consignee not constituting Subordinated Indebtedness.

*"Subordinated Indebtedness"* shall mean such indebtedness of Consignee which is specifically subordinated to Consignee's obligations to Consignor upon terms satisfactory to Bank and which is evidenced by a promissory note the original of which, except to the extent waived in writing by the Consignor, has been delivered to Consignor or such other bank as Consignor deems appropriate.

*"Tangible Net Worth"* shall mean the excess of total assets over its total liabilities computed in accordance with generally accepted accounting principles consistently applied, less all intangible assets and deferred charges, including without limitation, goodwill, debt discount, organization expenses, trademarks and trade names, patents, deferred product development costs and similar items, provided that in computing Tangible Net Worth there shall be excluded any receivables or other amounts payable from any of Consignee's officers or any person or entity affiliated with Consignee or any officer or shareholder thereof. In computing such assets and liabilities, all Consigned Precious Metal and the liability of the Consignee therefor shall be included as if on the balance sheet of the Consignee.

*"Tax Distributions"* shall mean distributions or dividends to any shareholder of the Consignee in an amount sufficient for such shareholder to pay the annual tax liabilities of such shareholder solely as a consequence of the Consignee's sub-chapter S designation under the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

*"Working Capital"* shall mean the excess of current assets over its current liabilities, computed in accordance with generally accepted accounting principles consistently applied.

*Section 2. Amount of Consignment.* Provided no notice of termination has been given by either party and no Event of Default nor any event which with notice or lapse of time, or both, would constitute an Event of Default has occurred hereunder, Consignor may, in its discretion, deliver from time to time to Consignee upon Consignee's request Precious Metal under the terms and conditions of this Agreement. In no event shall Consignor be requested to deliver Precious Metal if the number of troy ounces (in the case of gold) or ounces (in the case of silver) or Fair Market Value of Precious Metal requested when added to Consigned Precious Metal (*plus* any outstanding amounts of unpaid Purchase Price) exceeds Consignee's Consignment Limit.

If for any reason the number of troy ounces (in the case of gold) or ounces (in the case of silver) or Fair Market Value of all Consigned Precious Metal (*plus* any outstanding amounts of unpaid Purchase Price for unpaid ounces of Precious Metal) (together, the *"Consignment Exposure"*) at any time exceeds either (i) Consignee's Consignment Limit or (ii), the Borrowing

Base, Consignee, shall, at the request of Consignor immediately Redeliver to Consignor, or purchase and pay for, Precious Metal of a quantity, or with a Fair Market Value, sufficient to eliminate such excess Consignment Exposure.

Consignor shall provide Consignee with a monthly statement of the quantity of Consigned Precious Metal (in whatever form) held by Consignee. If the Consignee does not agree with the information reported in the statement, Consignee shall give Notice of such disagreement to Consignor within five (5) Business Days of the date of receipt of such statement. If Consignee fails to give Notice to Consignor within the five (5) Business Day period, Consignee shall be deemed to have affirmed the accuracy of the information reported in the statement and to have waived any claim Consignee may have by reason of a dispute as to such statement.

Consignee shall give Consignor at least two (2) full Business Days Notice of its requirements for Precious Metal. Consignor shall not be liable to Consignee if Consignor fails to deliver the Precious Metal by reason of an Act of God or other catastrophe, force majeure, lack of supply, delay in transportation, war or other hostilities, strike, lockout, epidemic, acts of government or other public authority, requirements of any regulatory board, agency or authority, unavoidable casualties or any other causes beyond Consignor's control. CONSIGNOR MAKES NO WARRANTY OF MERCHANTABILITY IN RESPECT TO PRECIOUS METAL CONSIGNED OR SOLD UNDER THIS AGREEMENT NOR OF FITNESS FOR ANY PARTICULAR PURPOSE NOR ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, except that Consignor does warrant to Consignee that all Precious Metal will be of the fineness stated in Section 1 for that Precious Metal.

*Section 3. Delivery of Precious Metal.* All Deliveries of Precious Metal by Consignor will be made to Consignee by Consignor's crediting an account of Consignee at a third party supplier of Precious Metal or by delivery to such locations mutually satisfactory to Consignee and Consignor, such Deliveries to be on terms and conditions satisfactory to Consignor. At the time of Delivery or crediting Consignor shall provide Consignee with particulars of the total quantity of the Precious Metal being Delivered or credited to Consignee. A Duly Authorized Officer of Consignee receiving any Delivery shall give a receipt to the Consignor for the same in form satisfactory to Consignor. All shipping expenses (including insurance) shall be borne by Consignee, and any such expenses paid or incurred by Consignor shall be reimbursed by the Consignee immediately in the same manner as payments under Section 5 hereof.

*Section 4. Title.* Title to Consigned Precious Metal shall remain in Consignor and shall not vest in Consignee until Consignor has received payment for the Consigned Precious Metal as required by Section 5 of this Agreement. Consignee shall execute such financing statements, security agreements and other documents as Consignor shall request to protect the Consignor's interest under the Uniform Commercial Code. Consignee shall not sell or transfer any Consigned Precious Metal or any interest therein except in the ordinary course of business as now conducted as expressly permitted hereunder. Upon each Precious Metal Delivery, Consignee shall bear the entire risk of loss, theft, damage or destruction of the Consigned Precious Metal from any cause whatsoever, whether or not insured. The Consignee agrees to hold the Consigned Precious Metal *in trust* for Consignor and to indemnify and hold harmless Consignor against any and all liabilities, damages, losses, costs, expenses, suits, claims, demands

or judgments of any nature (including, without limitation, attorneys' fees and expenses) arising from or connected with any loss, theft, damage or destruction of the Consigned Precious Metal.

