**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ARMBRUST INTERNATIONAL, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 08-00143-ML-LDA |
| | ) | |
| | ) | |
| ABN AMRO BANK N.V., | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER AND COUNTERCLAIM OF ABN AMRO BANK N.V.

Defendant, ABN AMRO Bank N.V. (*"ABN"*) by and through its undersigned attorneys, for its Answer to the Complaint dated April 18, 2008 (the *"Complaint"*), filed by Armbrust International, Ltd. (*"Armbrust"*) and for its Counterclaim against Armbrust alleges as follows:

### PARTIES

1. Armbrust International, Ltd. (*"Armbrust"*) is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island. Armbrust is in the business of manufacturing and distributing precious metal and fashion jewelry chain and other jewelry products.

**ANSWER:** ABN admits the allegations of paragraph 1.

2. ABN AMRO Bank N.V. (the *"Bank"*) is a bank organized under the laws of The Netherlands with its principal place of business located at Gustav Mahlerlan 10, Amsterdam, The Netherlands. The Bank's principal place of business in the United States is its New York branch, with offices at 500 Park Avenue, New York, New York 10022. The Bank is a foreign bank as defined in § 3101(7) of the International Banking Act, 12 U.S.C. § 3101(7), including its New York branch.

**ANSWER:** ABN admits that it is organized under the laws of The Netherlands with its headquarters located at Gustav Mahlerlan 10, Amsterdam, The Netherlands. ABN maintains a

New York branch located at 55 East 52nd Street, New York, NY. The remaining allegations of paragraph 2 are legal conclusion that require no answer.

## NATURE OF ACTION AND JURISDICTION

3. This is an action for declaratory judgment pursuant to 28 U.S.C. § 2210. Jurisdiction is founded upon 28 U.S.C. § 1332(2) since it is a civil action between a citizen of the State of Rhode Island and a citizen or subject of a foreign state. The matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

**ANSWER:** ABN admits that the amount in controversy exceeds the sum of $75,000. The remaining allegations of paragraph 3 contain legal conclusions that require no answer.

## FACTS GIVING RISE TO THE CLAIMS

4. On or about June 30, 2000, Armbrust and the Bank became parties to a commercial loan transaction including, *inter alia*, a secured revolving credit facility and secured term loan facility In addition to the commercial loans, Armbrust requested the Bank to deliver precious metals on consignment for sale to Armbrust and the Bank was willing to make such deliveries and sales on the terms and conditions under that certain Consignment Agreement dated as of June 30, 2000. A true and accurate copy of the Consignment Agreement (*"Agreement"*) is attached hereto and marked as *Exhibit A*. The Agreement was subsequently amended by a series of letter amendments which are attached hereto and marked collectively as *Exhibit B.*

**ANSWER:** ABN admits that it entered into the agreements, Exhibit A and B, and respectfully refers the Court to the Exhibits for the content and legal effect thereof. ABN denies the remaining allegations of paragraph 4.

5. Section 11 (d) of the Agreement permitted the Bank "to conduct at [Armbrust's] expense an annual audit of the Consigned Precious Metal in the possession and control of [Armbrust], such audits to consist of one physical verification of all of [Armbrust's] inventory including an audit review of [Armbrust's] control system and physical verifications of all on premises gold and silver. . . ."

**ANSWER:** ABN respectfully refers the Court to the Agreement for the contents and legal effect thereof. Answering further, paragraph 5 contains legal conclusions that require no answer.

6. The Bank availed itself of the opportunity to conduct annual audits and it retained the firm of Bourget & Associates, Inc. to conduct such audits. By way of example, Bourget conducted a field examination at Armbrust on May 11, May 12 and May 13, 2004 to determine

the adequacy of the collateral pledged to the Bank and to review Armbrust's internal accounting, accounts receivable, cash, precious metal accounting, precious metal inventory, production and security controls. Bourget billed Armbrust, and Armbrust paid on the Bank's behalf, the sum of $4,260.25 for such audit.

**ANSWER:** ABN denies the allegations of paragraph 6, except admits that in May 2004, ABN retained Bourget & Associates, Inc. to conduct the annual audit for the year then ended of Consigned Precious Metal as defined in the Agreement and provided for in Section 11(g) of the Agreement and admits that Bourget billed Armbrust the sum of $4,260.25 for such audit, which bill was paid by Armbrust.

