# EXHIBIT 1

# CONSIGNMENT AGREEMENT

THIS CONSIGNMENT AGREEMENT (*"Agreement"*) made as of the 30th day of June, 2000, by and between ABN AMRO BANK N.V., a bank organized under the laws of the Netherlands acting through its New York branch with its office at 500 Park Avenue, New York, New York 10022 (*"Consignor"*) and ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation with its principal office at 735 Allens Avenue, Providence, Rhode Island 02905 (the *"Consignee"*).

The Consignee has requested Consignor to deliver precious metals on consignment for sale to Consignee and Consignor is able and willing to make those deliveries and sales on the terms and conditions of this Consignment Agreement. To effectuate this arrangement, Consignor and Consignee agree as follows:

*Section 1.* *Definitions*. For the purposes of this Agreement:

*"Base Rate"* on any date shall mean the rate of interest announced by Consignor as being its *"prime rate"* of interest for U.S. dollar loans for that day and as from time to time in effect.

*"Borrowing Base"* shall mean the sum of (1) with respect to Precious Metal that is gold, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor plus (2) with respect to Precious Metal that is silver, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor.

*"Business Day"* shall mean any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Providence, Rhode Island and New York, New York.

*"Consignee's Counsel"* shall mean Tillinghast, Licht, Perkins, Smith & Cohen, LLP or such other counsel as Consignee may retain.

*"Consignment Limit"* shall mean the amount equal to (x) with respect to Consigned Precious Metal which is gold, the lesser of (1) 7,200 troy ounces of fine gold and (2) such Consigned Precious Metal with a Fair Market Value equal to $2,700,000 plus (y) with respect to Consigned Precious Metal which is silver, the lesser of (1) 220,000 ounces of silver and (2) such Consigned Precious Metal with a Fair Market Value equal to $1,300,000 minus (z) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note in excess of $2,300,000 outstanding under the Loan Agreement between Consignor and Consignee of even date herewith.

*"Consigned Precious Metal"* shall mean Precious Metal which Consignor has consigned to Consignee pursuant to the terms of this Agreement for which full payment has not been received or which has not been Redelivered to Consignor.

*"Current Assets"* shall mean all assets of Consignee that would, in accordance with generally accepted accounting principles consistently applied, be classified as current assets.

*"Current Liabilities"* shall mean all liabilities of Consignee that would, in accordance with generally accepted accounting principles consistently applied, be classified as current liabilities.

*"Daily Consignment Fee"* shall mean, for each day, (x) the fee mutually agreed on by Consignor and Consignee for that day, or, such other amount as Consignor shall determine in its discretion on seven (7) days prior Notice to Consignee or, (y) for Deliveries of Precious Metal having a Maturity Date, as hereinafter defined, of more than one day, the fee quoted by Consignor for such period. The parties hereto acknowledge and agree that, subject to subsequent adjustments as provided for herein, on the date hereof the initial Daily Consignment Fee shall be the sum of 4% per annum (in the case of Consigned Precious Metal which is gold) or 4.5% per annum (in the case of Consigned Precious Metal which is silver)

*"Delivery"* shall mean, as determined by Consignor, either actual receipt by Consignee or Consignor's crediting Precious Metal to the account of Consignee with one or more third parties when no physical movement thereof is contemplated by the parties, such Delivery to be confirmed via facsimile by the Consignor to the Consignee on the date such transaction takes place.

*"Duly Authorized Officer"* shall mean the Chief Executive Officer and Corporate Comptroller of Consignee or Consignor, or other officer or employee of either party who is authorized in writing by the party's Board of Directors or an executive committee of such Board of Directors.

*"Event of Default"* shall mean an event of default under Section 13 of this Agreement.

*"Fair Market Value"* on any day shall mean (i) in the case of gold, the Second London Gold Fixing for that day and (ii) in the case of silver, the value for silver based on the Handy & Harman noon price for that day. If no such price is available for a particular day, the price shall be fixed at the level for the next previous day for which a price is available.

*"Financial Statements"* shall mean the balance sheet of Consignee or Kunzmann, income statements of Consignee or Kunzmann, and retained earnings statements of Consignee or Kunzmann for the year or other period then ended, together with supporting

schedules, prepared in accordance with generally accepted accounting principles consistently applied.

*"Kunzmann"* shall mean The Kunzmann Chain Division of Erwin Pearl, Inc.

*"Loan Agreement"* shall mean the Loan Agreement between the Consignor and Consignee of even date herewith.

*"Merger"* means the merger between Kunzmann and the Consignee pursuant to which the Consignee is the surviving entity.

*"Notice"* or *"Notices"* shall mean all requests, demands and other communications, in writing (including telegraphic communications), mailed by registered or certified mail, return receipt requested, telegraphed, or hand-delivered to a Duly Authorized Officer of the other party at that party's Principal Office.

*"Precious Metal"* shall mean gold having a fineness of not less than .9995 or silver having a fineness of not less than .9990, without regard to whether such gold or silver is alloyed or unalloyed, is in bullion form or is contained in or processed into other materials which contain elements other than gold or silver.

*"Principal Office"* shall mean:

For Consignor:

ABN AMRO Bank N.V.
New York Branch
500 Park Avenue
New York, New York 10022
Attention: Mr. Jeffrey Sarfaty, Vice President

For Consignee:

Armbrust International Ltd.
735 Allens Avenue
Providence, Rhode Island 02905
Attention: Mr. Thomas Baker

*"Purchase Price"* shall mean a price to which both parties' Duly Authorized Officers agree and shall be stated in dollars per troy ounce (in the case of gold) or dollars per ounce (in the case of silver) of Precious Metal content; *provided, however,* that the Purchase Price shall not be less than the Fair Market Value of the applicable Precious Metal plus a market premium as determined in the Consignor's sole discretion.

*"Redeliver"* or *"Redelivery"* shall mean that Consignee deliver as directed by Consignor, at Consignee's sole risk and expense, Precious Metal of a fineness equal to

the fineness specified for that Precious Metal and of a type and quality and in a form reasonably acceptable to Consignor.

*"Senior Liabilities"* shall mean all liabilities of the Consignee not constituting Subordinated Indebtedness.

*"Subordinated Indebtedness"* shall mean such indebtedness of Consignee which is specifically subordinated to Consignee's obligations to Consignor upon terms satisfactory to Bank and which is evidenced by a promissory note the original of which, except to the extent waived in writing by the Consignor, has been delivered to Consignor or such other bank as Consignor deems appropriate.

*"Tangible Net Worth"* shall mean the excess of total assets over its total liabilities computed in accordance with generally accepted accounting principles consistently applied, less all intangible assets and deferred charges, including without limitation, goodwill, debt discount, organization expenses, trademarks and trade names, patents, deferred product development costs and similar items, provided that in computing Tangible Net Worth there shall be excluded any receivables or other amounts payable from any of Consignee's officers or any person or entity affiliated with Consignee or any officer or shareholder thereof. In computing such assets and liabilities, all Consigned Precious Metal and the liability of the Consignee therefor shall be included as if on the balance sheet of the Consignee.

*"Tax Distributions"* shall mean distributions or dividends to any shareholder of the Consignee in an amount sufficient for such shareholder to pay the annual tax liabilities of such shareholder solely as a consequence of the Consignee's sub-chapter S designation under the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

*"Working Capital"* shall mean the excess of current assets over its current liabilities, computed in accordance with generally accepted accounting principles consistently applied.

*Section 2. Amount of Consignment.* Provided no notice of termination has been given by either party and no Event of Default nor any event which with notice or lapse of time, or both, would constitute an Event of Default has occurred hereunder, Consignor may, in its discretion, deliver from time to time to Consignee upon Consignee's request Precious Metal under the terms and conditions of this Agreement. In no event shall Consignor be requested to deliver Precious Metal if the number of troy ounces (in the case of gold) or ounces (in the case of silver) or Fair Market Value of Precious Metal requested when added to Consigned Precious Metal (*plus* any outstanding amounts of unpaid Purchase Price) exceeds Consignee's Consignment Limit.

If for any reason the number of troy ounces (in the case of gold) or ounces (in the case of silver) or Fair Market Value of all Consigned Precious Metal (*plus* any outstanding amounts of unpaid Purchase Price for unpaid ounces of Precious Metal) (together, the *"Consignment Exposure"*) at any time exceeds either (i) Consignee's Consignment Limit or (ii), the Borrowing

Base, Consignee, shall, at the request of Consignor immediately Redeliver to Consignor, or purchase and pay for, Precious Metal of a quantity, or with a Fair Market Value, sufficient to eliminate such excess Consignment Exposure.

Consignor shall provide Consignee with a monthly statement of the quantity of Consigned Precious Metal (in whatever form) held by Consignee. If the Consignee does not agree with the information reported in the statement, Consignee shall give Notice of such disagreement to Consignor within five (5) Business Days of the date of receipt of such statement. If Consignee fails to give Notice to Consignor within the five (5) Business Day period, Consignee shall be deemed to have affirmed the accuracy of the information reported in the statement and to have waived any claim Consignee may have by reason of a dispute as to such statement.

Consignee shall give Consignor at least two (2) full Business Days Notice of its requirements for Precious Metal. Consignor shall not be liable to Consignee if Consignor fails to deliver the Precious Metal by reason of an Act of God or other catastrophe, force majeure, lack of supply, delay in transportation, war or other hostilities, strike, lockout, epidemic, acts of government or other public authority, requirements of any regulatory board, agency or authority, unavoidable casualties or any other causes beyond Consignor's control. CONSIGNOR MAKES NO WARRANTY OF MERCHANTABILITY IN RESPECT TO PRECIOUS METAL CONSIGNED OR SOLD UNDER THIS AGREEMENT NOR OF FITNESS FOR ANY PARTICULAR PURPOSE NOR ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, except that Consignor does warrant to Consignee that all Precious Metal will be of the fineness stated in Section 1 for that Precious Metal.

*Section 3. Delivery of Precious Metal.* All Deliveries of Precious Metal by Consignor will be made to Consignee by Consignor's crediting an account of Consignee at a third party supplier of Precious Metal or by delivery to such locations mutually satisfactory to Consignee and Consignor, such Deliveries to be on terms and conditions satisfactory to Consignor. At the time of Delivery or crediting Consignor shall provide Consignee with particulars of the total quantity of the Precious Metal being Delivered or credited to Consignee. A Duly Authorized Officer of Consignee receiving any Delivery shall give a receipt to the Consignor for the same in form satisfactory to Consignor. All shipping expenses (including insurance) shall be borne by Consignee, and any such expenses paid or incurred by Consignor shall be reimbursed by the Consignee immediately in the same manner as payments under Section 5 hereof.

*Section 4. Title.* Title to Consigned Precious Metal shall remain in Consignor and shall not vest in Consignee until Consignor has received payment for the Consigned Precious Metal as required by Section 5 of this Agreement. Consignee shall execute such financing statements, security agreements and other documents as Consignor shall request to protect the Consignor's interest under the Uniform Commercial Code. Consignee shall not sell or transfer any Consigned Precious Metal or any interest therein except in the ordinary course of business as now conducted as expressly permitted hereunder. Upon each Precious Metal Delivery, Consignee shall bear the entire risk of loss, theft, damage or destruction of the Consigned Precious Metal from any cause whatsoever, whether or not insured. The Consignee agrees to hold the Consigned Precious Metal *in trust* for Consignor and to indemnify and hold harmless Consignor against any and all liabilities, damages, losses, costs, expenses, suits, claims, demands

or judgments of any nature (including, without limitation, attorneys' fees and expenses) arising from or connected with any loss, theft, damage or destruction of the Consigned Precious Metal.

