**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ARMBRUST INTERNATIONAL, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 08-00143-ML-LDA |
| | ) | |
| | ) | |
| ABN AMRO BANK N.V., | ) | |
| | ) | |
| Defendant. | ) | |

ABN AMRO BANK N.V.,

Defendant Third Party Plaintiff,

v.

ERWIN PEARL,

Third Party Defendant.

**THIRD PARTY COMPLAINT OF ABN AMRO BANK N.V.**

Defendant Third Party Plaintiff, ABN AMRO Bank N.V. (*"ABN"*) by and through its undersigned attorneys, for its Third Party Complaint against Third Party Defendant Erwin Pearl (*"Pearl"*) alleges as follows:

**PARTIES AND JURISDICTION**

1. ABN is a bank organized under the laws of The Netherlands with its headquarters located at Gustav Mahlerlan 10, Amsterdam, The Netherlands. ABN maintains a New York branch located at 55 East 52nd Street, New York, NY.

2. Defendant Pearl is, on information and belief, a citizen and resident of the State of New York, who is the chief executive officer of Armbrust International, Ltd. (*"Armbrust"*) and is the guarantor of the indebtedness of Armbrust to ABN.

3. Armbrust is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island. Armbrust is in the business of manufacturing and distributing precious metal and fashion chain and other jewelry products.

## NATURE OF ACTION AND JURISDICTION

4. This is a Third Party Action pursuant to Rule 14 of the Federal Rules of Civil Procedure on a guaranty of indebtedness executed by Pearl. Jurisdiction is founded upon 28 U.S.C. § 1332(2) since this is a civil action between a citizen of the State of New York and a citizen or subject of a Foreign State. This is a state law cause of action to enforce Third Party Defendant Pearl's personal guaranty of Armbrust's obligations to ABN in this matter, which is the subject of the Complaint and Counterclaim in the above matter. Jurisdiction is also proper under 28 U.S.C. § 1367(a) because Pearl's liability on the personal guaranty shares a common nucleus of operative facts with the underlying dispute in this matter and is part of this case or controversy. The matter and controversy, exclusive of interest and costs, exceeds the sum of $75,000.

## FACTS GIVING RISE TO THE CLAIM

5. On information and belief, in the spring of 2000, Armbrust was in financial distress and experiencing difficulties working with its current lender. On information and belief, the loan to Armbrust was classified as problematic and placed within the jurisdiction of the work-out group for troubled loans with its then lender. On or about the time, Armbrust approached ABN regarding the possibility of transferring the financing of its business to ABN.

6. In the year 2000 and at all times relevant, ABN was a leading international provider of integrated credit facilities providing both dollar loans and precious metal consignment facilities to the jewelry industry.

7. In 2000, Armbrust expressed its belief to ABN that the innovative financing and understanding of the jewelry industry being provided by the International Diamond and Jewelry Group of ABN could assist Armbrust in righting its financial ship.

8. ABN was willing to explore a lending relationship with Armbrust but, as a condition of extending a credit facility to Armbrust, ABN insisted upon documentation acceptable to ABN and, in light of the financial position of Armbrust, ABN required the personal guaranty of Armbrust's principal shareholder and CEO, Pearl.

## THE CONSIGNMENT AGREEMENT

9. Armbrust's financial arrangement with ABN included a revolving credit facility and consignment arrangement documented by a facility letter, consignment agreement (the "Consignment Agreement") and loan agreement (the "Agreements"). A true and correct copy of the Consignment Agreement with all its Exhibits and amendments, is attached here as *Exhibit 1* and is incorporated herein. The Consignment Agreement governed the consignment of precious metals by ABN with Armbrust.

10. Under a consignment arrangement, the consignor of a precious metal retains ownership of the metal but delivers, or has its representative deliver, the metal to the consignee. The consignee is permitted to use the consigned metal in its ordinary course of business, but the consignee does not take title to the consigned metal. As consideration for use of the metal and the time value of the metal, the consignee will pay to the consignor a fee. The precise fee is fixed in the consignment agreement, either with a fixed rate or by reference to an index rate. At the expiration of the consignment period for the precious metal or at the expiration of the

consignment agreement itself, the consignee must either return the precious metal to the consignor or buy the precious metal from the consignor. The Consignment Agreement reflected such a relationship.