*Section 5. Purchase Price.* During the term of this Agreement, Consignee shall have the right to purchase any Consigned Precious Metal at Fair Market Value. To exercise the right, a Duly Authorized Officer of Consignee shall give Notice to a Duly Authorized Officer of Consignor that Consignee is purchasing specified quantities of Consigned Precious Metal. The parties' Duly Authorized Officers shall mutually agree on a Purchase Price for the Consigned Precious Metal. A Duly Authorized Officer of Consignor shall confirm Consignee's Notice, including quantity and purchase price, in writing.

The Consignee shall pay the full Purchase Price, plus any applicable sales or use tax, to Consignor within two (2) Business Days of the date of the fixing of such Purchase Price. The Daily Consignment Fee shall continue in effect until payment in full. Payment shall be made in the following manner: (i) by bank wire to the Federal Reserve Bank of New York for the account of Consignor, (ii) by Consignee authorizing Consignor to charge its account with Consignor, or (iii) by other means which Consignor approves in writing. Any amount not paid when due shall bear interest at two percent (2%) in excess of the Base Rate until paid in full (whether or not this Agreement has been terminated), such rate to be a floating rate to be redetermined daily in accordance with changes in the Base Rate. Such interest shall be paid upon demand in the manner specified above. If Consignor in its discretion grants payment terms different from the foregoing for particular purchases, then the Purchase Price shall not be deemed to be paid in full for the purposes of this Agreement until all payments under such terms have been made.

In addition to all payments required above, Consignee agrees to pay to Consignor the Daily Consignment Fee for Consignor's services under this Agreement during the preceding month on the tenth (10th) Business Day of each calendar month and Consignee expressly authorizes Consignor to charge Consignee's account with Consignor for the amount thereof.

*Section 6. Commingling; Redelivery of Precious Metal.* Consignee may use the Consigned Precious Metal only in the ordinary course of its business as now conducted.

At the time of each requested Delivery of Precious Metal, the Consignee and Consignor shall mutually agree to a maturity date with respect thereto and upon each extension of such Delivery, a renewal maturity date with respect thereto (the *"Maturity Dates"*). Prior to termination of this Agreement, any or all of the amount of the Consigned Precious Metal (excluding any Precious Metal as to which such Consignee is obligated to Purchase after the Purchase Price has been agreed to under Section 5) may be Redelivered by Consignee to Consignor to such place of delivery as directed by Consignor only upon the Maturity Date originally agreed to by the Consignee and Consignor with respect to the Consigned Precious Metal being Redelivered or upon any renewal Maturity Date mutually agreed to and not prior thereto.

*Section 7. Insurance.* Consignee, at its sole cost and expense, shall procure and maintain property insurance to cover all locations where Consigned Precious Metal will be

located on an all risk form and such other insurance with respect to the Consigned Precious Metal (in an amount not less than the Consignment Limit) as may from time to time be reasonably required by Consignor. All insurance provided for in this paragraph shall be effected under valid and enforceable policies, in such forms and in such amounts as may from time to time be reasonably required by Consignor, issued by financially sound and responsible insurance companies which are admitted in the jurisdiction in which the Consigned Precious Metal is located, or are approved under the applicable states' surplus lines insurance laws. At least ten (10) days prior to Consignor's first Delivery of Precious Metal to the Consignee and thereafter not less than fifteen (15) days prior to the expiration dates of insurance policies theretofore furnished pursuant to this Agreement, Consignee shall deliver to Consignor Accord Form 27 (2/84) or other similar forms reasonably satisfactory to Consignor evidencing the insurance coverage required by Consignor. All policies of insurance shall provide for (a) thirty (30) days notification in advance of any cancellation (except as provided below), non-renewal or material change in policy conditions and (b) thirty (30) days notification in advance of any cancellation for non-payment of premium.

All policies of insurance provided for or contemplated by this Agreement shall name Consignor as an additional insured and loss payee, as its interests may appear.

All policies of insurance provided for in this Agreement shall, to the extent obtainable, contain clauses or endorsements to the effect that:

(a) No act or negligence of Consignee which might otherwise result in a forfeiture of such insurance or any part thereof shall in any way affect the validity or enforceability of such insurance insofar as Consignor is concerned; and

(b) Consignor shall not be liable for any premiums or subject to any assessments on the policies.

Losses under each policy of insurance provided for or contemplated by this Section shall be adjusted with the insurers and/or underwriters and paid directly to Consignor and Consignee as their interests may appear. Written or verbal notice of all losses in excess of $ 100,000 shall promptly be given by Consignee to Consignor. Consignee shall pay all costs and expenses of collecting or recovering any insurance proceeds under such policies, including, but not limited to, any and all fees of attorneys, appraisers and adjusters.

*Section 8. Taxes, Etc.; Certain Rights of Consignor.* Consignee will promptly pay any and all taxes, assessments and governmental charges upon the Consigned Precious Metal prior to the date of any penalties. Consignee will not use the Consigned Precious Metal in violation of any statute or ordinance. Consignor may examine and inspect (upon not less than two (2) Business Days prior notice so long as no Event of Default has occurred and is then continuing) the Consigned Precious Metal at any time during normal business hours, wherever located, and Consignee agrees to keep all records relating to the Consigned Precious Metal at its Principal Office.

Upon an Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, Consignor may, at its option, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Consigned Precious Metal (which are not being contested in good faith), may pay for insurance on the Consigned Precious Metal and may pay for the maintenance and preservation of the Consigned Precious Metal, but only to the extent that Consignee has failed in its obligation to so pay, maintain or preserve. Consignee agrees to reimburse Consignor on demand for any payment made, or any expense incurred, by Consignor in connection with the foregoing, together with interest thereon at the Base Rate plus 2% per annum, computed from the date of such payment or expense until paid.