7. On May 15, May 16 and May 17, 2005, Bourget conducted a similar field examination at Armbrust which audited, among other things, Armbrust's precious metal accounting and precious metal inventory.

**ANSWER:** ABN denies the allegations of paragraph 7, except admits that in May 2005, Bourget conducted the annual audit of Consigned Precious Metals as defined in the Agreement provided for in Section 11(g) of the Agreement.

8. Section 11(e) of the Agreement required Armbrust to furnish the Bank each year with audited financial statements prepared by Syner, Cavallaro & Co., independent public accountants, which showed Armbrust's financial condition at the close of each fiscal year. These annual audits also included Armbrust's inventory of consigned precious metal and Armbrust's books and records and other parts of Armbrust's precious metal control systems. Each year, as part of the annual audit, the CPA firm would make specific requests to the Bank to confirm the amounts of outstanding and consigned precious metals. Each year, the Bank would respond to the auditor's request with confirmatory information. Examples of the Bank's responses to the CPA's confirmation requests, dated August, 2004 and August, 2005, are attached collectively as *Exhibit C*.

**ANSWER:** ABN respectfully refers the Court to the Agreement for the contents and legal effect thereof. Answering further, the first sentence of paragraph 8 contains legal conclusions that require no answer. ABN is without knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of paragraph 8. ABN is without knowledge or information sufficient as to form a belief as to the truth of the allegations of the third sentence contained in paragraph 8. ABN denies the allegations of the fourth sentence

contained in paragraph 8, except admits that ABN, as a matter of course, would respond to auditors' request for information to the degree it was available to ABN. ABN denies the allegations of the fifth sentence contained in paragraph 8, except admits that *Exhibit C* to the Complaint includes letters from ABN directed to Syner, Cavallaro & Co., responding to letters to ABN from Armbrust, in which ABN provides information on loans outstanding and metals consigned as of the stated date. Answering further, the documents which comprise Exhibit C speak for themselves and require no further answer from ABN.

9. In late 2005, as a result of Armbrust's dissatisfaction with the service level from the Bank, Armbrust decided to and did negotiate new loan agreements, including a precious metals consignment agreement, with Sovereign Bank. Armbrust informed the Bank that it intended to repay its obligations to the Bank under the Agreement and other loan agreements dated June 30, 2000.

**ANSWER:** ABN is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9, except that ABN admits that in late 2005, Armbrust informed ABN that Armbrust intended to repay its obligations to ABN under the Agreement and other loan agreements.

10. On or about December 1, 2005, a Payoff Letter was prepared by ABN and exchanged between Armbrust and ABN. A true and accurate copy of the Payoff Letter, executed by both ABN and Armbrust, is attached hereto and marked as *Exhibit D*.

**ANSWER:** ABN admits that the Bank prepared the document, Exhibit D to the Complaint and that it was exchanged between Armbrust and the Bank. ABN denies the remaining allegations of paragraph 10.

11. The Payoff Letter informed Armbrust that its purchase price obligations in respect of all consigned silver was 337,612.24 Fine Troy Ounces as of December 1, 2005. The Payoff Letter also provided for a Total Payoff Amount of $1,452,550.07. Furthermore, the Payoff Letter provided that if the Total Payoff Amount was received by the Bank by 10:00 a.m., New York time on December 1, 2005, "the Debtor's obligations under the above-described agreements shall be satisfied in full, with the exception of any terms of the Agreements that, by their express terms, survived payment or satisfaction of the Debtor's obligations."

**ANSWER:** ABN respectfully refers the Court to Exhibit D to the Complaint for the contents and legal effect thereof. Answering further, paragraph 11 contains legal conclusions that require no answer.

12. Armbrust timely paid the Bank the Total Payoff Amount set forth in the Payoff Letter and transferred its accounts and precious metal consignments to Sovereign Bank. Upon information and belief, Sovereign Bank, in addition to Armbrust, relied upon the accuracy and reliability of the Payoff Letter in entering into the new financing arrangements, which included granting Sovereign Bank a security interest in Armbrust's precious metal inventory.

**ANSWER:** ABN is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12, except ABN admits Armbrust paid ABN the amount set forth in Exhibit D.

13. Upon Armbrust's payment of the Total Payoff Amount, the Bank thereupon filed Uniform Commercial Code Termination Statements with respect to all UCC Financing Statements filed by the Bank against Armbrust. New UCC Financing Statements were filed by Sovereign Bank.