*Section 5. Purchase Price.* During the term of this Agreement, Consignee shall have the right to purchase any Consigned Precious Metal at Fair Market Value. To exercise the right, a Duly Authorized Officer of Consignee shall give Notice to a Duly Authorized Officer of Consignor that Consignee is purchasing specified quantities of Consigned Precious Metal. The parties' Duly Authorized Officers shall mutually agree on a Purchase Price for the Consigned Precious Metal. A Duly Authorized Officer of Consignor shall confirm Consignee's Notice, including quantity and purchase price, in writing.

The Consignee shall pay the full Purchase Price, plus any applicable sales or use tax, to Consignor within two (2) Business Days of the date of the fixing of such Purchase Price. The Daily Consignment Fee shall continue in effect until payment in full. Payment shall be made in the following manner: (i) by bank wire to the Federal Reserve Bank of New York for the account of Consignor, (ii) by Consignee authorizing Consignor to charge its account with Consignor, or (iii) by other means which Consignor approves in writing. Any amount not paid when due shall bear interest at two percent (2%) in excess of the Base Rate until paid in full (whether or not this Agreement has been terminated), such rate to be a floating rate to be redetermined daily in accordance with changes in the Base Rate. Such interest shall be paid upon demand in the manner specified above. If Consignor in its discretion grants payment terms different from the foregoing for particular purchases, then the Purchase Price shall not be deemed to be paid in full for the purposes of this Agreement until all payments under such terms have been made.

In addition to all payments required above, Consignee agrees to pay to Consignor the Daily Consignment Fee for Consignor's services under this Agreement during the preceding month on the tenth (10th) Business Day of each calendar month and Consignee expressly authorizes Consignor to charge Consignee's account with Consignor for the amount thereof.

*Section 6. Commingling; Redelivery of Precious Metal.* Consignee may use the Consigned Precious Metal only in the ordinary course of its business as now conducted.

At the time of each requested Delivery of Precious Metal, the Consignee and Consignor shall mutually agree to a maturity date with respect thereto and upon each extension of such Delivery, a renewal maturity date with respect thereto (the *"Maturity Dates"*). Prior to termination of this Agreement, any or all of the amount of the Consigned Precious Metal (excluding any Precious Metal as to which such Consignee is obligated to Purchase after the Purchase Price has been agreed to under Section 5) may be Redelivered by Consignee to Consignor to such place of delivery as directed by Consignor only upon the Maturity Date originally agreed to by the Consignee and Consignor with respect to the Consigned Precious Metal being Redelivered or upon any renewal Maturity Date mutually agreed to and not prior thereto.

*Section 7. Insurance.* Consignee, at its sole cost and expense, shall procure and maintain property insurance to cover all locations where Consigned Precious Metal will be

located on an all risk form and such other insurance with respect to the Consigned Precious Metal (in an amount not less than the Consignment Limit) as may from time to time be reasonably required by Consignor. All insurance provided for in this paragraph shall be effected under valid and enforceable policies, in such forms and in such amounts as may from time to time be reasonably required by Consignor, issued by financially sound and responsible insurance companies which are admitted in the jurisdiction in which the Consigned Precious Metal is located, or are approved under the applicable states' surplus lines insurance laws. At least ten (10) days prior to Consignor's first Delivery of Precious Metal to the Consignee and thereafter not less than fifteen (15) days prior to the expiration dates of insurance policies theretofore furnished pursuant to this Agreement, Consignee shall deliver to Consignor Accord Form 27 (2/84) or other similar forms reasonably satisfactory to Consignor evidencing the insurance coverage required by Consignor. All policies of insurance shall provide for (a) thirty (30) days notification in advance of any cancellation (except as provided below), non-renewal or material change in policy conditions and (b) thirty (30) days notification in advance of any cancellation for non-payment of premium.

All policies of insurance provided for or contemplated by this Agreement shall name Consignor as an additional insured and loss payee, as its interests may appear.

All policies of insurance provided for in this Agreement shall, to the extent obtainable, contain clauses or endorsements to the effect that:

(a) No act or negligence of Consignee which might otherwise result in a forfeiture of such insurance or any part thereof shall in any way affect the validity or enforceability of such insurance insofar as Consignor is concerned; and

(b) Consignor shall not be liable for any premiums or subject to any assessments on the policies.

Losses under each policy of insurance provided for or contemplated by this Section shall be adjusted with the insurers and/or underwriters and paid directly to Consignor and Consignee as their interests may appear. Written or verbal notice of all losses in excess of $ 100,000 shall promptly be given by Consignee to Consignor. Consignee shall pay all costs and expenses of collecting or recovering any insurance proceeds under such policies, including, but not limited to, any and all fees of attorneys, appraisers and adjusters.

*Section 8. Taxes, Etc.; Certain Rights of Consignor.* Consignee will promptly pay any and all taxes, assessments and governmental charges upon the Consigned Precious Metal prior to the date of any penalties. Consignee will not use the Consigned Precious Metal in violation of any statute or ordinance. Consignor may examine and inspect (upon not less than two (2) Business Days prior notice so long as no Event of Default has occurred and is then continuing) the Consigned Precious Metal at any time during normal business hours, wherever located, and Consignee agrees to keep all records relating to the Consigned Precious Metal at its Principal Office.

Upon an Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, Consignor may, at its option, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Consigned Precious Metal (which are not being contested in good faith), may pay for insurance on the Consigned Precious Metal and may pay for the maintenance and preservation of the Consigned Precious Metal, but only to the extent that Consignee has failed in its obligation to so pay, maintain or preserve. Consignee agrees to reimburse Consignor on demand for any payment made, or any expense incurred, by Consignor in connection with the foregoing, together with interest thereon at the Base Rate plus 2% per annum, computed from the date of such payment or expense until paid.

*Section 9. Representations and Warranties.* The following representations and warranties shall survive the delivery of this Agreement and the Delivery of Precious Metal by Consignor to Consignee and shall be deemed to be made by Consignee at each Delivery of Consigned Precious Metal and at each Maturity Date. Consignee represents and warrants to Consignor that:

(a) Consignee has heretofore furnished to Consignor: (i) the audited Financial Statements of the Consignee for the period ending June 30, 1999, prepared by Syner, Cavallaro & Co., Inc., independent public accountants, (ii) the audited Financial Statements of Kunzmann for the period ending June 30, 1999, prepared by BDO Seidman, independent public accountants, (iii) the compiled combined Financial Statements of the Consignee and Kunzmann for the period ending June 30, 1999, prepared by Syner, Cavallaro & Co., Inc. and (iv) the unaudited combined Financial Statements of the Consignee and Kunzmann for the period ending December 31, 1999 and prepared by the Consignee, each of such Financial Statements to the best of Consignee's knowledge and belief, fairly present the consolidated financial condition of Consignee and Kunzmann (as applicable) as of each such date, and the results of their respective operations for the applicable period then ended. Neither the Consignee nor Kunzmann has any contingent obligations, liabilities for taxes or unusual forward or long-term commitments except as specifically mentioned in the applicable Financial Statements. Since December 31, 1999, there has been no material adverse change in the condition of the Consignee or Kunzmann, financial or otherwise;

(b) Consignee (i) is duly organized, validly existing and in good standing under the laws of the state of its organization as of the date hereof, (ii) has full power and authority to own its properties and to carry on business as now being conducted and is qualified to do business in every jurisdiction where such qualification is necessary and where failure to be so qualified would have a material adverse effect on the business of Consignee and (iii) has full power to execute, deliver and perform this Agreement and any security document or documents securing the obligations of Consignee under this Agreement;

(c) The execution, delivery and performance by Consignee of the terms and provisions of this Agreement and any such security document (i) have been duly authorized by all requisite corporate action, (ii) will not violate any provision of law, any

order of any court or other agency of government, the corporate charter or by-laws or other organizational documents of Consignee, (iii) will not violate any indenture, agreement or other instrument to which it is a party, or by which it or its assets is or are bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time or both) a default under such agreement, and (iv) except as this Agreement may provide, will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Consignee pursuant to any such indenture, agreement or instrument;

(d) Except as disclosed in the Financial Statements, there is no action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or, to the knowledge of Consignee, threatened, against or affecting Consignee which, if adversely determined, would have a material adverse effect on the business, operations, properties, assets or condition, financial or otherwise, of Consignee;

(e) Consignee is not a party to any agreement or instrument or subject to any charter or other corporate restriction adversely affecting its business, properties or assets, operations or condition, financial or otherwise; Consignee, to the best of its knowledge and belief, is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument to which it is a party; and

(f) Except for financing statements and agreements filed solely in connection with purchase money indebtedness of the Consignee incurred in connection with purchases of equipment by the Consignee, no financing statement or agreement is on file in any public office pertaining to or affecting the Consigned Precious Metal or any property of Consignee, now owned or hereafter acquired, which does or will include the Consigned Precious Metal or portions, products or proceeds thereof.

*Section 10. Conditions of Consignment.* Delivery by Consignor of any Precious Metal or any extension or rollover of any prior delivery period under this Agreement is subject to the following conditions precedent:

(a) The representations and warranties set forth in Section 9 of this Agreement shall be true and correct on and as of the date of this Agreement and the date each Delivery is made.

(b) Consignee shall have executed and delivered to Consignor, upon the execution of this Agreement, the following:

(i) All financing statements and all security documents required by Consignor;

(ii) A certificate of the Secretary or Assistant Secretary of Consignee certifying to the votes of Consignee's Board of Directors authorizing the

execution, delivery and performance of this Agreement and any security documents;

(iii) A certificate of the Secretary or Assistant Secretary of Consignee certifying the names of the officers of Consignee authorized to sign this Agreement, any security documents and any other documents or certificates to be delivered pursuant to this Agreement by Consignee or any of its officers, together with the true signatures of such officers, on which certificates Consignor may conclusively rely until it shall receive a further certificate canceling or amending the prior certificate and submitting the signatures of the officers named in such further certificate;

(iv) A certificate of the Secretary of State of the state of organization of Consignee, dated reasonably near the date of this Agreement, stating that Consignee is duly organized and in good standing in such state and has filed all annual reports and has paid all franchise taxes required to be filed or paid to the date of such certificate;

(v) A favorable written opinion of Consignee's Counsel, dated the date of this Agreement, reasonably satisfactory to Consignor and its counsel in scope and substance, with respect to the matters set forth in subsections 9(b), (c) and (d); and further to the effect that this Agreement and all required security documents have been duly authorized, executed and delivered by Consignee and constitute the legal, valid, binding obligations of Consignee enforceable in accordance with their terms;

(vi) A certificate signed by Consignee's Chief Executive Officer to the effect stated in (c) below;

(vii) A guaranty agreement of Mr. Erwin Pearl (the *"Guarantor"*) in form satisfactory to Consignor, and personal financial statements of the Guarantor in form satisfactory to Consignor certified by the Guarantor as complete, true and accurate in all respects, such personal financial statement to be updated on an annual basis;

(viii) A subordination agreement from each of the officers of the Company in form and substance satisfactory to Consignor subordinating certain indebtedness existing on the date hereof of Consignee to such officers to indebtedness of Consignee to Consignor;

(ix) Such other supporting documents and legal opinions as Consignor may reasonably request;

(x) Performance by Consignor of satisfactory collateral audit, inventory of receivables and appraisal of fixed assets of Consignee.

(xi) Execution and delivery of the Facility Letter and the Loan Agreement of even date herewith between the Consignor and Consignee; and

(xii) Evidence satisfactory to the Consignor of the completion of the Merger.

(c) No Event of Default nor any event which with notice or the lapse of time, or both, would constitute an Event of Default shall have occurred.