**THE GUARANTY**

11. Because the Consignment Agreement allowed Armbrust to utilize consigned metal owned by ABN, and because of the financial condition f Armbrust, ABN required security over and above that which Armbrust alone could provide. Accordingly, ABN insisted that the obligations of Armbrust under the Agreements be guaranteed by Pearl. At the time of the execution of the Consignment Agreement in 2000, Pearl's Guaranty in the amount of $3.5 million was required and obtained. In 2002, the amount of the Guaranty was increased to $5 million. Although the amount of this Guaranty was amended in 2004 to the reduced amount of one million dollars reflecting the then improved financial performance or Armbrust, the Guaranty obtained in 2002 has never been released and remains in full force and effect. Pearl was the CEO and principal shareholder of Armbrust. Accordingly, he benefited from ABN's extending credit to Armbrust and the Guaranty was supported by adequate consideration. A true and correct copy of the Guaranty with all the amendments thereto is attached as *Exhibit 2* and is incorporated herein.

12. The Guaranty given by Pearl in 2002 covered the obligations of Armbrust under the Agreements. Among other things, the Guaranty recited that, up to the agreed upon amount, it was unconditional, irrespective of the legality, validity or enforceability of the obligations under the Agreements. Further, Section 3(b)(v) provided that the Bank could "settle or compromise any or all of the obligations with the Borrower, and/or any other person or persons liable thereon and/or subordinate the payment of same or any part thereof to the payment of any other debts or claims which at any time may be due or owing to the Bank and/or other person; all in such

manner and upon such terms as Bank may see fit and without notice to or consent from Guarantor who hereby agrees to be and remain bound upon this Guaranty irrespective of the effect upon the existence or status of the obligations or the collateral security and notwithstanding any such change, alternation, renewal, continuance, extension, acceleration, sale, exchange, release, compromise, surrender, application, subordination or any other action here and above mentioned." The Guaranty provided that it included the attorneys fees expended by the Bank in collecting on the Guaranty.

## THE 15,000 OUNCES OF SILVER

13. On March 17, 2004, Karl Kunzmann, of Armbrust requested a silver transfer from ABN pursuant to the Consignment Agreement in the amount of 15,000 Fine Troy Ounces of silver. A copy of the request is attached as *Exhibit 3* and is incorporated herein.

14. On March 18, 2004, ABN confirmed to Armbrust that the 15,000 Fine Troy Ounces of silver would be transferred to Sovereign Bank for the account of Stern Leach. Stern Leach acted as the receiving agent for the delivery of silver to Armbrust. A copy of the confirmation of the transfer by ABN to Armbrust is attached as *Exhibit 4* and is incorporated herein.

15. On March 18, 2004, ABN confirmed to Sovereign Bank New England that it would transfer 15,000 ounces of silver for the account of Stern Leach to J. P. Morgan Chase Bank London. A copy of the confirmation is attached as *Exhibit 5* and is incorporated herein.

16. Stern Leach confirmed to Armbrust that it received the March 19, 2004 silver transfer. A copy of the confirmation is attached as *Exhibit 6* and is incorporated herein. Although this silver transfer was made by ABN to Armbrust, through a clerical error, the transfer was not booked internally by ABN. As a result, the electronic records of the aggregate outstanding amount of Fine Troy Ounces of silver on consignment by ABN to and owed by

Armbrust on an ongoing revolving basis neglected to capture the 15,000 Fine Troy Ounces of silver in question.