*Section 9. Representations and Warranties.* The following representations and warranties shall survive the delivery of this Agreement and the Delivery of Precious Metal by Consignor to Consignee and shall be deemed to be made by Consignee at each Delivery of Consigned Precious Metal and at each Maturity Date. Consignee represents and warrants to Consignor that:

(a) Consignee has heretofore furnished to Consignor: (i) the audited Financial Statements of the Consignee for the period ending June 30, 1999, prepared by Syner, Cavallaro & Co., Inc., independent public accountants, (ii) the audited Financial Statements of Kunzmann for the period ending June 30, 1999, prepared by BDO Seidman, independent public accountants, (iii) the compiled combined Financial Statements of the Consignee and Kunzmann for the period ending June 30, 1999, prepared by Syner, Cavallaro & Co., Inc. and (iv) the unaudited combined Financial Statements of the Consignee and Kunzmann for the period ending December 31, 1999 and prepared by the Consignee, each of such Financial Statements to the best of Consignee's knowledge and belief, fairly present the consolidated financial condition of Consignee and Kunzmann (as applicable) as of each such date, and the results of their respective operations for the applicable period then ended. Neither the Consignee nor Kunzmann has any contingent obligations, liabilities for taxes or unusual forward or long-term commitments except as specifically mentioned in the applicable Financial Statements. Since December 31, 1999, there has been no material adverse change in the condition of the Consignee or Kunzmann, financial or otherwise;

(b) Consignee (i) is duly organized, validly existing and in good standing under the laws of the state of its organization as of the date hereof, (ii) has full power and authority to own its properties and to carry on business as now being conducted and is qualified to do business in every jurisdiction where such qualification is necessary and where failure to be so qualified would have a material adverse effect on the business of Consignee and (iii) has full power to execute, deliver and perform this Agreement and any security document or documents securing the obligations of Consignee under this Agreement;

(c) The execution, delivery and performance by Consignee of the terms and provisions of this Agreement and any such security document (i) have been duly authorized by all requisite corporate action, (ii) will not violate any provision of law, any

order of any court or other agency of government, the corporate charter or by-laws or other organizational documents of Consignee, (iii) will not violate any indenture, agreement or other instrument to which it is a party, or by which it or its assets is or are bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time or both) a default under such agreement, and (iv) except as this Agreement may provide, will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Consignee pursuant to any such indenture, agreement or instrument;

(d) Except as disclosed in the Financial Statements, there is no action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or, to the knowledge of Consignee, threatened, against or affecting Consignee which, if adversely determined, would have a material adverse effect on the business, operations, properties, assets or condition, financial or otherwise, of Consignee;

(e) Consignee is not a party to any agreement or instrument or subject to any charter or other corporate restriction adversely affecting its business, properties or assets, operations or condition, financial or otherwise; Consignee, to the best of its knowledge and belief, is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument to which it is a party; and

(f) Except for financing statements and agreements filed solely in connection with purchase money indebtedness of the Consignee incurred in connection with purchases of equipment by the Consignee, no financing statement or agreement is on file in any public office pertaining to or affecting the Consigned Precious Metal or any property of Consignee, now owned or hereafter acquired, which does or will include the Consigned Precious Metal or portions, products or proceeds thereof.

*Section 10. Conditions of Consignment.* Delivery by Consignor of any Precious Metal or any extension or rollover of any prior delivery period under this Agreement is subject to the following conditions precedent:

(a) The representations and warranties set forth in Section 9 of this Agreement shall be true and correct on and as of the date of this Agreement and the date each Delivery is made.

(b) Consignee shall have executed and delivered to Consignor, upon the execution of this Agreement, the following:

(i) All financing statements and all security documents required by Consignor;

(ii) A certificate of the Secretary or Assistant Secretary of Consignee certifying to the votes of Consignee's Board of Directors authorizing the

execution, delivery and performance of this Agreement and any security documents;

(iii) A certificate of the Secretary or Assistant Secretary of Consignee certifying the names of the officers of Consignee authorized to sign this Agreement, any security documents and any other documents or certificates to be delivered pursuant to this Agreement by Consignee or any of its officers, together with the true signatures of such officers, on which certificates Consignor may conclusively rely until it shall receive a further certificate canceling or amending the prior certificate and submitting the signatures of the officers named in such further certificate;

(iv) A certificate of the Secretary of State of the state of organization of Consignee, dated reasonably near the date of this Agreement, stating that Consignee is duly organized and in good standing in such state and has filed all annual reports and has paid all franchise taxes required to be filed or paid to the date of such certificate;

(v) A favorable written opinion of Consignee's Counsel, dated the date of this Agreement, reasonably satisfactory to Consignor and its counsel in scope and substance, with respect to the matters set forth in subsections 9(b), (c) and (d); and further to the effect that this Agreement and all required security documents have been duly authorized, executed and delivered by Consignee and constitute the legal, valid, binding obligations of Consignee enforceable in accordance with their terms;

(vi) A certificate signed by Consignee's Chief Executive Officer to the effect stated in (c) below;

(vii) A guaranty agreement of Mr. Erwin Pearl (the *"Guarantor"*) in form satisfactory to Consignor, and personal financial statements of the Guarantor in form satisfactory to Consignor certified by the Guarantor as complete, true and accurate in all respects, such personal financial statement to be updated on an annual basis;

(viii) A subordination agreement from each of the officers of the Company in form and substance satisfactory to Consignor subordinating certain indebtedness existing on the date hereof of Consignee to such officers to indebtedness of Consignee to Consignor;

(ix) Such other supporting documents and legal opinions as Consignor may reasonably request;

(x) Performance by Consignor of satisfactory collateral audit, inventory of receivables and appraisal of fixed assets of Consignee.