**ANSWER:** ABN is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13, except ABN filed Uniform Commercial Code Termination Statements with respect to all UCC Financing Statements filed against Armbrust.

14. In December, 2007, more than two years after Armbrust's payment of the Total Payoff Amount to the Bank, the Bank communicated to Armbrust that the Bank had discovered that it had made an error in calculating the Total Payoff Amount. According to the Bank, the Bank had failed to include an entry in its electronic records concerning a consignment transaction of 15,000 Fine Troy Ounces of silver which allegedly occurred on or about March 19, 2004 — over one and one-half years before the Total Payoff Amount was calculated.

**ANSWER:** ABN denies the allegations of paragraph 14, except ABN admits that the Bank inadvertently failed to include an entry in its electronic records concerning a consignment transaction of 15,000 Fine Troy Ounces of silver which occurred on or about March 19, 2004. Answering further, ABN alleges that, in September of 2006, upon the discovery by ABN of the shortfall in calculation of the Estimated Total Payoff Amount in Exhibit D, ABN immediately

informed Armbrust of the underpayment and, that in December 2007, after efforts to resolve the matter were unsuccessful, a formal demand for payment was made by ABN.

15. On or about December 28, 2007, legal counsel for the Bank sent a demand letter to Armbrust demanding payment of 15,000 Fine Troy Ounces of silver or its dollar equivalent, which totaled approximately $219,600.00 based upon the spot market purchase price as of December 27, 2007. The demand also included interest and payment of legal costs and expenses. A true and accurate copy of the demand letter is attached hereto and marked as *Exhibit E.*

**ANSWER:** ABN admits the allegations of paragraph 15.

16. Due to the passage of time, it was and remains impossible for Armbrust to accurately reconstruct its precious metal inventory records going back more than four years. Moreover, Armbrust's financial records, including its audited financial statements and the annual audits and field examinations performed by Bourget & Associates, Inc., failed to disclose any discrepancy in the consignment inventory of the magnitude claimed by the Bank. To the contrary, any discrepancies which may have existed or which were known by Armbrust were minor and within industry norms. Any mistake regarding the Total Payoff Amount was a unilateral mistake on the part of the Bank.

**ANSWER:** ABN denies the allegations of paragraph 16.

17. On or about April 1, 2008, the Bank, via legal counsel, advised Armbrust that it intended to pursue legal and other equitable remedies unless Armbrust paid the amount the Bank claimed was due and owing.

**ANSWER:** ABN admits the allegations of paragraph 17.

18. Armbrust denies that it owes the Bank anything, denies that there is any mutual mistake by the parties that might render the release and accord and satisfaction contained in the Payoff Letter voidable, and asserts that, at most, the Bank's claim is predicated upon its own unilateral mistake. Armbrust, furthermore, asserts that equity should deny the Bank any ability to avoid the release and accord and satisfaction contained in the Payoff Letter due to the Bank's own negligent error. Armbrust is innocent of any wrongdoing and has materially changed its position in reliance upon the Total Payoff Amount provided by the Bank.

**ANSWER:** ABN denies the allegations of paragraph 18.

19. This is a case of actual controversy within the jurisdiction of the Court.

**ANSWER:** Paragraph 19 contains legal conclusions that require no answer.

## ABN's Counterclaim Against Armbrust

ABN, for it's counterclaim against Armbrust alleges as follows:

## Parties and Jurisdiction

1. ABN is a corporation organized under the laws of The Netherlands with its headquarters located at Gustav Mahlerlan 10, Amsterdam, The Netherlands. ABN maintains a branch located at 55 East 52nd St., New York, NY.

2. Armbrust International, Ltd. (*"Armbrust"*) is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island. Armbrust is in the business of manufacturing and distributing precious metal and fashion chain and other jewelry products.

## Nature of Action and Jurisdiction

3. This in an action for declaratory judgment pursuant to 28 U.S.C. § 2210 and restitution based upon unjust enrichment. Jurisdiction is founded upon 28 U.S.C. § 1332(2) since it is a civil action between a citizen of the State of Rhode Island and a citizen or subject of a Foreign State. The matter and controversy, exclusive of interest and costs, exceeds the sum of $75,000.

## Facts Giving Rise to the Claim

4. On information and belief, in the spring of 2000, Armbrust was in financial distress and experiencing difficulties working with its current lender. On information and belief, the loan to Armbrust was classified as problematic and placed within the jurisdiction of the work-out group for troubled loans with its then lender. On or about the time, Armbrust approached ABN regarding the possibility of transferring the financing of its business to ABN.