*Section 11. Affirmative Covenants.* Consignee hereby covenants and agrees that, until Consignee makes payment and performs in full all of its indebtedness, obligations and liabilities under this Agreement or under any other indebtedness, obligations and liabilities to Consignor, whether now existing or arising hereafter, unless Consignor consents otherwise in writing, Consignee will:

(a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all laws and regulations applicable to it; at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and keep the same in good repair, working order and condition, and from time to time, make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto, so that the business carried on in connection therewith may be properly conducted in a manner consistent with the ordinary course of business at all times;

(b) Comply with all applicable laws and regulations, whether now in effect or hereafter enacted or promulgated by any governmental authority having jurisdiction in the premises;

(c) Pay and discharge or cause to be paid and discharged all taxes, assessments and governmental charges or levies imposed upon it or upon its respective income and profits or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a lien or charge upon such properties or any part thereof; provided that Consignee shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and, except for the alleged federal tax liability in the approximate amount of $160,000 currently being contested by the Consignee, it shall have set aside on its books reasonable reserves with respect to any such tax, assessment, charge, levy or claim, so contested, and provided, further, that payment with respect to any such tax, assessment, charge, levy or claim shall be made before any of its property shall be seized and sold in satisfaction thereof;

(d) Give prompt written notice to Consignor of any proceedings instituted against it by or in any Federal or state court or before any commission or other regulatory

body, Federal, state or local, which, if adversely determined, would have a materially adverse effect upon its business, operations, properties, assets, or condition, financial or otherwise;

(e) Furnish to Consignor:

(i) Within one hundred and twenty (120) calendar days after the end of each fiscal year audited Financial Statements prepared by Syner, Cavallaro & Co., Inc. or any other independent public accountants acceptable to Consignor and showing Consignee's financial condition at the close of such fiscal year, the results of operations during such year, such Financial Statements to contain a statement to the effect that such independent public accountants have examined the provisions of this Agreement and that no Event of Default nor any event which with notice or lapse of time, or both, would constitute an Event of Default has occurred and accompanied by a complete copy of all management letters delivered by such accountants in connection with preparation of such reviewed financial statements;

(ii) Within sixty (60) calendar days after the end of each quarterly fiscal period ending March 31, September 30 and December 31, unaudited balance sheets and statements of income in form satisfactory to the Consignor and submitted by the Chief Executive Officer or Corporate Comptroller of Consignee; and

(iii) Not later than twenty (20) calendar days after the end of each calendar month, a borrowing base report (in the form of Exhibit A attached hereto) demonstrating compliance with the Borrowing Base restrictions set forth in this Agreement (*"Borrowing Base Reports"*) and an aged analysis of all outstanding receivables and a reconciliation of the receivables aging to the receivables reported to the Consignor all in form and substance satisfactory to Consignor; and accompanied by a certification of the Chief Executive Officer or Corporate Comptroller of Consignee to the effect that as of the date of such statement there does not exist any Event of Default hereunder or any event or condition which with notice or lapse of time, or both, would constitute an Event of Default;

(f) Promptly, from time to time, furnish such other information regarding its operations, assets, business affairs and financial condition as Consignor may reasonably request;

(g) Permit agents or representatives of Consignor, during normal business hours and in a manner so as not to interfere with Consignee's business, (i) upon 24 hours prior notice (or two (2) Business Days prior notice so long as no Event of Default has occurred and is continuing) and upon any Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, to (x) conduct a spot-check of Consignee's Inventory and (y) to inspect the Consigned Precious Metal and Consignee's books and records and to make abstracts or reproductions of such books and

records; and (ii) to conduct at Consignee's expense an annual audit of the Consigned Precious Metal in the possession and control of Consignee, such audits to consist of one physical verification of all of Consignee's inventory including an audit review of Consignee's control system and physical verifications of all on premises gold and silver; *provided, however,* that when an Event of Default has occurred and is continuing, Consignor may conduct such audits as frequently as it may desire at Consignee's expense. Consignee shall give Consignor not less than ten (10) days' Notice of the taking of any physical inventory of Consigned Precious Metal in Consignee's possession and shall permit Consignor and its designated representatives to observe the taking of such inventory. In addition, at Consignee's expense, Consignee shall permit Consignor, at reasonable times, and at any time upon any Event of Default or any event which with notice or the lapse of time, or both, would constitute an Event of Default, to take a physical inventory of the Consigned Precious Metal in Consignee's possession;

(h) Promptly advise Consignor or its agent of any material adverse change in its condition, financial or otherwise, and of any condition or event which constitutes, or with notice or lapse of time or both would constitute, an Event of Default;

(i) Promptly join with Consignor or its agent from time to time in executing one or more financing statements pursuant to the Uniform Commercial Code in form reasonably satisfactory to Consignor, and execute such other instruments in form suitable for recording or filing as Consignor may reasonably require;

(j) Remain, at all times, in compliance with the Borrowing Base and Consignment Limit;

(k) Defend the Consigned Precious Metal against any claims and demands of any persons (other than Consignor) at any time claiming the same or any interest therein;

(l) Provide copies to Consignor of all reconsignment agreements with all reconsignees, if so requested;

(m) Maintain, at all times, Net Working Capital in an amount not less than $2,500,000;

(n) Maintain, at all times, minimum Capitalization (being the sum of Tangible Net Worth plus Subordinated Indebtedness) in an amount not less than $3,500,000; and

(o) Maintain, at all times, a ratio of total Senior Liabilities to Capitalization (as defined above) in an amount not exceeding 2.75 to 1.00; *provided,* that such calculation shall be made as if Consigned Precious Metal and the liability of the Consignee therefor were set forth on the balance sheet of the Consignee; and

(p) Maintain ownership of all Precious Metal which is reconsigned, on memo or otherwise located outside of the United States of America.

*Section 12. Negative Covenants.* Consignee covenants and agrees that, until Consignee makes payment and performs in full its indebtedness, obligations and liabilities under this Agreement or under any other indebtedness, obligations and liabilities to Consignor, whether now existing or arising hereafter, unless Consignor consents otherwise in writing, Consignee will not, directly or indirectly:

(a) Create, incur, assume or suffer to exist any mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of the Consigned Precious Metal or any products or property now or hereafter owned which does or will include the Consigned Precious Metal;

(b) Sell, lease, transfer or otherwise dispose of its properties (other than obsolete property or property of negligible value), assets, rights, licenses and franchises to any person, except in the ordinary course of its business, or turn over the management of, or enter into a management contract with respect to, such properties, assets, rights, licenses and franchises;

(c) Dissolve, liquidate, consolidate with or merge with, or acquire all or substantially all of the assets or properties of, any other corporation, or make any substantial change in its executive management which change would result in the Guarantor ceasing to be actively involved in the management of the Consignee's business;

(d) Sell, assign, encumber, pledge, discount or dispose in any way of any accounts receivable, promissory notes or trade acceptances held by any Consignee, with or without recourse, except for collection (including endorsements) in the ordinary course of business;

(e) Grant any security interest or ownership rights to any customer of any Consignee with respect to any of the Consigned Precious Metal while at such Consignee's premises whether or not such customers have prepaid orders for the Consigned Precious Metal or any products or property which does or will include the Consigned Precious Metal;

(f) Guarantee, endorse or otherwise in any way become or be responsible for obligations of any other person, except endorsements of negotiable instruments for collection in the ordinary course of business;

(g) Enter into any arrangements, directly or indirectly, with any person whereby it shall sell or transfer any property, real, personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property;

(h) Obtain any direct advances or other extensions of credit from any factor or other accounts receivable insurance provider;

(i) Except for Tax Distributions, declare or pay any dividends, or make any distribution, of cash or property, or both, to holders of shares of its capital stock, or directly or indirectly, redeem, purchase or otherwise acquire for a consideration, any shares of its capital stock, of any class or permit to exist outstanding any officer withdrawals, advances or loans, other than the withdrawals, advances and loans existing on the date hereof, in excess of $50,000 in the aggregate;

(j) Allow Precious Metal which is gold which is on memo, reconsigned or in any form located at locations outside of the United States of America to exceed two thousand (2,000) troy ounces;

(k) Allow Precious Metal which is silver which is on memo, reconsigned or in any form located at locations outside of the United States of America to exceed twenty thousand (20,000) ounces;

(l) Allow Precious Metal which is gold located at refiners, fabricators or contractors domiciled in the United States of America to exceed two thousand (2,000) troy ounces; or

(m) Allow Precious Metal which is silver located at refiners, fabricators or contractors domiciled in the United States of America to exceed twenty-five thousand (25,000) ounces.

*Section 13. Event of Default.* The occurrence of any of the following events shall constitute an Event of Default:

(a) Any representation or warranty made herein, or in any report, certificate, financial statement or other instrument furnished in connection with this Agreement, or the Delivery of Precious Metal by Consignor hereunder, shall prove to be false or misleading in any material respect;

(b) Consignee fails to pay any amounts due hereunder or any other indebtedness, obligations or liabilities of Consignee to Consignor when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or by acceleration or otherwise and such failure shall continue unremedied for seven (7) days;

(c) Consignee fails to observe or perform (i) (A) Sections 4 and 7 of the Loan Agreement, (B) Sections 11(e), 11(m), 11(n), 11(o), 12(j); 12(k), 12(l) and 12(m) hereof and (C) any covenant, condition or agreement required by the terms of the Facility Letter and such failure shall continue unremedied for fifteen (15) days or (ii) any other covenant, condition or agreement required by the terms of this Agreement or the Loan Agreement and such failure shall continue unremedied for thirty (30) days;

(d) Default with respect to any evidence of indebtedness, obligations or liabilities of Consignee (including but not limited to loan agreements, other consignment

agreements or precious metals sales or lease agreements), if the effect of such default is to accelerate the maturity of such indebtedness, obligations or liabilities or to permit the holder thereof to cause such indebtedness, obligations or liabilities to become due prior to the stated maturity thereof, or if any indebtedness, obligations or liabilities of Consignee is not paid, when due and payable within any applicable grace periods applicable thereto, whether at the due date thereof or by acceleration or otherwise;

(e) Consignee shall (i) apply for, consent to, or suffer the appointment of a custodian, receiver, trustee or liquidator of it or any of its property, (ii) admit in writing its inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) fail to pay its debts generally as they become due, (v) file, or have filed against it (and, if filed against it, not dismissed by the Consignee within sixty (60) days of such filing), a petition for relief under Title 11 of the United States Code, or (vi) file, or have filed against it (and, if filed against it, not dismissed by the Consignee within sixty (60) days of an order for relief), a petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or corporate action shall be taken for the purpose of effecting any of the foregoing;

(f) An order, judgment or decree shall be entered, without the application, approval or consent of Consignee by any court of competent jurisdiction, approving a petition seeking reorganization of Consignee or appointing a custodian, receiver, trustee or liquidator of Consignee or of all or a substantial part of the assets of Consignee;

(g) Occurrence of any loss, theft, or destruction of, or damage to the Consigned Precious Metal or any products or property which includes Consigned Precious Metal having a value greater than $100,000 in excess of the net proceeds of insurance payable in respect thereof;

(h) Discontinuance of the operation of Consignee's business (as presently conducted) for any reason;

(i) The death, incompetency or other incapacity of the Guarantor; or

(k) The occurrence of any Event of Default under the Loan Agreement or Security Agreement; or

(l) the present shareholders of Consignee or any trusts created for such shareholders or their spouses or children shall cease to own directly at least 75% of the outstanding voting stock of the Consignee.