ARMBRUST LEAVES ABN

17. On information and belief, in late 2005, Armbrust had the opportunity with another financial institution to obtain alternative financing that would not require the personal guaranty of Pearl. Accordingly, Armbrust informed ABN that it wished to terminate its banking relationship with ABN in favor of another institution and requested a statement of the amount then due to satisfy Armbrust's obligations to ABN. The Bank generated a statement of the amount necessary to repay the indebtedness of Armbrust to ABN and quoted an "Estimated Total Payoff Amount", a true and correct copy of which is attached as *Exhibit 7* and incorporated herein, but, because of the inadvertent omission of the 15,000 Fine Troy Ounces of silver from the electronic records of ABN, the Total Estimated Payoff Amount provided by ABN understated the silver on consignment with Armbrust and the amount due. The Total Estimated Payoff Amount was based upon the mistaken assumption by both ABN and Armbrust that the records of ABN included all the silver consigned to Armbrust by ABN. Accordingly, the Total Estimated Payoff Amount did not reflect all of Armbrust's obligations under its Agreements with ABN. Had ABN entered the March 19, 2004 silver transfer into its ledger for consigned silver, such entry would have resulted in an increase in the aggregate amount outstanding under the Consignment Agreement and an increase in the Total Estimated Payoff Amount.

**ARMBRUST FAILS TO PAY ABN FOR 15,000 OUNCES OF SILVER**

18. In September of 2006, upon reconciliation of the silver account, ABN's Precious Metals Group in Amsterdam located the discrepancy of the 15,000 ounces of silver. By letter dated September 22, 2006 and telephone conversation of that date, ABN informed Armbrust of the understatement of the Total Estimated Payoff Amount and provided Armbrust with the documentation for the delivery of the silver. A copy of the letter from ABN to Armbrust is attached as *Exhibit 8* and incorporated herein.

19. Since that time, despite repeated requests, Armbrust has failed and refused to satisfy it obligation under the Consignment Agreement to pay for the 15,000 ounces of silver. A copy of the formal demand letter from counsel to ABN to Armbrust dated December 28, 2007 is attached *Exhibit 9* and is incorporated herein. In addition to receiving the 15,000 Fine Troy Ounces of silver for which Armbrust has not paid, Armbrust has enjoyed the benefit of a rising silver market and therefore has been unjustly enriched in the amount of the increased value of the silver.

20. Armbrust has failed to comply with its Obligations under the Consignment Agreement to pay for the 15,000 ounces of silver. Moreover, because Armbrust has been enriched by the 15,000 ounces of silver for which it has not paid ABN, in equity Armbrust is required to make restitution to ABN. However, despite demand for such payment, Armbrust has failed to do so.

**PEARL IS LIABLE ON THE GUARANTY**

21. Under the terms of the unconditional and continuing Guaranty, Pearl has guaranteed the performance of all the Obligations of Armbrust to ABN, of every kind and nature whatsoever, up to the aggregate amount of $1 million. This liability under the Guaranty is unconditional irrespective of the legality, validity or enforceability of the Obligations and any

settlement or compromise of the Obligations owed to Armbrust. The terms of the Guaranty expressly waive notice of dishonor, notice of non-payment, demand and conditions enumerated therein.

22. The Guaranty remains in full force and effect and has never been terminated by Pearl.

23. Pearl is aware of the failure and refusal of Armbrust to pay for the 15,000 ounces of silver and, on information and belief, has urged Armbrust to resist its Obligations to make payment to ABN.

24. Neither Armbrust nor Pearl has paid the Obligations owed to ABN for the 15,000 ounces of silver.

25. There is now due and payable by Pearl to ABN by reason of the Guaranty the sum of at least $244,650, plus consignment fee, interest and costs (including attorneys fees) no part of which has been paid.

WHEREFORE, ABN requests judgment against Pearl for:

1. damages in the amount of at least $244,650,
2. legal interest,
3. fees (including consignment and attorneys fees) and costs of this suit, and
4. such other and further relief as the Court deems just and proper.

/s/ Staci L. Kolb
Joseph V. Cavanagh, Jr. (#1139)
Staci L. Kolb (#5451)
BLISH & CAVANAGH LLP
30 Exchange Terrace
Providence, RI 02903
Tel: (401) 831-8900
Fax: (401) 751-7542

Of counsel:
Chapman and Cutler LLP
James E. Spiotto
Ann Acker
David Schrodt
111 West Monroe Street
Chicago, Illinois 60603

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June, 2008, an exact copy of the within document was electronically submitted to the Electronic Case Filing System of the United States District Court for its electronic distribution to all counsel of record as follows:

Steven E. Snow, Esq.
ses@psh.com

/s/ Staci L. Kolb
of Blish & Cavanagh LLP