(xi) Execution and delivery of the Facility Letter and the Loan Agreement of even date herewith between the Consignor and Consignee; and

(xii) Evidence satisfactory to the Consignor of the completion of the Merger.

(c) No Event of Default nor any event which with notice or the lapse of time, or both, would constitute an Event of Default shall have occurred.

*Section 11.* *Affirmative Covenants.* Consignee hereby covenants and agrees that, until Consignee makes payment and performs in full all of its indebtedness, obligations and liabilities under this Agreement or under any other indebtedness, obligations and liabilities to Consignor, whether now existing or arising hereafter, unless Consignor consents otherwise in writing, Consignee will:

(a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all laws and regulations applicable to it; at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and keep the same in good repair, working order and condition, and from time to time, make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto, so that the business carried on in connection therewith may be properly conducted in a manner consistent with the ordinary course of business at all times;

(b) Comply with all applicable laws and regulations, whether now in effect or hereafter enacted or promulgated by any governmental authority having jurisdiction in the premises;

(c) Pay and discharge or cause to be paid and discharged all taxes, assessments and governmental charges or levies imposed upon it or upon its respective income and profits or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a lien or charge upon such properties or any part thereof; provided that Consignee shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and, except for the alleged federal tax liability in the approximate amount of $160,000 currently being contested by the Consignee, it shall have set aside on its books reasonable reserves with respect to any such tax, assessment, charge, levy or claim, so contested, and provided, further, that payment with respect to any such tax, assessment, charge, levy or claim shall be made before any of its property shall be seized and sold in satisfaction thereof;

(d) Give prompt written notice to Consignor of any proceedings instituted against it by or in any Federal or state court or before any commission or other regulatory

body, Federal, state or local, which, if adversely determined, would have a materially adverse effect upon its business, operations, properties, assets, or condition, financial or otherwise;

(e) Furnish to Consignor:

(i) Within one hundred and twenty (120) calendar days after the end of each fiscal year audited Financial Statements prepared by Syner, Cavallaro & Co., Inc. or any other independent public accountants acceptable to Consignor and showing Consignee's financial condition at the close of such fiscal year, the results of operations during such year, such Financial Statements to contain a statement to the effect that such independent public accountants have examined the provisions of this Agreement and that no Event of Default nor any event which with notice or lapse of time, or both, would constitute an Event of Default has occurred and accompanied by a complete copy of all management letters delivered by such accountants in connection with preparation of such reviewed financial statements;

(ii) Within sixty (60) calendar days after the end of each quarterly fiscal period ending March 31, September 30 and December 31, unaudited balance sheets and statements of income in form satisfactory to the Consignor and submitted by the Chief Executive Officer or Corporate Comptroller of Consignee; and

(iii) Not later than twenty (20) calendar days after the end of each calendar month, a borrowing base report (in the form of Exhibit A attached hereto) demonstrating compliance with the Borrowing Base restrictions set forth in this Agreement (*"Borrowing Base Reports"*) and an aged analysis of all outstanding receivables and a reconciliation of the receivables aging to the receivables reported to the Consignor all in form and substance satisfactory to Consignor; and accompanied by a certification of the Chief Executive Officer or Corporate Comptroller of Consignee to the effect that as of the date of such statement there does not exist any Event of Default hereunder or any event or condition which with notice or lapse of time, or both, would constitute an Event of Default;

(f) Promptly, from time to time, furnish such other information regarding its operations, assets, business affairs and financial condition as Consignor may reasonably request;

(g) Permit agents or representatives of Consignor, during normal business hours and in a manner so as not to interfere with Consignee's business, (i) upon 24 hours prior notice (or two (2) Business Days prior notice so long as no Event of Default has occurred and is continuing) and upon any Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, to (x) conduct a spot-check of Consignee's Inventory and (y) to inspect the Consigned Precious Metal and Consignee's books and records and to make abstracts or reproductions of such books and

records; and (ii) to conduct at Consignee's expense an annual audit of the Consigned Precious Metal in the possession and control of Consignee, such audits to consist of one physical verification of all of Consignee's inventory including an audit review of Consignee's control system and physical verifications of all on premises gold and silver; *provided, however,* that when an Event of Default has occurred and is continuing, Consignor may conduct such audits as frequently as it may desire at Consignee's expense. Consignee shall give Consignor not less than ten (10) days' Notice of the taking of any physical inventory of Consigned Precious Metal in Consignee's possession and shall permit Consignor and its designated representatives to observe the taking of such inventory. In addition, at Consignee's expense, Consignee shall permit Consignor, at reasonable times, and at any time upon any Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, to take a physical inventory of the Consigned Precious Metal in Consignee's possession;

(h) Promptly advise Consignor or its agent of any material adverse change in its condition, financial or otherwise, and of any condition or event which constitutes, or with notice or lapse of time or both would constitute, an Event of Default;

(i) Promptly join with Consignor or its agent from time to time in executing one or more financing statements pursuant to the Uniform Commercial Code in form reasonably satisfactory to Consignor, and execute such other instruments in form suitable for recording or filing as Consignor may reasonably require;

(j) Remain, at all times, in compliance with the Borrowing Base and Consignment Limit;

(k) Defend the Consigned Precious Metal against any claims and demands of any persons (other than Consignor) at any time claiming the same or any interest therein;

(l) Provide copies to Consignor of all reconsignment agreements with all reconsignees, if so requested;

(m) Maintain, at all times, Net Working Capital in an amount not less than $2,500,000;

(n) Maintain, at all times, minimum Capitalization (being the sum of Tangible Net Worth plus Subordinated Indebtedness) in an amount not less than $3,500,000; and

(o) Maintain, at all times, a ratio of total Senior Liabilities to Capitalization (as defined above) in an amount not exceeding 2.75 to 1.00; *provided,* that such calculation shall be made as if Consigned Precious Metal and the liability of the Consignee therefor were set forth on the balance sheet of the Consignee; and

(p) Maintain ownership of all Precious Metal which is reconsigned, on memo or otherwise located outside of the United States of America.