5. In the year 2000 and at all times relevant, ABN was a leading international provider of integrated credit facilities providing both dollar loans and precious metal consignment facilities to the jewelry industry.

6. In 2000, Armbrust expressed its belief to ABN that the innovative financing and understanding of the jewelry industry being provided by the International Diamond and Jewelry Group of ABN could assist Armbrust in righting its financial ship.

7. ABN was willing to explore a lending relationship with Armbrust but, as a condition of extending a credit facility to Armbrust, ABN insisted upon documentation acceptable to ABN and, in light of the financial position of Armbrust, ABN required the personal guaranty of Armbrust's principal shareholder and CEO, Erwin Pearl ("Pearl").

## THE CONSIGNMENT AGREEMENT

8. Armbrust's financial arrangement with ABN included a revolving credit facility and consignment arrangement documented by a facility letter, consignment agreement (the "Consignment Agreement") and loan agreement (the "Agreements"). A true and correct copy of the Consignment Agreement with all its Exhibits and amendments, is attached here as *Exhibit 1* and is incorporated herein. This Consignment Agreement governed the consignment of precious metals by ABN with Armbrust.

9. Under a consignment arrangement, the consignor of a precious metal retains ownership of the metal but delivers, or has its representative deliver, the metal to the consignee. The consignee is permitted to use the consigned metal in its ordinary course of business, but the consignee does not take title to the consigned metal. As consideration for use of the metal and the time value of the metal, the consignee will pay to the consignor a fee. The precise fee is fixed in the consignment agreement, either with a fixed rate or by reference to an index rate. At the expiration of the consignment period for the precious metal or at the expiration of the

consignment agreement itself, the consignee must either return the precious metal to the consignor or buy the precious metal from the consignor. The Consignment Agreement provided for the payment of costs, including legal fees and expenses of ABN, in connection with enforcement of the Consignment Agreement. The Consignment Agreement reflected such a relationship.

**THE GUARANTY**

10. Because the Consignment Agreement allowed Armbrust to utilize consigned metal owned by ABN and because of the financial condition of Armbrust, ABN required security over and above that which Armbrust alone could provide. Accordingly, ABN insisted that the obligations of Armbrust under the Agreements be guaranteed by Pearl. At the time of the execution of the Consignment Agreement in 2000, Pearl's Guaranty in the amount of $3.5 million was required and obtained. In 2002, the amount of the Guaranty was increased to $5 million. Although the amount of this Guaranty was amended in 2004 to the reduced amount of one million dollars reflecting the then improved financial performance of Armbrust, the Guaranty obtained in 2002 has never been released and remains in full force and effect. A true and correct copy of the Guaranty with all amendments is attached as *Exhibit 2* and is incorporated herein.

11. The Guaranty given by Pearl in 2002 covered the obligations of Armbrust under the Agreements. Among other things, the Guaranty recited that, up to the agreed upon amount, it was unconditional, irrespective of the legality, validity or enforceability of the obligations under the Agreements. Further, Section 3(b)(v) provided that the Bank could "settle or compromise any or all of the obligations with the Borrower, and/or any other person or persons liable thereon and/or subordinate the payment of same or any part thereof to the payment of any other debts or claims which at any time may be due or owing to the Bank and/or other person; all in such

manner and upon such terms as Bank may see fit and without notice to or consent from Guarantor who hereby agrees to be and remain bound upon this Guaranty irrespective of the effect upon the existence or status of the obligations or the collateral security and notwithstanding any such change, alternation, renewal, continuance, extension, acceleration, sale, exchange, release, compromise, surrender, application, subordination or any other action here and above mentioned."

**THE 15,000 OUNCES OF SILVER**

12. On March 17, 2004, Karl Kunzmann of Armbrust requested a silver transfer from ABN pursuant to the Consignment Agreement in the amount of 15,000 Fine Troy Ounces. A copy of the request is attached as *Exhibit 3* and is incorporated herein.

13. On March 18, 2004, ABN confirmed to Armbrust that the 15,000 Fine Troy Ounces of silver would be transferred to Sovereign Bank for the account of Stern Leach. Stern Leach acted as the receiving agent for the delivery of silver to Armbrust. A copy of the confirmation of the transfer by ABN to Armbrust is attached as *Exhibit 4* and is incorporated herein.