Upon the occurrence of any such Event of Default and at any time thereafter during the continuance of such Event of Default, Consignor may, by Notice to Consignee, terminate this Agreement as provided in Section 14 and declare all liabilities, indebtedness or obligations of

Consignee to be due and payable provided, however that automatically upon the occurrence of any Event of Default under Section 13(e) or (f) and without presentment, demand, protest or notice of any kind, all such liabilities, indebtedness and obligations of Consignee shall become due and payable. Upon Consignor's declaration (or automatically upon the occurrence of any Event of Default under Section 13(e) or (f)), such indebtedness shall become due and payable, both as to principal and/or interest, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other evidence of such indebtedness, obligations and liabilities to the contrary notwithstanding. Consignor may enforce payment of the same and exercise and direct its agent to exercise any or all of the rights, powers and remedies possessed by Consignor, under this Agreement or under any agreement securing the obligations of Consignee hereunder, whether afforded by the Uniform Commercial Code or otherwise afforded by law or in equity. The remedies provided for herein are cumulative and are not exclusive of any other remedies provided by law. Consignee agrees to pay Consignor's and its agent's reasonable attorney's fees and legal expenses incurred in enforcing Consignor's rights, powers and remedies under this Agreement and any agreement securing the liabilities, indebtedness or obligations of Consignee to Consignor, whether such enforcement is directly by Consignor or through its agent, provided Consignor prevails in any action or proceeding brought or commenced to enforce such rights, powers and remedies.

*Section 14. Termination.* This Agreement shall terminate, at the election of Consignor, upon the occurrence of any Event of Default. Furthermore, unless otherwise terminated in accordance with the terms hereof, this Agreement shall continue until either Consignor or any Consignee elects to terminate this Agreement by not less than ninety (90) days' prior Notice to the other party. Termination of this Agreement shall not affect Consignee's duty to pay and perform in full its obligations to Consignor hereunder. On the effective date of the termination of this Agreement, Consignee shall either Redeliver or purchase and pay for all Consigned Precious Metal which Consignor has previously Delivered and which has not been paid for or Redelivered, the Price to be equal to the Consignor's spot market price (as determined by Consignor) for Precious Metal on the effective date of termination.

*Section 15. Miscellaneous.*

(a) All notices, communications and distributions hereunder shall be given or made (i) if to Consignee, to it at its Principal Office, with a copy (in the case of an Event of Default) to: (A) Tillinghast Licht Perkins Smith & Cohen LLP, Ten Weybosset Street, Providence, Rhode Island 02903-2818, Attention: Patrick A. Guida, Esq., Telecopy: (401) 456-1210 and (B) Erwin Pearl Inc., 389 Fifth Avenue, New York, New York 10016, Attention: Mr. Joel Weinstein, Telecopy: (212) 889-3076 and (ii) if to the Consignor, to it at its Principal Office; or in any of the foregoing cases at such other address as the addressee may hereafter specify for the purposes by written notice to the other party hereto. Such notices and other communications will be effectively given only if and when given in writing and delivered at the address set forth hereinabove or five (5) Business Days after being duly deposited in the mails with first class postage prepaid, or transmitted by confirmed facsimile transmission (*"FAX"*) or delivered by a telegraph company with all charges prepaid, addressed as aforesaid.

(b) This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto, shall survive the execution and delivery to Consignor of this Agreement, and shall continue in full force and effect so long as this Agreement and any other indebtedness, obligations and liabilities of Consignee to Consignor is outstanding and unpaid. In this Agreement, reference to a party shall be deemed to include the successors and permitted assigns of such party, and all covenants and agreements in this Agreement by or on behalf of Consignee shall inure to the benefit of the successors and assigns of Consignor.

(c) Consignee shall reimburse Consignor upon demand for all reasonable out-of-pocket, costs, charges and expenses of Consignor (including reasonable fees and disbursements of counsel to Consignor) in connection with (i) the preparation, execution and delivery of this Agreement (such fees (exclusive of disbursements) to be in an amount not in excess of $25,000), (ii) any amendments, modifications, consents or waivers in respect hereof and (iii) any enforcement hereof.

(d) This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

(e) No modification or waiver of any provision of this Agreement, or of any security document, nor consent to any departure of any Consignee from a provision, shall be effective unless the same shall be in writing. A written consent shall be effective only in the specific instance, and for the purpose, for which given. No notice to, or demand on Consignee, in any one case, shall entitle such Consignee to any other or future notice or demand in the same, similar or other circumstances.

(f) Neither any failure nor any delay on the part of Consignor in exercising any right, power or privilege hereunder, or in any other instrument given as security therefor, shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or future exercise, or the exercise of any other right, power or privilege.

(g) Consignee shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Consignor.

(h) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction unless such prohibition or unenforceability materially and adversely affects the intent of parties hereto as to the primary subject matter of this Agreement.

(i) Any Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. As used in this Agreement, the term *"person"* shall include any individual, corporation, partnership, joint venture, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

(j) The parties hereto each hereby submit to the jurisdiction of the courts of the State of New York, the venue of which shall be in the county of New York, and the United States District Court for the Southern District of New York, as well as to the jurisdiction of all courts to which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of any of Consignee's obligations under or with respect to this Agreement, and expressly waives any and all objections it may have as to venue in any of such courts. CONSIGNEE AND CONSIGNOR EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this Agreement, including *but not limited* to any assignee or successor of a party, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this Agreement, any related instruments, any collateral or the dealings or the relationship between the parties. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO WITH LEGAL COUNSEL, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

(k) This Agreement may be executed in counterparts, and by the different parties on different counterparts, all of which taken together shall constitute one and the same instrument and each of such counterparts shall, for all purposes, be deemed to be an original.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Consignor and Consignee have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

ARMBRUST INTERNATIONAL LTD.

By [signature]
Its Senr VP

ABN AMRO BANK N.V., New York Branch

By ____________________
Its ____________________

By ____________________
Its ____________________

IN WITNESS WHEREOF, Consignor and Consignee have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

ARMBRUST INTERNATIONAL LTD.

By ______________________

Its ______________________

ABN AMRO BANK N.V., New York Branch

By Jeffrey Saffety

Its VP

By [signature]

Its VP

# EXHIBIT A

## BORROWING BASE CERTIFICATE

***ABN AMRO***
***MONTHLY REPORT***

____ LO COMPLIANCE REVIEW
____ OPER. BALANCE CONFIRM/TICKLER

ARMBRUST INTERNATIONAL, LTD.

DATE ____________

***INVENTORY***

| | | | |
|---|---|---|---|
| GOLD BALANCES | | GOLD OUNCE LOCATIONS | |
| TOTAL INVENTORY VALUE | | IN- HOUSE OUNCES ** | |
| TOTAL FINE GOLD OUNCES | | OUNCES AT REFINERS | |
| LESS: OUNCES OWED TO ABN AMRO | | DOMESTIC CONTRACTORS | |
| | | | |
| | | | |
| LESS: OUNCES OWED TO OTHERS* | | FOREIGN CONTRACTORS | |
| | | | |
| NET OWNERSHIP POSITION | | SALESLINES | |
| | | MEMOS | |
| PLEASE PROVIDE DETAIL | | SAMPLES | |
| | | OTHER | |
| | | TOTAL FINE GOLD OUNCES | |

| | | | |
|---|---|---|---|
| SILVER BALANCES | | SILVER OUNCE | |
| TOTAL INVENTORY VALUE | | LOCATIONS | |
| TOTAL FINE SILVER | | IN- HOUSE OUNCES ** | |
| OUNCES | | | |
| LESS: OUNCES OWED TO ABN AMRO | | OUNCES AT REFINERS | |
| | | | |
| LESS: OUNCES OWED TO OTHERS* | | DOMESTIC CONTRACTORS | |
| | | | |
| NET OWNERSHIP POSITION | | FOREIGN CONTRACTORS | |
| | | | |
| PLEASE PROVIDE DETAIL | | SALESLINES | |
| | | MEMOS | |
| | | SAMPLES | |
| | | OTHER | |
| | | TOTAL FINE SILVER | |
| | | OUNCES | |

SCHEDULES:

ATTACH SCHEDULE A TO CONFIRM ADDRESSES OF INVENTORY LOCATIONS OTHER THAN IN HOUSE. CONFIRM EACH MONTH THE ADDRESS OF YOUR COMPANY'S CHEIF EXECUTIVE OFFICE: 735 ALLENS AVENUE, PROVIDENCE, RHODE ISLAND 02905.
ATTACH SCHEDULE B IF YOU HAVE RETAIL MEMO PROGRAMS

SCHEDULE A

ABN AMRO MONTHLY REPORT

OFF - PREMISE PRECIOUS METAL POSITIONS

| LOCATION GOLD | OUNCES | RELATIONSHIP |
|---|---|---|
| TECHNIC | | DOMESTIC |
| GENERAL FINDINGS | | |
| GANNON & SCOTT | | REFINERS |
| ROYAL CHAIN | | DOMESTIC |
| OROAMERICA | | DOMESTIC |
| HALLMARK | | DOMESTIC |
| TP TASCA | | |
| STERN LEACH | | DOMESTIC |
| JOYEROS | | FOREIGN |
| IMPERIAL SMELTING | | FOREIGN |
| TOTAL GOLD | | |
| HANDY & HARMAN | | |
| GANNON & SCOTT | | REFINERS |
| TOTAL SILVER @ REFINERS | | |
| AMERICAN PLATING | | DOMESTIC |
| FERNANDO | | DOMESTIC |
| MAINELLI | | DOMESTIC |
| ROBBINS CO. | | DOMESTIC |
| MURPHY | | DOMESTIC |
| NATIONAL CHAIN | | DOMESTIC |
| GOLD N CREATION | | DOMESTIC |
| 2224 JEWELRY | | DOMESTIC |
| APAC | | DOMESTIC |
| P.R. EXPORT | | DOMESTIC |
| BRESLOF | | DOMESTIC |
| A.M. SCHALER | | DOMESTIC |
| MYER JEWELRY MFG LTD | | DOMESTIC |
| PROVIDENCE CHAIN | | DOMESTIC |
| STANARD CHAIN | | DOMESTIC |
| KENDRA'S JOBBERS | | DOMESTIC |
| TRACY BOTSFORD | | DOMESTIC |
| BA BALLOU | | DOMESTIC |
| MEL CO'ED | | DOMESTIC |
| N.E.I. DO ALL | | DOMESTIC |
| CRISVAL JEWELRY | | DOMESTIC |
| HAMILTON TOOL | | DOMESTIC |
| TITUS ENGRAVING | | DOMESTIC |
| TAYLOR STAMPING | | DOMESTIC |
| ALUMA INDUSTRIES | | DOMESTIC |
| UNIT FINDINGS | | DOMESTIC |
| VILLAGE GOLDSMITH | | DOMESTIC |
| TASCA | | DOMESTIC |
| SUBTOTAL DOMESTIC | | |
| ITALY | | FOREIGN |
| FIOR | | FOREIGN |
| JOYEROS | | FOREIGN |
| SUBTOTAL FOREIGN | | |
| TOTAL SILVER @ CONTRACTORS | | |

***COVENANTS***

| | TESTED | REQUIREMENT | ACTUAL |
|---|---|---|---|
| GOLD EQUITY | MONTHLY | 10% MINIMUM | |
| SILVER EQUITY(1) | MONTHLY | 10% MINIMUM | |
| IN- HOUSE GOLD CONSIGNMENT | MONTHLY | CAP OF 2,000 OZS @ DOMESTIC CONTRACTORS | |
| IN- HOUSE SILVER CONSIGNMENT | MONTHLY | CAP OF 25,000 OZS DOMESTIC CONTRACTORS | |
| OUTSIDE GOLD ON MEMO | MONTHLY | CAP OF 2,000 OZS @ FOREIGN CONTRACTORS | |
| OUTSIDE SILVER ON MEMO | MONTHLY | CAP OF 20,000 OZS @ FOREIGN CONTRACTORS | |
| TL/TNW MAXIMUM | QUARTERLY | 2.75 AT ALL TIMES | |
| $2.5 MINIMUM AT ALL TIMES | | | |
| TNW MINIMUM | QUARTERLY | $3.5 MILLION AT ALL TIMES | |

(1) Assumes Gannon & Scott, Handy & Harman, and General Findings (a Leach & Garner Company) are all approved locations.