*Section 12. Negative Covenants.* Consignee covenants and agrees that, until Consignee makes payment and performs in full its indebtedness, obligations and liabilities under this Agreement or under any other indebtedness, obligations and liabilities to Consignor, whether now existing or arising hereafter, unless Consignor consents otherwise in writing, Consignee will not, directly or indirectly:

(a) Create, incur, assume or suffer to exist any mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of the Consigned Precious Metal or any products or property now or hereafter owned which does or will include the Consigned Precious Metal;

(b) Sell, lease, transfer or otherwise dispose of its properties (other than obsolete property or property of negligible value), assets, rights, licenses and franchises to any person, except in the ordinary course of its business, or turn over the management of, or enter into a management contract with respect to, such properties, assets, rights, licenses and franchises;

(c) Dissolve, liquidate, consolidate with or merge with, or acquire all or substantially all of the assets or properties of, any other corporation, or make any substantial change in its executive management which change would result in the Guarantor ceasing to be actively involved in the management of the Consignee's business;

(d) Sell, assign, encumber, pledge, discount or dispose in any way of any accounts receivable, promissory notes or trade acceptances held by any Consignee, with or without recourse, except for collection (including endorsements) in the ordinary course of business;

(e) Grant any security interest or ownership rights to any customer of any Consignee with respect to any of the Consigned Precious Metal while at such Consignee's premises whether or not such customers have prepaid orders for the Consigned Precious Metal or any products or property which does or will include the Consigned Precious Metal;

(f) Guarantee, endorse or otherwise in any way become or be responsible for obligations of any other person, except endorsements of negotiable instruments for collection in the ordinary course of business;

(g) Enter into any arrangements, directly or indirectly, with any person whereby it shall sell or transfer any property, real, personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property;

(h) Obtain any direct advances or other extensions of credit from any factor or other accounts receivable insurance provider;

(i) Except for Tax Distributions, declare or pay any dividends, or make any distribution, of cash or property, or both, to holders of shares of its capital stock, or directly or indirectly, redeem, purchase or otherwise acquire for a consideration, any shares of its capital stock, of any class or permit to exist outstanding any officer withdrawals, advances or loans, other than the withdrawals, advances and loans existing on the date hereof, in excess of $50,000 in the aggregate;

(j) Allow Precious Metal which is gold which is on memo, reconsigned or in any form located at locations outside of the United States of America to exceed two thousand (2,000) troy ounces;

(k) Allow Precious Metal which is silver which is on memo, reconsigned or in any form located at locations outside of the United States of America to exceed twenty thousand (20,000) ounces;

(l) Allow Precious Metal which is gold located at refiners, fabricators or contractors domiciled in the United States of America to exceed two thousand (2,000) troy ounces; or

(m) Allow Precious Metal which is silver located at refiners, fabricators or contractors domiciled in the United States of America to exceed twenty-five thousand (25,000) ounces.

*Section 13. Event of Default.* The occurrence of any of the following events shall constitute an Event of Default:

(a) Any representation or warranty made herein, or in any report, certificate, financial statement or other instrument furnished in connection with this Agreement, or the Delivery of Precious Metal by Consignor hereunder, shall prove to be false or misleading in any material respect;

(b) Consignee fails to pay any amounts due hereunder or any other indebtedness, obligations or liabilities of Consignee to Consignor when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or by acceleration or otherwise and such failure shall continue unremedied for seven (7) days;

(c) Consignee fails to observe or perform (i) (A) Sections 4 and 7 of the Loan Agreement, (B) Sections 11(e), 11(m), 11(n), 11(o), 12(j); 12(k), 12(l) and 12(m) hereof and (C) any covenant, condition or agreement required by the terms of the Facility Letter and such failure shall continue unremedied for fifteen (15) days or (ii) any other covenant, condition or agreement required by the terms of this Agreement or the Loan Agreement and such failure shall continue unremedied for thirty (30) days;

(d) Default with respect to any evidence of indebtedness, obligations or liabilities of Consignee (including but not limited to loan agreements, other consignment

agreements or precious metals sales or lease agreements), if the effect of such default is to accelerate the maturity of such indebtedness, obligations or liabilities or to permit the holder thereof to cause such indebtedness, obligations or liabilities to become due prior to the stated maturity thereof, or if any indebtedness, obligations or liabilities of Consignee is not paid, when due and payable within any applicable grace periods applicable thereto, whether at the due date thereof or by acceleration or otherwise;

(e) Consignee shall (i) apply for, consent to, or suffer the appointment of a custodian, receiver, trustee or liquidator of it or any of its property, (ii) admit in writing its inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) fail to pay its debts generally as they become due, (v) file, or have filed against it (and, if filed against it, not dismissed by the Consignee within sixty (60) days of such filing), a petition for relief under Title 11 of the United States Code, or (vi) file, or have filed against it (and, if filed against it, not dismissed by the Consignee within sixty (60) days of an order for relief), a petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or corporate action shall be taken for the purpose of effecting any of the foregoing;