14. On March 18, 2004, ABN confirmed to Sovereign Bank New England that it would transfer 15,000 ounces of silver for the account of Stern Leach to J. P. Morgan Chase Bank London. A copy of the confirmation is attached as *Exhibit 5* and is incorporated herein.

15. Stern Leach confirmed to Armbrust that it received the March 19, 2004 silver transfer. A copy of the confirmation is attached as *Exhibit 6* and is incorporated herein. Although this silver transfer was made by ABN to Armbrust, through a clerical error, the transfer was not booked internally by ABN. As a result, the electronic records of the aggregate outstanding amount of Fine Troy Ounces of silver on consignment by ABN to and owed by

Armbrust on an ongoing revolving basis neglected to capture the 15,000 Fine Troy Ounces in question.

## ARMBRUST LEAVES ABN

16. On information and belief, in late 2005, Armbrust had the opportunity with another financial institution to obtain alternative financing that would not require the personal guaranty of Pearl. Accordingly, Armbrust informed ABN that it wished to terminate its banking relationship with ABN in favor of another institution and requested a statement of the amount then due to satisfy Armbrust's obligations to ABN. The Bank generated a statement of the amount necessary to repay the indebtedness of Armbrust to ABN and quoted an "Estimated Total Payoff Amount", a true and correct copy of which is attached as *Exhibit 7* and incorporated herein, but, because of the inadvertent omission of the 15,000 Fine Troy Ounces of silver from the electronic records of ABN, the Estimated Total Payoff Amount provided by ABN understated the silver on consignment with Armbrust and the amount due. The Estimated Total Payoff Amount was based upon the mistaken assumption by both ABN and Armbrust that the records of ABN included all the silver consigned to Armbrust by ABN. Accordingly, the Estimated Total Payoff Amount did not reflect all of Armbrust's obligations under its Agreements with ABN. Had ABN entered the March 19, 2004 silver transfer into its ledger for consigned silver, such entry would have resulted in an increase in the aggregate amount outstanding under the Consignment Agreement and an increase in the Estimated Total Payoff Amount.

**ARMBRUST FAILS TO PAY ABN FOR 15,000 OUNCES OF SILVER**

17. In September of 2006, upon reconciliation of the silver account, ABN's Precious Metals Group in Amsterdam located the discrepancy of the 15,000 Fine Troy Ounces of silver. By letter dated September 22, 2006 and telephone conversation of that date, ABN informed Armbrust of the understatement of the Estimated Total Payoff Amount and provided Armbrust with the documentation for the delivery of the silver. A copy of the letter from ABN to Armbrust is attached as *Exhibit 8* and incorporated herein.

18. Since that time, despite repeated requests, Armbrust has failed and refused to satisfy it obligation under the Consignment Agreement to pay for the 15,000 ounces of silver. A copy of the formal demand letter from counsel to ABN to Armbrust dated December 28, 2007 is attached *Exhibit 9* and is incorporated herein. In addition to receiving the 15,000 ounces of silver which Armbrust has not paid, Armbrust has enjoyed the benefit of a rising silver market and therefore has been unjustly enriched in the amount of the increased value of the silver.

**COUNT 1**

**DECLARATORY JUDGMENT**

19. ABN repeats and realleges paragraphs 1 through 18 as if fully set forth herein.

20. The Estimated Total Payoff Amount contained *Exhibit 7* hereto is a product of mutual mistake in that it erroneously failed to include 15,000 Fine Troy Ounces of silver that had been consigned by ABN to Armbrust. This mistake in calculation of the Estimated Total Payoff Amount does not relieve Armbrust from its Obligations under the Agreements, including the Consignment Agreement, to pay the full amount due ABN. The erroneous Estimated Total Payoff Amount did not amount to or effect an accord and satisfaction, and the claim of ABN based on the Consignment Agreement was not discharged by the payment of Armbrust and acceptance by ABN of the lesser estimated amount.

21. In the alternative, the Payoff Amount was denominated an "estimate" and is subject to modification, or if the erroneous Estimated Total Payoff Amount represented a unilateral mistake by ABN, such mistake cannot be enforced against it since to do so would be a windfall to Armbrust and unconscionable.

22. Moreover, since Armbrust has had the benefit of the silver in a rising silver market, it will not be prejudiced by requiring Armbrust to live up to its Obligations under the Consignment Agreement. For example, while the value of 15,000 ounces of silver (based upon the New York Spot Price) in 2004 was $100,050, the value as of June 13, 2008 was $244,650.