***ACCOUNTS RECEIVABLE AGING ( CHECK: DUE DATE ____ OR INVOICE DATE __X__ )***

| | FUTURE | CURRENT | 1-30 | 31-90 | OVER 90 | TOTAL |
|---|---|---|---|---|---|---|
| $ | | | | | | |
| % | | | | | | |

***ADVANCE FORMULA***

| | | |
|---|---|---|
| A | TOTAL A/R | |
| B | LESS: A/R > 90 DAYS PAST INVOICE DATE * NET OF INSURED ACCOUNTS | |
| C | LESS: UNINSURED FOREIGN A/R | |
| D | LESS: AFFILIATE A/R | |
| E | LESS: CROSS- AGINGS* | |
| F | LESS: INVOICES > 120 DAYS | |
| G | LESS: OTHER INELIGIBLES ( i.e. NON- TRADE, BANKRUPTCIES, ETC. - PLEASE SPECIFY) | |
| H | ELIGIBLE A/R = (A-B-C-D-E-F-G) | |
| | H * 80% = (AVAILABLE UNDER FORMULA) | |
| | LESS: OUTSTANDING UNDER LINE OF CREDIT | |
| | = SURPLUS OR ( DEFICIT) | |

* CROSS-AGINGS ARE THOSE A/R OWED BY ANY ACCOUNT DEBTOR AS TO WHOM 50% OR MORE OF THE INVOICES SUMITTED TO SUCH DEBOTR ARE OR HAVE BEEN OUTSTANDING FOR 90 DAYS OR MORE; ALL SUCH INVOICES DUE FROM THAT DEBTOR ARE THEREFORE RENDERED INELIGIBLE (I.E. NOT JUST 90 DAYS PAST DUE A/R)

***OTHER LOANS PAYABLE***

| BANK NAME | DESCRIPTION | AMOUNT OUTSTANDING |
|---|---|---|
| 1 ABN AMRO | TERM LOAN | |
| 2 ERWIN PEARL | SUBORDINATED | |

***ACCOUNTS RECEIVABLE CONCENTRATION***

| | CUSTOMER | BALANCE | BALANCE > 90 DAYS |
|---|---|---|---|
| 1 | Q.V.C. NETWORK | | |
| 2 | MEDIC ALERT | | |
| 3 | ERWIN PEARL, INC. | | |
| 4 | DANECRAFT | | |
| 5 | MERVYN'S | | |
| 6 | O.C. TANNER JEWELRY | | |
| 7 | THE BELL GROUP | | |
| 8 | JEWELRY CONCEPTS 21 | | |
| 9 | COLIBRI | | |
| 10 | JUDITH JACK | | |
| | TOTAL | | |

***ACCOUNTS PAYABLE AGING***

| | CURRENT | 1-30 | 31-60 | OVER 60 | TOTAL |
|---|---|---|---|---|---|
| $ | | | | | |
| % | | | | | |

***OFFICER CERTIFICATION***

THE UNDERSIGNED CERTIFIES THAT THE ABOVE INFORMATION IS CORRECT ACCORDING TO THE CUSTOMER'S BOOKS AND RECORDS, AND THAT THE UNDERSIGNED HAS NO KNOWLEDGE OF ANY EVENT OR CONDITION WHICH CONSTITUTES AN EVENT OF DEFAULT UNDER THE CUSTOMER'S CREDIT ARRANGEMENTS WITH FLEET PRECIOUS METALS OR ANY OTHER CREDITOR.

AUTHORIZED SIGNER
(SIGNER MUST BE AN OFFICER OF THE CORPORATION)

TITLE

DATE

ABN·AMRO Bank

New York Branch
500 Park Avenue
New York, New York 10022
(212) 838-7300

# Amendment to Consignment Agreement

This Amendment (the "*Amendment*") to Consignment Agreement, dated as of December __, 2000, between ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (the "*Consignee*"), and ABN AMRO BANK N.V., a public company with limited liability (the "*Consignor*").

## Witnesseth:

WHEREAS, the Consignee and Consignor are parties to that certain Consignment Agreement, dated as of June 30, 2000 (the "*Consignment Agreement*"); and

WHEREAS, the Consignee has requested that the Consignor agree to certain amendments of the Consignment Agreement; and

WHEREAS, the Consignor is willing to so amend the Consignment Agreement, subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound thereby, covenant and agree as follows:

1. *General.* All terms used herein which are not otherwise specifically defined herein shall have the same meaning herein as defined in the Consignment Agreement as further amended hereby.

2. *Definitions.* The present definition of "*Consignment Limit*" shall be deleted and there shall be inserted in its place the following:

> "*Consignment Limit*" shall mean the amount equal to (x) with respect to Consigned Precious Metal which is gold, the lesser of (1) 7,200 troy ounces of fine gold and (2) such Consigned Precious Metal with a Fair Market Value equal to $2,300,000 plus (y) with respect to Consigned Precious Metal which is silver, the lesser of (1) 320,000 ounces of silver and (2) such Consigned Precious Metal with a Fair Market Value equal to $1,700,000 minus (z) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note in excess of $2,300,000 outstanding under the Loan Agreement between Consignor and Consignee of even date herewith.

3. *Negative Covenants.* Section 12(m) of the Consignment Agreement shall be amended by deleting the reference therein to "twenty-five thousand (25,000) ounces" and inserting in its place "forty-five thousand (45,000) ounces."

ABN·AMRO Bank

4. *No Default or Event of Default.* The Consignee hereby agrees that after giving effect to this Amendment, no Event of Default shall have occurred and be continuing under the Consignment Agreement as amended hereby.

5. *Effectiveness.* This Amendment shall become effective as of the date hereof when Consignor and Consignee shall have signed a counterpart hercof. This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Amendment and the rights and obligations of the parties hereunder shall be construed in accordance with and be governed by the laws of the State of New York. Except as herein specifically amended, the Consignment Agreement shall be and remain in full force and effect and wherever reference is made in any note, document, letter or other communication to the Consignment Agreement, such reference shall, without more, be deemed to refer to the Consignment Agreement as amended hereby.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date above written.

ARMBRUST INTERNATIONAL LTD.
By: [signature]
Name: Joel S. Weinstein
Title: Sen VP

ABN AMRO BANK N.V.

By: [signature]
Name: Jeffrey Sarfaty
Title: VP

By: [signature]
Name: Ned Koppelson
Title: VP

S:\jsa\7402js

# AMENDMENT TO CONSIGNMENT AGREEMENT

This Amendment (the *"Amendment"*) to Consignment Agreement, dated as of December 17, 2002, among ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (the "*Consignee*"), and ABN AMRO BANK N.V. (the "*Consignor*").

## WITNESSETH:

WHEREAS, the Consignee and Consignor are parties to that certain Consignment Agreement, dated as of June 30, 2000 as amended (the "*Consignment Agreement*"); and

WHEREAS, the Consignee has requested that the Consignor agree to certain amendments of the Consignment Agreement; and

WHEREAS, the Consignor is willing to so amend the Consignment Agreement, subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound thereby, covenant and agree as follows:

1. *General.* All terms used herein which are not otherwise specifically defined herein shall have the same meaning herein as defined in the Consignment Agreement as further amended hereby.

2. *Definitions.* The present definition of *"Consignment Limit"* shall be deleted and there shall be inserted in its place the following:

> *"Consignment Limit"* shall mean the amount equal to (x) with respect to Consigned Precious Metal which is gold, the lesser of (1) 7,400 troy ounces of fine gold and (2) such Consigned Precious Metal with a Fair Market Value equal to $2,600,000 plus (y) with respect to Consigned Precious Metal which is silver, the lesser of (1) 320,000 ounces of silver and (2) such Consigned Precious Metal with a Fair Market Value equal to $1,700,000 minus (z) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note in excess of $2,000,000 outstanding under the Loan Agreement between Consignor and Consignee of even date herewith.

3. *No Default or Event of Default.* The Consignee hereby agrees that after giving effect to this Amendment, no Event of Default shall have occurred and be continuing under the Consignment Agreement as amended hereby.

4. *Effectiveness.* This Amendment shall become effective as of the date hereof when Consignor and Consignee shall have signed a counterpart hereof and the Consignee shall have delivered: (i) a new Revolving Note in the form of Exhibit A hereto executed by the Consignee

and (ii) a new Unconditional and Continuing guaranty executed by Mr. Erwin Pearl in an amount of $5,000,000. This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Amendment and the rights and obligations of the parties hereunder shall be construed in accordance with and be governed by the law of the State of New York. Except as herein specifically amended, the Consignment Agreement shall be and remain in full force and effect and wherever reference is made in any note, document, letter or other communication to the Consignment Agreement, such reference shall, without more, be deemed to refer to the Consignment Agreement as amended hereby.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date above written.

ARMBRUST INTERNATIONAL LTD.

By: [signature]
Name: JOEL S WEINSTEIN
Title: CFO - Sen VP

ABN AMRO BANK N.V.

By: [signature]
Name: Jeffrey SARFATY
Title: VP

By: [signature]
Name: FREDERICK JENNINGS
Title: VP

# AMENDMENT TO CONSIGNMENT AGREEMENT

This Amendment (the "*Amendment*") to Consignment Agreement, dated as of November 6, 2003, between ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (the "*Consignee*"), and ABN AMRO BANK N.V. (the "*Consignor*").

## WITNESSETH:

WHEREAS, the Consignee and Consignor are parties to that certain Consignment Agreement, dated as of June 30, 2000 as amended (the "*Consignment Agreement*"); and

WHEREAS, the Consignee has requested that the Consignor agree to certain additional amendments of the Consignment Agreement; and

WHEREAS, the Consignor is willing to so amend the Consignment Agreement, subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound thereby, covenant and agree as follows:

1. *General*. All terms used herein which are not otherwise specifically defined herein shall have the same meaning herein as defined in the Consignment Agreement as further amended hereby.

2. *Definitions*. The present definition of "*Consignment Limit*" shall be deleted and there shall be inserted in its place the following:

> "*Consignment Limit*" shall mean the amount equal to (x) with respect to Consigned Precious Metal which is gold, the lesser of (1) 8,750 troy ounces of fine gold and (2) such Consigned Precious Metal with a Fair Market Value equal to $3,500,000 plus (y) with respect to Consigned Precious Metal which is silver, the lesser of (1) 320,000 ounces of silver and (2) such Consigned Precious Metal with a Fair Market Value equal to $1,700,000 minus (z) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note in excess of $1,100,000 outstanding under the Loan Agreement between Consignor and Consignee of even date herewith.

3. *No Default or Event of Default*. The Consignee hereby agrees that after giving effect to this Amendment, no Event of Default shall have occurred and be continuing under the Consignment Agreement as amended hereby.