(f) An order, judgment or decree shall be entered, without the application, approval or consent of Consignee by any court of competent jurisdiction, approving a petition seeking reorganization of Consignee or appointing a custodian, receiver, trustee or liquidator of Consignee or of all or a substantial part of the assets of Consignee;

(g) Occurrence of any loss, theft, or destruction of, or damage to the Consigned Precious Metal or any products or property which includes Consigned Precious Metal having a value greater than $100,000 in excess of the net proceeds of insurance payable in respect thereof;

(h) Discontinuance of the operation of Consignee's business (as presently conducted) for any reason;

(i) The death, incompetency or other incapacity of the Guarantor; or

(k) The occurrence of any Event of Default under the Loan Agreement or Security Agreement; or

(l) the present shareholders of Consignee or any trusts created for such shareholders or their spouses or children shall cease to own directly at least 75% of the outstanding voting stock of the Consignee.

Upon the occurrence of any such Event of Default and at any time thereafter during the continuance of such Event of Default, Consignor may, by Notice to Consignee, terminate this Agreement as provided in Section 14 and declare all liabilities, indebtedness or obligations of

Consignee to be due and payable provided, however that automatically upon the occurrence of any Event of Default under Section 13(e) or (f) and without presentment, demand, protest or notice of any kind, all such liabilities, indebtedness and obligations of Consignee shall become due and payable. Upon Consignor's declaration (or automatically upon the occurrence of any Event of Default under Section 13(e) or (f)), such indebtedness shall become due and payable, both as to principal and/or interest, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other evidence of such indebtedness, obligations and liabilities to the contrary notwithstanding. Consignor may enforce payment of the same and exercise and direct its agent to exercise any or all of the rights, powers and remedies possessed by Consignor, under this Agreement or under any agreement securing the obligations of Consignee hereunder, whether afforded by the Uniform Commercial Code or otherwise afforded by law or in equity. The remedies provided for herein are cumulative and are not exclusive of any other remedies provided by law. Consignee agrees to pay Consignor's and its agent's reasonable attorney's fees and legal expenses incurred in enforcing Consignor's rights, powers and remedies under this Agreement and any agreement securing the liabilities, indebtedness or obligations of Consignee to Consignor, whether such enforcement is directly by Consignor or through its agent, provided Consignor prevails in any action or proceeding brought or commenced to enforce such rights, powers and remedies.

*Section 14.* *Termination.* This Agreement shall terminate, at the election of Consignor, upon the occurrence of any Event of Default. Furthermore, unless otherwise terminated in accordance with the terms hereof, this Agreement shall continue until either Consignor or any Consignee elects to terminate this Agreement by not less than ninety (90) days' prior Notice to the other party. Termination of this Agreement shall not affect Consignee's duty to pay and perform in full its obligations to Consignor hereunder. On the effective date of the termination of this Agreement, Consignee shall either Redeliver or purchase and pay for all Consigned Precious Metal which Consignor has previously Delivered and which has not been paid for or Redelivered, the Price to be equal to the Consignor's spot market price (as determined by Consignor) for Precious Metal on the effective date of termination.

*Section 15.* *Miscellaneous.*

(a) All notices, communications and distributions hereunder shall be given or made (i) if to Consignee, to it at its Principal Office, with a copy (in the case of an Event of Default) to: (A) Tillinghast Licht Perkins Smith & Cohen LLP, Ten Weybosset Street, Providence, Rhode Island 02903-2818, Attention: Patrick A. Guida, Esq., Telecopy: (401) 456-1210 and (B) Erwin Pearl Inc., 389 Fifth Avenue, New York, New York 10016, Attention: Mr. Joel Weinstein, Telecopy: (212) 889-3076 and (ii) if to the Consignor, to it at its Principal Office; or in any of the foregoing cases at such other address as the addressee may hereafter specify for the purposes by written notice to the other party hereto. Such notices and other communications will be effectively given only if and when given in writing and delivered at the address set forth hereinabove or five (5) Business Days after being duly deposited in the mails with first class postage prepaid, or transmitted by confirmed facsimile transmission (*"FAX"*) or delivered by a telegraph company with all charges prepaid, addressed as aforesaid.

(b) This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto, shall survive the execution and delivery to Consignor of this Agreement, and shall continue in full force and effect so long as this Agreement and any other indebtedness, obligations and liabilities of Consignee to Consignor is outstanding and unpaid. In this Agreement, reference to a party shall be deemed to include the successors and permitted assigns of such party, and all covenants and agreements in this Agreement by or on behalf of Consignee shall inure to the benefit of the successors and assigns of Consignor.

(c) Consignee shall reimburse Consignor upon demand for all reasonable out-of-pocket costs, charges and expenses of Consignor (including reasonable fees and disbursements of counsel to Consignor) in connection with (i) the preparation, execution and delivery of this Agreement (such fees (exclusive of disbursements) to be in an amount not in excess of $25,000), (ii) any amendments, modifications, consents or waivers in respect hereof and (iii) any enforcement hereof.

(d) This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

(e) No modification or waiver of any provision of this Agreement, or of any security document, nor consent to any departure of any Consignee from a provision, shall be effective unless the same shall be in writing. A written consent shall be effective only in the specific instance, and for the purpose, for which given. No notice to, or demand on Consignee, in any one case, shall entitle such Consignee to any other or future notice or demand in the same, similar or other circumstances.

(f) Neither any failure nor any delay on the part of Consignor in exercising any right, power or privilege hereunder, or in any other instrument given as security therefor, shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or future exercise, or the exercise of any other right, power or privilege.

(g) Consignee shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Consignor.

(h) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction unless such prohibition or unenforceability materially and adversely affects the intent of parties hereto as to the primary subject matter of this Agreement.