23. Despite the demand by ABN, Armbrust has failed to comply with the requirements of the Consignment Agreement and to pay for the 15,000 Fine Troy Ounces of silver consigned to it by ABN.

24. Armbrust has failed to acknowledge that it is responsible for the payment of the 15,000 Fine Troy Ounces of silver and contends that, because of the execution of *Exhibit 7*, it is excused from payment for the 15,000 Fine Troy Ounces of silver. Armbrust has failed to admit that the failure to pay for the 15,000 Fine Troy Ounces of silver constitutes a breach of the Consignment Agreement and that the execution of *Exhibit 7*, which is an estimate or based on a mutual mistake or a unilateral mistake going to the heart of the understanding of ABN in delivering *Exhibit 8*, cannot serve to avoid this obligation of Armbrust.

25. A dispute has arisen between ABN and Armbrust with respect to the rights of the parties under the Consignment Agreement and *Exhibit 7*.

26. An actual controversy has arisen and now exists between the Plaintiff and Defendant concerning the obligations of Armbrust with respect to the silver.

27. ABN deserves a judicial determination of its rights and Armbrust's duties.

28. A judicial determination at this time is necessary and appropriate under the circumstances so that ABN may ascertain its rights and duties.

29. Declaratory relief from this Court will terminate some or all of the disputes and controversies and avoid the need for multiple litigation of similar issues thereby conserving judicial resources.

30. ABN is entitled to a declaration by this Court of its rights.

WHEREFORE, ABN prays that the Court enter judgment in its favor and against Armbrust:

1. declaring that Armbrust is obligated to promptly pay for the 15,000 Fine Troy Ounces of silver or its dollar equivalent which totals approximately $244,650 based on ABN's spot market purchase price as of June 13, 2008 (such amount to be redetermined based on changes in such spot market purchase price until paid) plus the consignment fee on such ounces as stipulated per the Consignment Agreement, accrued from March 19, 2004 until December 1, 2005, interest on the unpaid amounts in accordance with the provisions of the Consignment Agreement from December 1, 2005, such interest to continue to accrue until final payment is made and the payment of all legal costs and expenses of ABN and any other relief that the Court deems proper.

**COUNT II - RESTITUTION BASED UPON UNJUST ENRICHMENT**

31. ABN realleges and incorporates by reference paragraphs 1 through 30 as though alleged in this paragraph 31 herein.

32. On March 19, 2004, the 15,000 Fine Troy Ounces of silver were delivered by ABN and placed under the control of Armbrust. As of June 13, 2008 the silver has a value of at least $244,650 plus interest that has accrued thereon. Possession of this silver by Armbrust for which it has not paid ABN has unjustly enriched Armbrust and resulted in a windfall to Armbrust and a loss to ABN.

33. Armbrust has held such silver without compensating ABN therefore, first by mistake, and then by wrongly withholding payment from ABN.

34. ABN has demanded payment of Armbrust for the silver.

35. Armbrust has refused to compensate ABN for the silver or return the silver.

36. In equity, Armbrust must compensate ABN for the value of the silver.

WHEREFORE, ABN requests:

1. judgment against Armbrust for at least $244,650, the value of the 15,000 Fine Troy Ounces of silver as of June 13, 2008;

2. the consignment fee accrued from March 19, 2004 until December 1, 2005 and interest on the amount at the rate of 4.75% per annum from December 1, 2005 until paid,

3. costs of the suit including attorneys fees, and

4. such other and further relief as the Court deems just and proper.

By their Attorneys,

/s/ Staci L. Kolb
Joseph V. Cavanagh, Jr. (#1139)
Staci L. Kolb (#5451)
BLISH & CAVANAGH LLP
30 Exchange Terrace
Providence, RI 02903
Tel: (401) 831-8900
Fax: (401) 751-7542

Of counsel:
Chapman and Cutler LLP
James E. Spiotto
Ann Acker
David Schrodt
111 West Monroe Street
Chicago, Illinois 60603

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June, 2008, an exact copy of the within document was electronically submitted to the Electronic Case Filing System of the United States District Court for its electronic distribution to all counsel of record as follows:

Steven E. Snow, Esq.
ses@psh.com

/s/ Staci L. Kolb
of Blish & Cavanagh LLP