4. *Effectiveness*. This Amendment shall become effective as of the date hereof when Consignor, Consignee and Mr. Erwin Pearl shall have signed a counterpart hereof. This Amendment may be executed in any number of counterparts and by the different parties hereto

on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Amendment and the rights and obligations of the parties hereunder shall be construed in accordance with and be governed by the law of the State of New York. Except as herein specifically amended, the Consignment Agreement shall be and remain in full force and effect and wherever reference is made in any note, document, letter or other communication to the Consignment Agreement, such reference shall, without more, be deemed to refer to the Consignment Agreement as amended hereby.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date above written.

ARMBRUST INTERNATIONAL LTD.

By: [signature]
Name: JOEL SWEINSTEIN
Title: SR VP, CFO

ABN AMRO BANK N.V.

By: [signature]
Name: JEFF SARFATY
Title: VP

By: [signature]
Name: FREDERICK G. JENNINGS
Title: VP

The undersigned hereby consents to the foregoing amendment and hereby reaffirms tits Unconditional and Continuing Guaranty dated December 17, 2002.

[signature]
Erwin Pearl

# AMENDMENT TO CONSIGNMENT AGREEMENT AND LOAN AGREEMENT AND AMENDMENT TO SECURITY AGREEMENT, GUARANTY AGREEMENT AND SUBORDINATION AND PLEDGE AGREEMENT

This Amendment to Consignment Agreement and Loan Agreement, and Amendment to Security Agreement, Guaranty Agreement and Subordination and Pledge Agreement (this *"Amendment"*), dated as of November 8, 2004, by and between ABN AMRO BANK N.V., a bank organized under the laws of The Netherlands and acting through its New York office currently located at 565 Fifth Avenue, New York, New York 10017 (the *"Bank"* or *"Consignor"*) and ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation with its principal office at 735 Allens Avenue, Providence, Rhode Island 02905 (the *"Company"* or *"Consignee"*).

## WITNESSETH THAT:

WHEREAS, (i) the Company and the Bank are currently party to the following: (A) that certain Consignment Agreement dated as of June 30, 2000, as amended by Amendment to Consignment Agreement dated November 6, 2003 (together with all of its appendices, exhibits, schedules and attachments thereto, the *"Consignment Agreement"*); (B) that certain Loan Agreement dated as of June 30, 2000, as amended by Amendment to Facility Letter and Loan Agreement dated December 17, 2002 (together with all of its appendices, exhibits, schedules and attachments thereto, the *"Loan Agreement"*); and (C) that certain Security Agreement dated as of June 30, 2000; (ii) Erwin Pearl has delivered that certain Guaranty Agreement dated as of December 17, 2002 (the *"Guaranty Agreement"*); and (iii) Company and Erwin Pearl are currently party to that certain Subordination and Pledge Agreement dated as of June 30, 2000 (the *"Subordination and Pledge Agreement"*) (the Consignment Agreement, the Loan Agreement, the Guaranty Agreements and the Subordination and Pledge Agreement being hereinafter referred to collectively as the *"Agreements"*);

WHEREAS, unless otherwise defined herein or the context otherwise requires, all terms and phrases which are defined in each of the Agreements shall have the same meaning when used herein as that which is ascribed to them in such Agreement; and

WHEREAS, the Company and the Bank desire to amend each Agreement as herein provided;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Consignee and ABN AMRO hereby agree as follows:

1. Upon the satisfaction of the pre-conditions set forth in Section 6 and effective as of the date hereof (the *"Effective Date"*), the Agreements shall each be amended and hereby are amended as follows:

   (a) Section 1 of the Consignment Agreement is hereby amended by amending and restating the following definitions appearing therein to read as follows:

*"Borrowing Base"* shall mean the sum of (1) with respect to Precious Metal that is gold, ninety percent (90%) of the Fair Market Value of such Precious metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor, not to exceed 2,000 ounces as to (b), plus (2) with respect to Precious Metal that is silver, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor, not to exceed 45,000 ounces as to (b).

*"Consignment Limit"* shall mean, with respect to Consigned Precious Metal which is gold, the amount equal to the lesser of: (1) such Consigned Precious Metal with a Fair Market Value equal to $7,500,000 and (2) the Gold Borrowing Base minus the sum of (x) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note outstanding under the Loan Agreement between Consignor and Consignee of even date herewith and (y) the Fair Market Value of all Consigned Precious Metal which is Silver. "Consignment Limit" shall mean, with respect to Consigned Precious Metal which is silver, the amount equal to the lesser of: (1) such Consigned Precious Metal with a Fair Market Value equal to $7,500,000 and (2) the Silver Borrowing Base, minus the sum of (x) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note outstanding under the aforesaid Loan Agreement and (y) the Fair Market Value of all Consigned Precious Metal which is gold.

*"Daily Consignment Fee"* shall mean either the floating consignment fee or fixed consignment fee as set forth in Section 5.

*"Principal Office"* shall mean:

For Consignor:

ABN AMRO Bank N.V.
New York Branch
565 Fifth Avenue
New York, New York 10017
Attention: Mr. Jeff Sarfaty, Vice President
Fax: (212) 649-5149

(b) Section 5 of the Consignment Agreement is hereby amended by deleting the last paragraph thereof and inserting the following paragraph:

"In addition to all payments required above, Consignee agrees to pay to Consignor a Daily Consignment Fee for Consignor's services under this Agreement during the preceding month on the tenth (10th) Business Day of each calendar month and Consignee expressly authorizes Consignor to charge Consignee's account with Consignor for the amount thereof. The Company may elect to pay either a floating consignment fee or, *provided* that no Event of Default has occurred and is then continuing, a fixed consignment fee with respect to each consignment of Precious Metal under the Consignment Facility, subject to the terms and conditions hereinafter set forth. Upon the occurrence and during the continuance of an Event of Default, all Consignments shall automatically convert to a floating consignment fee at the end of the applicable consignment period. A floating consignment fee shall mean, for each day, the fee mutually agreed on by Consignor and Consignee for that day. A fixed consignment fee for Deliveries of Precious Metal having a Maturity Date (as defined in Section 6) of more than one day, shall be the rate equal to the sum of (i) two and one-half percent (2.5%) and (ii) the cost to the Bank of funding the delivery of such specific amount of Precious Metal for the relevant period as determined pursuant to Appendix I hereto. Once the Company has selected the specific quantity and type of Precious Metal and the specific Maturity Date, such selection shall be irrevocable and binding on the Company and shall obligate the Company to accept the consignment requested in the amount and for the Maturity Date selected. The Consignee shall compensate the Consignor for any loss, cost or expense caused by the failure of the Company to accept delivery of any requested Precious Metal consignment or by any redelivery or purchase by the Consignee of Precious Metal prior to a specific Maturity Date."

(c) Section 11(m) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

"(m) Maintain, at all times, Net Working Capital in an amount not less than $3,000,000;"

(d) Section 11(n) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

"(n) Maintain, at all times, minimum Capitalization (being the sum of Tangible Net Worth plus Subordinated Indebtedness) in an amount not less than $4,000,000; and"

(e) Section 12(m) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

> "(m) Allow Precious Metal which is silver located at refiners, fabricators or contractors domiciled in the United States of America to exceed forty-five thousand(45,000) ounces."

(f) Section 15(a)(i) of the Consignment Agreement is hereby amended by deleting the present wording of clause (A) and inserting in its place the following:

> "(A) Thomas Baker, Chief Executive Officer, 735 Allens Avenue, Providence, Rhode Island 02905; Telecopy: 401-784-9107."

(g) The second paragraph of the Loan Agreement is hereby amended by adding the following language at the end thereof:

> "The Company may, as to any advance, request that interest thereon be based upon Adjusted LIBOR plus the applicable margin of 2.50%.. In such event, the Company shall give the Bank not less than three Business Days' prior written or facsimile notice (which shall be irrevocable once given) of such requested advance and shall be in a minimum amount of $500,000 or such greater amount which is an integral multiple of $100,000. The Company shall also specify the LIBOR Interest Period relating to such Advance.
>
> Subject to all of the terms and conditions hereof, portions of the principal indebtedness evidenced by the Revolving Note (all of the indebtedness evidenced by the Revolving Note bearing interest at the same rate for the same period of time being hereinafter referred to as a *"Portion"*) may, at the option of the Company, bear interest with reference to the Domestic Rate (the *"Domestic Rate Portion"*) or with reference to Adjusted LIBOR (*"LIBOR Portion"*) and Portions may be converted from time to time from one basis to the other. All of the indebtedness evidenced by the Revolving Note which is not part of a LIBOR Portion shall constitute a single Domestic Rate Portion. All of the indebtedness evidenced by the Revolving Note which bears interest with reference to a particular Adjusted LIBOR for a particular Interest Period shall constitute a single LIBOR Portion. Anything contained herein to the contrary notwithstanding, the obligation of the Bank to create, continue or effect by conversion any LIBOR Portion shall be conditioned upon the fact that at the time no Default or Event of Default shall have occurred and be continuing. The Company hereby promises to pay interest on each Portion at the rates and times specified hereunder.

The Domestic Rate Portion of each Note shall bear interest at the rate per annum equal to the Domestic Rate as in effect from time to time, *provided* that if the Domestic Rate Portion or any part thereof is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto from time to time. Interest on the Domestic Rate Portion shall be payable monthly in arrears on the last day of each month in each year and at maturity of the Revolving Note and interest after maturity (whether by lapse of time, acceleration or otherwise) shall be due and payable upon demand. Any change in the interest rate on the Domestic Rate Portion of each Note resulting from a change in the Domestic Rate shall be effective on the date of the relevant change in the Domestic Rate.

Each LIBOR Portion shall bear interest for each Interest Period selected therefor at a rate per annum determined by adding 2.5% to the Adjusted LIBOR for such Interest Period, provided that if any LIBOR Portion is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof through the end of the Interest Period then applicable thereto at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto, and effective at the end of such Interest Period such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion and shall thereafter bear interest at the interest rate applicable to the Domestic Rate Portion after default. Interest on each LIBOR Portion shall be due and payable on the last day of each Interest Period applicable thereto and, with respect to any Interest Period applicable to a LIBOR Portion in excess of 3 months, on the date occurring every 3 months after the date such Interest Period began and at the end of such Interest Period, and interest after maturity (whether by lapse of time, acceleration or otherwise) shall be due and payable upon demand. The Company shall notify the Bank on or before 11:00 a.m. (New York time) on the third Business Day preceding the end of an Interest Period applicable to a LIBOR Portion whether such LIBOR Portion is to continue as a LIBOR Portion, in which event the Company shall notify the Bank of the new Interest Period selected therefor, and in the event the Company shall fail to so notify the Bank, such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion as of and on the last day of such Interest Period.

Each Domestic Rate Portion shall be in an amount equal to $50,000. Each LIBOR Portion shall be in an amount equal to $500,000 or such greater amount which is an integral multiple of $100,000.

The Company shall notify the Bank in writing (via facsimile or otherwise), followed by telephone confirmation by the Company of such notice by (i) no later than 1:30 p.m. (New York time) on the date upon which the Company requests that any Domestic Rate Portion be created and (ii) by no later than 11:00 a.m. (New York time) at least 3 Business Days prior to the date upon which the Company requests that any LIBOR Portion be created or that any part of the Domestic Rate Portion be converted into a LIBOR Portion. If any request is made to convert a LIBOR Portion into another type of Portion available hereunder, such conversion shall only be made so as to become effective as of the last day of the Interest Period applicable thereto. All requests for the creation, continuance and conversion of Portions under this Agreement shall be irrevocable.