(i) Any Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. As used in this Agreement, the term *"person"* shall include any individual, corporation, partnership, joint venture, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

(j) The parties hereto each hereby submit to the jurisdiction of the courts of the State of New York, the venue of which shall be in the county of New York, and the United States District Court for the Southern District of New York, as well as to the jurisdiction of all courts to which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of any of Consignee's obligations under or with respect to this Agreement, and expressly waives any and all objections it may have as to venue in any of such courts. CONSIGNEE AND CONSIGNOR EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this Agreement, including *but not limited* to any assignee or successor of a party, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this Agreement, any related instruments, any collateral or the dealings or the relationship between the parties. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO WITH LEGAL COUNSEL, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

(k) This Agreement may be executed in counterparts, and by the different parties on different counterparts, all of which taken together shall constitute one and the same instrument and each of such counterparts shall, for all purposes, be deemed to be an original.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Consignor and Consignee have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

ARMBRUST INTERNATIONAL LTD.

By ______________________

Its ______________________

ABN AMRO BANK N.V., New York Branch

By ______________________

Its ______________________

By ______________________

Its ______________________

IN WITNESS WHEREOF, Consignor and Consignee have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

ARMBRUST INTERNATIONAL LTD.

By ____________________
Its ____________________

ABN AMRO BANK N.V., New York Branch

By [signature]
Its VP

By [signature]
Its VP

# EXHIBIT A

## BORROWING BASE CERTIFICATE

**ABN AMRO**
**MONTHLY REPORT**

____ LO COMPLIANCE REVIEW
____ OPER. BALANCE CONFIRM/TICKLER

ARMBRUST INTERNATIONAL, LTD. DATE ______________

***INVENTORY***

| GOLD BALANCES | | GOLD OUNCE LOCATIONS | |
|---|---|---|---|
| TOTAL INVENTORY VALUE | | IN- HOUSE OUNCES ** | |
| TOTAL FINE GOLD OUNCES | | OUNCES AT REFINERS | |
| LESS: OUNCES OWED TO ABN AMRO | | DOMESTIC CONTRACTORS | |
| | | | |
| | | | |
| LESS: OUNCES OWED TO OTHERS* | | FOREIGN CONTRACTORS | |
| | | | |
| NET OWNERSHIP POSITION | | SALESLINES | |
| | | MEMOS | |
| PLEASE PROVIDE DETAIL | | SAMPLES | |
| | | OTHER | |
| | | TOTAL FINE GOLD OUNCES | |

| SILVER BALANCES | | SILVER OUNCE | |
|---|---|---|---|
| TOTAL INVENTORY VALUE | | LOCATIONS | |
| TOTAL FINE SILVER | | IN- HOUSE OUNCES ** | |
| OUNCES | | | |
| LESS: OUNCES OWED TO ABN AMRO | | OUNCES AT REFINERS | |
| | | | |
| LESS: OUNCES OWED TO OTHERS* | | DOMESTIC CONTRACTORS | |
| | | | |
| NET OWNERSHIP POSITION | | FOREIGN CONTRACTORS | |
| | | | |
| PLEASE PROVIDE DETAIL | | SALESLINES | |
| | | MEMOS | |
| | | SAMPLES | |
| | | OTHER | |
| | | TOTAL FINE SILVER | |
| | | OUNCES | |

SCHEDULES:

ATTACH SCHEDULE A TO CONFIRM ADDRESSES OF INVENTORY LOCATIONS OTHER THAN IN HOUSE. CONFIRM EACH MONTH THE ADDRESS OF YOUR COMPANY'S CHEIF EXECUTIVE OFFICE: 735 ALLENS AVENUE, PROVIDENCE, RHODE ISLAND 02905.
ATTACH SCHEDULE B IF YOU HAVE RETAIL MEMO PROGRAMS

ABN AMRO MONTHLY REPORT

SCHEDULE A

OFF - PREMISE PRECIOUS METAL POSITIONS

| LOCATION GOLD | OUNCES | RELATIONSHIP |
|---|---|---|
| TECHNIC | | DOMESTIC |
| GENERAL FINDINGS | | |
| GANNON & SCOTT | | REFINERS |
| ROYAL CHAIN | | DOMESTIC |
| OROAMERICA | | DOMESTIC |
| HALLMARK | | DOMESTIC |
| TP TASCA | | |
| STERN LEACH | | DOMESTIC |
| JOYEROS | | FOREIGN |
| IMPERIAL SMELTING | | FOREIGN |
| TOTAL GOLD | | |
| HANDY & HARMAN | | |
| GANNON & SCOTT | | REFINERS |
| TOTAL SILVER @ REFINERS | | |
| AMERICAN PLATING | | DOMESTIC |
| FERNANDO | | DOMESTIC |
| MAINELLI | | DOMESTIC |
| ROBBINS CO. | | DOMESTIC |
| MURPHY | | DOMESTIC |
| NATIONAL CHAIN | | DOMESTIC |
| GOLD N CREATION | | DOMESTIC |
| 2224 JEWELRY | | DOMESTIC |
| APAC | | DOMESTIC |
| P.R. EXPORT | | DOMESTIC |
| BRESLOF | | DOMESTIC |
| A.M. SCHALER | | DOMESTIC |
| MYER JEWELRY MFG LTD | | DOMESTIC |
| PROVIDENCE CHAIN | | DOMESTIC |
| STANARD CHAIN | | DOMESTIC |
| KENDRA'S JOBBERS | | DOMESTIC |
| TRACY BOTSFORD | | DOMESTIC |
| SA BALLOU | | DOMESTIC |
| MEL CO'ED | | DOMESTIC |
| N.E.I. DO ALL | | DOMESTIC |
| CRISVAL JEWELRY | | DOMESTIC |
| HAMILTON TOOL | | DOMESTIC |
| TITUS ENGRAVING | | DOMESTIC |
| TAYLOR STAMPING | | DOMESTIC |
| ALUMA INDUSTRIES | | DOMESTIC |
| UNIT FINDINGS | | DOMESTIC |
| VILLAGE GOLDSMITH | | DOMESTIC |
| TASCA | | DOMESTIC |
| SUBTOTAL DOMESTIC | | |
| ITALY | | FOREIGN |
| FIOR | | FOREIGN |
| JOYEROS | | FOREIGN |
| SUBTOTAL FOREIGN | | |
| TOTAL SILVER @ CONTRACTORS | | |