The proceeds of borrowings hereunder will be made available to the Company at the Bank's offices in New York City by transferring such proceeds to such account of the Company in the United States as the Company may specify at time of borrowing on the same business day, if the Bank receives your borrowing request by (i) in the case of Domestic Rate Portions, 1:30 p.m., New York City time and (ii) in the case of LIBOR Portions, 11:00 a.m., New York City time, at least 3 Business Days upon which you request a LIBOR Portion hereunder. The proceeds of own note borrowings hereunder will be made available to the Company on the (i) business day following the requested borrowing date, if the Bank shall receive your borrowing request after 1:30 p.m., New York City time and no later than 4:00 p.m. New York City time and (ii) in the case of LIBOR Portions, the 4th Business Day following the date of your borrowing request, if the Bank shall receive your borrowing request after 11:00 a.m., New York City time, and no later than 4:00 p.m. New York City time.

Notwithstanding any other provisions of this Agreement or the Revolving Note, if at any time the Bank shall determine that any change in applicable laws, treaties or regulations or in the interpretation thereof makes it unlawful for the Bank to create or continue to maintain any LIBOR Portion, it shall promptly so notify the Company and the obligation of the Bank to create, continue or maintain any such LIBOR Portion under this Agreement shall terminate until it is no longer unlawful for the Bank to create, continue or maintain such LIBOR Portion. The Company, on

demand, shall, if the continued maintenance of any such LIBOR Portion is unlawful, thereupon prepay the outstanding principal amount of the affected LIBOR Portion, together with all interest accrued thereon and all other amounts payable to the Bank with respect thereto under this Agreement; *provided, however*, that the Company may elect to convert the principal amount of the affected Portion into another type of Portion available hereunder, subject to the terms and conditions of this Agreement.

Notwithstanding any other provision of this Agreement or the Revolving Note, if prior to the commencement of any Interest Period, the Bank shall determine that deposits in the amount of any LIBOR Portion scheduled to be outstanding during such Interest Period are not readily available to the Bank in the relevant market or, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining Adjusted LIBOR, then the Bank shall promptly give notice thereof to the Company and the obligations of the Bank to create, continue or effect by conversion any such LIBOR Portion in such amount and for such Interest Period shall terminate until deposits in such amount and for the Interest Period selected by the Company shall again be readily available in the relevant market and adequate and reasonable means exist for ascertaining Adjusted LIBOR.

With respect to any LIBOR Portion, if the Bank shall determine that any change in any applicable law, treaty, regulation or guideline (including, without limitation, Regulation D of the Board of Governors of the Federal Reserve System) or any new law, treaty, regulation or guideline, or any interpretation of any of the foregoing by any governmental authority charged with the administration thereof or any central bank or other fiscal, monetary or other authority having jurisdiction over the Bank or its lending branch (whether or not having the force of law), shall:

(i) impose, increase, or deem applicable any reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds or disbursements by, the Bank which is not in any instance already accounted for in computing the interest rate applicable to such LIBOR Portion;

(ii) subject the Bank, any LIBOR Portion or the Revolving Note, to the extent it evidences such a LIBOR Portion, to any tax (including, without limitation, any United States interest equalization tax or similar tax however named applicable to the acquisition or holding of debt obligations and any interest or

penalties with respect thereto), duty, charge, stamp tax, fee, deduction or withholding in respect of this Agreement, any LIBOR Portion or the Revolving Note to the extent it evidences such a LIBOR Portion, except such taxes as may be measured by the overall net income or gross receipts of the Bank or its lending branches and imposed by the jurisdiction, or any political subdivision or taxing authority thereof, in which the Bank's principal executive office or its lending branch is located;

(iii) change the basis of taxation of payments of principal and interest due from the Company to the Bank hereunder or under the Revolving Note to the extent it evidences any LIBOR Portion (other than by a change in taxation of the overall net income or gross receipts of the Bank); or

(iv) impose on the Bank any penalty with respect to the foregoing or any other condition regarding this Agreement, any LIBOR Portion, or its disbursement, or the Revolving Note to the extent it evidences any LIBOR Portion;

and the Bank shall determine that the result of any of the foregoing is to increase the cost (whether by incurring a cost or adding to a cost) to the Bank of creating or maintaining any LIBOR Portion hereunder or to reduce the amount of principal or interest received or receivable by the Bank (without benefit of, or credit for, any prorations, exemption, credits or other offsets available under any such laws, treaties, regulations, guidelines or interpretations thereof), then the Company shall either (i) pay on demand to the Bank from time to time as specified by the Bank such additional amounts as the Bank shall reasonably determine are sufficient to compensate and indemnify it for such increased cost or reduced amount or (ii) prepay the outstanding principal amount of the affected LIBOR Portion, together with all interest accrued thereon and all other amounts payable to the Bank with respect thereto under this Agreement; *provided, however*, that the Company may elect to convert the principal amount of the affected Portion into another type of Portion available hereunder, subject to the terms of this Agreement. If the Bank makes such a claim for compensation, it shall provide to the Company a certificate setting forth the computation of the increased cost or reduced amount as a result of any event mentioned herein in reasonable detail.

In the event the Bank shall incur any loss, cost or expense (including, without limitation, any loss (including loss of profit), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired or contracted to be acquired by the Bank to

fund or maintain any LIBOR Portion or the relending or reinvesting of such deposits or other funds or amounts paid or prepaid to the Bank) as a result of:

(i) any payment of a LIBOR Portion on a date other than the last day of the then applicable Interest Period for any reason, whether before or after default, and whether or not such payment is required by any provisions of this Agreement; or

(ii) any failure by the Company to create, borrow, continue or effect by conversion a LIBOR Portion on the date specified in a notice given pursuant to this Agreement;

then upon the demand of the Bank, the Company shall pay to the Bank such amount as will reimburse the Bank for such loss, cost or expense. If the Bank requests such a reimbursement, it shall provide to the Company a certificate setting forth the computation of the loss, cost or expense giving rise to the request for reimbursement in reasonable detail and such certificate shall be conclusive if reasonably determined.

The Bank may, at its option, elect to make, fund or maintain Portions of the advances hereunder at such of its branches or offices as the Bank may from time to time elect.

Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Revolving Note in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if the Bank had actually funded and maintained each LIBOR Portion during each Interest Period applicable thereto through the purchase of deposits in the relevant LIBOR market in the amount of such LIBOR Portion, having a maturity corresponding to such Interest Period, and, bearing an interest rate equal to the LIBOR for such Interest Period.

For purposes hereof, the following terms shall have the meanings ascribed to them as follows:

*"Adjusted LIBOR"* means a rate per annum determined by the Bank in accordance with the following formula:

$$\text{Adjusted LIBOR} = \frac{\text{LIBOR}}{100\%\text{-Reserve Percentage}}$$

*"Reserve Percentage"* means the maximum rate of all reserve requirements from time to time imposed by the Board of Governors of the Federal Reserve System (or any successor) for the applicable Interest Period as of the first day of such Interest Period *"LIBOR"* means, for each Interest Period, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to such Interest Period, which appears on the Telerate Page 3750 as of 11:00 a.m. (London, England time) on the day two (2) Business Days before the commencement of such Interest Period. *"Telerate Page 3750"* means the display designated as *"Page 3750"* on the Telerate Service (or such other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits). Each determination of LIBOR made by the Bank shall be conclusive and binding absent manifest error.

*"Business Day"* means any day other than a Saturday or Sunday on which the Bank is not authorized or required to close in New York, New York and a day on which the Bank is also dealing in United States Dollar deposits in London, England.

*"Domestic Rate"* means the rate per annum from time to time announced by the Bank as its prime commercial rate for U.S. Dollar loans (any change in the interest rate on the Revolving Note resulting from a change in the Domestic Rate shall be and become effective as of and on the date of the relevant change in such Domestic Rate).

*"Interest Period"* means the period commencing on, as the case may be, the creation, continuation or conversion date with respect to a LIBOR Portion and ending 1, 2, 3 or 6 months thereafter as selected by the Company in its notice as provided herein; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day, unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) no Interest Period may extend beyond the final maturity date of the Revolving Note;

(iii) the interest rate to be applicable to each Portion for each Interest Period shall apply from and including the first day of such Interest Period to but excluding the last day thereof; and

(iv) no Interest Period may be selected if after giving effect thereto the Company will be unable to make a principal payment scheduled to be made during such Interest Period without paying part of a LIBOR Portion on a date other than the last day of the Interest Period applicable thereto.

For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding day in the next calendar month, *provided, however*, if an Interest Period begins on the last day of a month or if there is no numerically corresponding day in the month in which an Interest Period is to end, then such Interest Period shall end on the last Business Day of such month."

(h) The fourth paragraph of the Loan Agreement (prior to giving effect hereto) shall be amended by adding the following at the end thereof:

"Unless the Company otherwise directs, principal payments shall be first applied to the Domestic Rate Portion of the Revolving Note until payment in full thereof, with any balance applied to the LIBOR Portions of the Revolving Note in the order in which their Interest Periods expire."

(i) The first sentence of Section 2 of the Loan Agreement shall be amended and restated in its entirety to read as follows:

"The total borrowings at any one time outstanding under this facility shall in no event exceed (x) the lesser of (a) Seven Million Five Hundred Thousand ($7,500,000) and (b) the Borrowing Base, minus the Fair Market Value of all Consigned Precious Metal outstanding under the Consignment Agreement."

(j) Section 9 of the Loan Agreement shall be amended by (i) adding ", *Indemnities and Reimbursement*" to the section heading thereof and (ii) adding the following sentence at the end thereof:

"All indemnities and other provisions relative to reimbursement to the Bank of amounts sufficient to protect the yield of the Bank with respect to the advances shall survive the termination of this Agreement and the payment of the Revolving Note."

(k) Section 13 of the Loan Agreement shall be amended as to the address of the Bank as follows:

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017
Attention: Mr. Jeffery Sarfaty
Telecopy: 212-649-5149

and, in the case of the Company, there shall be deleted, the requirement of a copy to Tillinghast, Licht, etc. and replaced with the requirement of a copy to:

Thomas Baker, Chief Executive Officer
735 Allens Avenue
Providence, Rhode Island 02905
Telecopy: 401-784-9107

(l) Exhibit A, C, D and E to the Loan Agreement shall be amended and restated in its entirety to read as set forth on Exhibit A, C, D and E hereto and Exhibit B to the Loan Agreement shall be deleted in its entirety.

(m) The Bank hereby agrees that so long as the Company shall not be in default under the Agreements, notwithstanding the present wording of Section 3(b) of the Subordination and Pledge Agreement, and, notwithstanding any other Section of the Subordination Agreement, the Creditor may make up to $150,000 in principal payments of the Subordinated Indebtedness in the Company's fiscal year ending June 30, 2005.

2. By their execution hereof, each of the parties hereto agree that, as of the Effective Date, Section 1 and Section 3(c) of the Guaranty Agreement shall be amended by deleting the amount of "$5,000,000" and inserting in its place the amount of "$1,000,000."

3. The Company has heretofore executed and delivered to the Bank that certain Security Agreement dated as of June 30, 2000 (as the same may be amended, modified or supplemented, the *"Security Agreement"*) and the Company hereby acknowledges and agrees that, notwithstanding the execution and delivery of this Amendment, the Security Agreement remains in full force and effect and the rights and remedies of the Bank thereunder, the obligations of the Company thereunder and the liens and security interests created and provided for thereunder remain in full force and effect and shall not be affected, impaired or discharged hereby. Nothing herein contained shall in any manner affect or impair the priority of the liens and security interests created and provided for by the Security Agreement as to the indebtedness which would be secured thereby prior to giving effect to this Amendment.