***COVENANTS***

| | TESTED | REQUIREMENT | ACTUAL |
|---|---|---|---|
| GOLD EQUITY | MONTHLY | 10% MINIMUM | |
| SILVER EQUITY(1) | MONTHLY | 10% MINIMUM | |
| IN- HOUSE GOLD CONSIGNMENT | MONTHLY | CAP OF 2,000 OZS @ DOMESTIC CONTRACTORS | |
| IN- HOUSE SILVER CONSIGNMENT | MONTHLY | CAP OF 25,000 OZS DOMESTIC CONTRACTORS | |
| OUTSIDE GOLD ON MEMO | MONTHLY | CAP OF 2,000 OZS @ FOREIGN CONTRACTORS | |
| OUTSIDE SILVER ON MEMO | MONTHLY | CAP OF 20,000 OZS @ FOREIGN CONTRACTORS | |
| TL/TNW MAXIMUM | QUARTERLY | 2.75 AT ALL TIMES | |
| $2.5 MINIMUM AT ALL TIMES | | | |
| TNW MINIMUM | QUARTERLY | $3.5 MILLION AT ALL TIMES | |

(1) Assumes Gannon & Scott, Handy & Harman, and General Findings (a Leach & Garner Company) are all approved locations.

***ACCOUNTS RECEIVABLE AGING ( CHECK: DUE DATE____ OR INVOICE DATE __X__ )***

| | FUTURE | CURRENT | 1-30 | 31-90 | OVER 90 | TOTAL |
|---|---|---|---|---|---|---|
| $ | | | | | | |
| % | | | | | | |

***ADVANCE FORMULA***

| | | |
|---|---|---|
| A | TOTAL A/R | |
| B | LESS: A/R > 90 DAYS PAST INVOICE DATE * NET OF INSURED ACCOUNTS | |
| C | LESS: UNINSURED FOREIGN A/R | |
| D | LESS: AFFILIATE A/R | |
| E | LESS: CROSS- AGINGS* | |
| F | LESS: INVOICES > 120 DAYS | |
| G | LESS: OTHER INELIGIBLES ( i.e. NON- TRADE, BANKRUPTCIES, ETC. - PLEASE SPECIFY) | |
| H | ELIGIBLE A/R = (A-B-C-D-E-F-G) | |
| | H * 80% = (AVAILABLE UNDER FORMULA) | |
| | LESS: OUTSTANDING UNDER LINE OF CREDIT | |
| | = SURPLUS OR ( DEFICIT) | |

* CROSS - AGINGS ARE THOSE A/R OWED BY ANY ACCOUNT DEBTOR AS TO WHOM 50% OR MORE OF THE INVOICES SUMITTED TO SUCH DEBOTR ARE OR HAVE BEEN OUTSTANDING FOR 90 DAYS OR MORE; ALL SUCH INVOICES DUE FROM THAT DEBTOR ARE THEREFORE RENDERED INELIGIBLE ( I.E. NOT JUST 90 DAYS PAST DUE A/R)

***OTHER LOANS PAYABLE***

| BANK NAME | DESCRIPTION | AMOUNT OUTSTANDING |
|---|---|---|
| 1 ABN AMRO | TERM LOAN | |
| 2 ERWIN PEARL | SUBORDINATED | |

***ACCOUNTS RECEIVABLE CONCENTRATION***

| | CUSTOMER | BALANCE | BALANCE > 90 DAYS |
|---|---|---|---|
| 1 | Q.V.C. NETWORK | | |
| 2 | MEDIC ALERT | | |
| 3 | ERWIN PEARL, INC. | | |
| 4 | DANECRAFT | | |
| 5 | MERVYN'S | | |
| 6 | O.C. TANNER JEWELRY | | |
| 7 | THE BELL GROUP | | |
| 8 | JEWELRY CONCEPTS 21 | | |
| 9 | COLIBRI | | |
| 10 | JUDITH JACK | | |
| | TOTAL | | |

***ACCOUNTS PAYABLE AGING***

| | CURRENT | 1-30 | 31-60 | OVER 60 | TOTAL |
|---|---|---|---|---|---|
| $ | | | | | |
| % | | | | | |

***OFFICER CERTIFICATION***

THE UNDERSIGNED CERTIFIES THAT THE ABOVE INFORMATION IS CORRECT ACCORDING TO THE CUSTOMER'S BOOKS AND RECORDS, AND THAT THE UNDERSIGNED HAS NO KNOWLEDGE OF ANY EVENT OR CONDITION WHICH CONSTITUTES AN EVENT OF DEFAULT UNDER THE CUSTOMER'S CREDIT ARRANGEMENTS WITH FLEET PRECIOUS METALS OR ANY OTHER CREDITOR.

AUTHORIZED SIGNER (SIGNER MUST BE AN OFFICER OF THE CORPORATION) — TITLE — DATE