4. Except as expressly amended hereby, the Agreements and all other documents executed in connection therewith shall remain in full force and effect. Each of the Agreements, as amended hereby, and all rights and powers created thereby and thereunder or under such other documents are in all respects ratified and confirmed. From and after the Effective Date, each of the

Agreements shall be deemed to be amended and modified as herein provided, but, except as so amended and modified, each of the Agreements shall continue in full force and effect and each of the Agreements and this Amendment shall be read, taken and construed as one and the same instrument. On and after the Effective Date, the term *"Agreement"* as used in each of the Agreements and all other references to such agreement therein shall mean such agreement as hereby amended.

5. On and as of the Effective Date, the Company represents and warrants to the Bank that:

(a) its representations and warranties contained in this Amendment and each of the Agreements are true and correct in all material respects, in each case as though made on and as of such date, except to the extent such representations and warranties relate solely to an earlier date (and then as of such earlier date); and

(b) both before and after giving effect to this Amendment, no Event of Default has occurred and is continuing or would result from the execution and delivery of this Amendment or any other document arising in connection with or pursuant to this Amendment; and

(c) the Company is, and will be, in full compliance with all of the material terms, conditions and all other provisions of this Amendment and each of the Agreements; and

(d) this Amendment has been duly authorized, executed and delivered on its behalf, and each of the Agreements, both before being amended and supplemented hereby and as amended and supplemented hereby, and this Amendment constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms, except to the extent that a remedy or default may be determined by a court of competent jurisdiction to constitute a penalty and except to the extent that enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights or by general principles of equity; and

(e) all of the pre-conditions set forth in Section 6 of this Amendment have been and remain satisfied.

6. Section 1 of this Amendment shall become effective on the Effective Date only once all of the pre-conditions set forth in this Section 6 shall have been satisfied:

(a) each of the representations and warranties set forth in Section 5 of this Amendment shall be and remain true, accurate, correct and complete as of the Effective Date, as though made on and as of the as Effective Date, except to the extent such representations and warranties relate solely to an earlier date (and then as of such earlier date); and

(b) ABN AMRO shall have received an executed promissory note of the Company in the form of Exhibit A hereto; and

(c) on the Effective Date, the Company shall be in full compliance with all of the terms and conditions of each of the Agreements and this Amendment; and

(d) on the Effective Date, all legal matters incident to the execution and delivery of this Amendment shall be satisfactory to the Bank.

7. The Company agrees promptly to pay or reimburse all reasonable fees and expenses of Chapman and Cutler LLP, legal counsel for the Bank, relating to the preparation, execution and delivery of this Amendment and any other documents referred to in this Amendment.

8. THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

9. This Amendment may be signed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10. Except as otherwise specified herein, this Amendment embodies the entire agreement and understanding between the Company and the Bank with respect to the subject matter hereof and supersedes all prior agreements, consents and understandings relating to such subject matter.

11. The headings in this Amendment have been inserted for convenience only and shall be given no substantive meaning or significance in construing the terms and provisions of this Amendment.

12. This Amendment shall be binding upon and inure to the benefit of each Consignor and its successors and assigns, the Bank and the Company and its permitted successors and assigns.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Company and the Bank have caused this Amendment to be duly executed as of the date first hereinabove written, effective, however, as herein provided.

ARMBRUST INTERNATIONAL LTD.

By: Thomas J. Baker

Its: CHIEF EXECUTIVE OFFICER

ABN AMRO BANK N.V.

By: [signature]

Its: VP

By: [signature]

Its: Vice President

The undersigned hereby consents to this Amendment and acknowledges that the Unconditional and Continuing Guaranty, as amended hereby, and Subordination and Pledge Agreement, as amended hereby, to which the undersigned is a party remains in full force and effect.

[signature]

Erwin Pearl

# EXHIBIT A

## REVOLVING NOTE

$7,500,000

New York, New York
November ___, 2004

ON the date ninety (90) days after notice from ABN AMRO Bank N.V. (the *"Bank"*) that payment is demanded hereunder for value received, the undersigned, ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (the *"Company"*), promises to pay to the order of the Bank at its New York office at 565 Fifth Avenue, New York, New York 10017 the principal sum of Seven Million Five Hundred Thousand Dollars ($7,500,000), or such lesser amount as may be advanced under the revolving credit facility by the Bank to the Company hereon pursuant to the Loan Agreement hereinafter identified.

The Company hereby promises to pay interest (computed on the basis of a year of 360 days for the actual number of days elapsed) on the principal amount from time to time remaining unpaid hereon from the date hereof until the maturity thereof at the rate per annum as provided in the Loan Agreement (as hereinafter defined) payable as provided in said Loan Agreement.

On demand, the Company promises to pay interest on any overdue principal hereof (whether by acceleration or otherwise), until paid at the rate per annum as provided in the Loan Agreement.

All loans made by the Bank hereof against this Note, and all payments made by the Company on account of the unpaid principal amount hereof, shall be recorded on the books and records of the holder hereof and endorsed hereon prior to any transfer hereof, and the Company agrees that in any action or proceeding instituted to collect or enforce collection of this Note, the amount shown as owing on this Note on the books and records of the holder hereof shall be deemed prima facie correct.

This Note is issued under the terms and provisions of a letter agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, by and between the Company and the holder hereof (the *"Loan Agreement"*), and this Note and the holder hereof are entitled to all of the benefits provided for by said Loan Agreement or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. This Note shall be immediately due and payable upon the occurrence of any Event of Default as provided in the Loan Agreement. This Note is secured by, among other things, that certain Security Agreement dated as of June 30, 2000 from the Company to the Bank. This Note and the holder hereof are entitled to all of the benefits and security provided for by or referred to in the Security Agreement, to which Security Agreement reference is hereby made for a statement thereof.

This Note shall be construed in accordance with, and governed by, the internal laws of the State of New York.

The Company hereby promises to pay all costs and expenses (including reasonable attorneys' fees) suffered or incurred by the holder hereof in collecting this Note or in enforcing any rights in any collateral therefor. The Company hereby waives presentment for payment and notice of dishonor.

ARMBRUST INTERNATIONAL LTD.

By ______________________________
Its ______________________________

# EXHIBIT B

[INTENTIONALLY DELETED]

**EXHIBIT C**

______________, 200_

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

Re: ADDITIONAL BORROWING UNDER REVOLVING CREDIT

Ladies and Gentlemen:

We refer to our Revolving Note dated November ___, 2004, payable to your order in the face principal sum of $7,500,000 (the *"Revolving Note"*). We hereby request a borrowing from you under our revolving credit in the amount of $______________, which borrowing shall be made against and evidenced by the Revolving Note. We promise to pay such borrowing in accordance with the Revolving Note or upon termination of the Loan Agreement or acceleration of the advance in accordance with the Loan Agreement.

In order to induce you to make the advance hereby requested, we hereby certify to you that as of the date hereof, each of our representations and warranties in Section 8 of the loan agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, currently in effect between us (the *"Loan Agreement"*) remains true and correct and we are in full compliance with all of the terms and conditions of the Loan Agreement.

We hereby certify that the proceeds of this borrowing will be used solely for general working capital purposes in our business as presently conducted in the ordinary course. Our records indicate that after giving effect to this borrowing, our total outstanding borrowings in respect of the Revolving Note are $______________.

ARMBRUST INTERNATIONAL LTD.

By ________________________________
Authorized Signature

**EXHIBIT D**

_____________, 200__

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

Re: ADDITIONAL BORROWING UNDER REVOLVING CREDIT

Ladies and Gentlemen:

_____________________________ of this company had a telephone conversation with your office today whereby we requested a borrowing from you under our revolving credit in the amount of $____________. In that connection, we refer to our Revolving Note dated November ___, 2004 payable to your order in the face principal sum of $7,500,000 (the *"Revolving Note"*). This letter will serve to confirm our aforesaid request for a borrowing from you under our revolving credit in said amount, which borrowing shall be made against and evidenced by the Note.

In order to induce your continued extension of the advance hereby confirmed, we hereby certify to you that as of the date hereof, each of our representations and warranties in Section 8 of the loan agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, currently in effect between us (the *"Loan Agreement"*) remains true and correct and we are in full compliance with all of the terms and conditions of the Loan Agreement.

We hereby certify that the proceeds of this borrowing will be used solely for general working capital purposes in our business as presently conducted in the ordinary course. Our records indicate that after giving effect to this borrowing, our total outstanding borrowings in respect of the Revolving Note are $_______________.

ARMBRUST INTERNATIONAL LTD.

By ___________________________________
Authorized Signature

# EXHIBIT E

## BORROWING BASE CERTIFICATE

______________________________

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

This Certificate is delivered pursuant to the Loan Agreement (the *"Loan Agreement"*) dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, between Armbrust International Ltd. (the *"Borrower"*) and ABN AMRO Bank, N.V. (the *"Bank"*). Unless otherwise defined herein, terms used herein have the meaning provided in the Loan Agreement.

The Borrower hereby certifies and warrants that as of _____________, 20__ (the *"Borrowing Base Calculation Date"*):

1. The gross outstanding amount of Eligible Accounts (net of all non-eligible accounts receivable) is $__________. Attached hereto is a detailed breakdown and aging of all non-eligible Accounts.

2. 85% of the amount designated in Item 1 above is $________________.

3. As of the Borrowing Base Calculation Date, the Borrowing Base is $________________.

4. The information contained in this Certificate (including the information upon which the foregoing calculations are based) is materially true and complete in all respects.

5. Except as disclosed in this Certificate, there has been no material adverse change in Eligible Accounts receivable since ________________, 20__.

6. As of the Borrowing Base Calculation Date, the aggregate outstanding principal amount of all loans from the Bank (and, after giving effect to the making of all loans being requested in conjunction with the delivery of such certificate) does not exceed the Borrowing Base.

7. To the best of our knowledge after due inquiry and in good faith, the calculations contained herein are based upon the book value, determined in accordance with generally accepted accounting principles of Eligible Accounts receivable.

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be executed and delivered, at the certification and warranties contained herein to be made, by its ____________________________ this ________ day of ____________, 20__.

ARMBRUST INTERNATIONAL LTD.

By ______________________________________
Chief Executive Officer/Corporate Comptroller

# APPENDIX I
# TO
# AMENDMENT TO
# CONSIGNMENT AGREEMENT AND LOAN AGREEMENT
# AND
# AMENDMENT TO SECURITY AGREEMENT, GUARANTY AGREEMENT AND SUBORDINATION AND PLEDGE AGREEMENT
# ARMBRUST INTERNATIONAL LTD.
# DATED NOVEMBER __, 2004

---

The *"Consignment Fixed Rate"* means, with respect to any Deliveries having a Maturity Date (the *"Interest Period"*) and so long as comparable market funding conditions applicable to the Bank permit, the rate per annum equal to the LIBFR Rate, plus two and one-half percent (2.50%). *"LIBFR"* means, with respect to any Interest Period and so long as comparable market funding conditions applicable to the Bank permit, the rate per annum equal to the greater of (i) LIBOR for such Interest Period minus the GOFO Rate, in the case of gold and minus the SIFO Rate, in the case of silver and (ii) zero. *"GOFO Rate"* means the mean rate per annum (rounded upward, if necessary, to the nearest 1/32 of one percent), for a period of time equal to the applicable Interest Period which appears on the Reuters GOFO page as at 11:00 a.m. local London time on the day that is two London banking days preceding the first day of such interest Period, or, if Reuter's gold screen is unavailable, as set by the Bank for gold forwards for such period. *"SIFO Rate"* means the rate per annum (rounded upward, if necessary, to the nearest 1/32 of one percent), for a period of time equal to the applicable Interest Period which appears on the Reuters SIFO page for the London Interbank silver forwards rate as of 11:00 a.m. local London time on the day that is two London banking days preceding the first day of such Interest Period, or, if Reuter's screen is unavailable, as set by the Bank for such period.