# EXHIBIT 2

# UNCONDITIONAL AND CONTINUING GUARANTY

WHEREAS, the undersigned, ERWIN PEARL, an individual who resides at the address set forth below (*"Guarantor"*), seeks to induce ABN AMRO BANK N.V., a bank organized under the laws of The Netherlands acting through its New York Branch, with its main office at 500 Park Avenue, New York, New York 10022 (*"Bank"*), to extend or continue to extend credit and/or consign or continue to consign precious metals to ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (*"Borrower"*); and

WHEREAS, the execution and delivery by Guarantor of this Unconditional and Continuing Guaranty (the *"Guaranty"*) is a condition precedent to the obligation of Bank to extend or continue to extend credit and/or consign or continue to consign precious metals to the Borrower; and

WHEREAS, Guarantor will derive substantial benefits from such extensions of credit and/or consignments to the Borrower;

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt of which is hereby acknowledged, Guarantor hereby represents and agrees as follows:

1. *Guaranty.* Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Bank the full and prompt performance by Borrower of all of its covenants and obligations under a certain Facility Letter, Consignment Agreement and a certain Loan Agreement each between Bank and Borrower and of even date herewith, and the related Security Agreement, all as amended or modified from time to time (collectively, the *"Agreements"*), and the punctual and full payment and performance when due, whether at the stated date or dates for such payment, by acceleration or otherwise, of all indebtedness, liabilities and obligations of the Borrower to Bank thereunder, of every kind and nature whatsoever, whether absolute or contingent, now existing or hereafter arising, secured or unsecured, and whether on open account, or evidenced by a promissory note, check, draft or any other instrument or document related thereto, and including, without limitation, all principal, interest, premiums, fees, cost and expense reimbursements, letter of credit reimbursement obligations, acceptance fees and commissions and all other obligations assumed under the documentation of such indebtedness, liabilities and obligations (all of the foregoing are hereinafter sometimes referred to as the *"Obligations"*). Notwithstanding anything contained herein to the contrary, the Bank's right of recovery against the Guarantor for payment of the Obligations and any expenses in connection with the Obligations shall not exceed the aggregate amount of $3,500,000.

2. *Payment by Guarantor; Set-Off.* In the event of the occurrence of any Event of Default (as defined therein) under the Agreements or a default by Borrower under any of the Obligations and/or the failure of Borrower punctually to pay or perform any of the Obligations when due, Guarantor hereby agrees to make such payment and/or

performance punctually when and as the same shall become due and payable, whether at maturity, by acceleration or otherwise. Each such payment shall be made at the main New York office of Bank (or at such other office as Bank shall specify by written notice to Guarantor), in immediately available and freely transferable funds. While this Guaranty is in effect, all accounts, deposits and property of Guarantor on deposit with or otherwise in the hands of Bank are hereby and shall continue to be and stand pledged and impressed with a lien as collateral security for all Obligations, and Bank shall have the same right of set-off with respect to deposits and credits in favor of Guarantor as it has with respect to deposits and credits of Borrower.

3. *Obligation of Guarantor Unconditional.* Guarantor hereby agrees that:

(a) Its liability hereunder is unconditional, irrespective of:

(i) the legality, validity or enforceability of the Obligations;

(ii) the legality, validity or enforceability of any security interest, mortgage or pledge granted by Borrower as collateral for the Obligations, any guarantee, suretyship, letter of credit or reimbursement agreement issued by any person secondarily or otherwise liable for any of the Obligations, any security interest, mortgage, or pledge granted by any person secondarily or otherwise liable for any of the Obligations, any right of set-off against any deposit account or credit on the Bank's books in favor of Borrower or any person secondarily or otherwise liable for any of the Obligations, or any other device providing collateral security for payment of any of the Obligations, all of the hereinabove referenced devices being referred to herein as the *"Collateral Security"*;

(iii) the absence of any action or effort by Bank to either resort to, enforce or exhaust its remedies under or against the Obligations and/or the Collateral Security;

(iv) the waiver or consent by Bank with respect to any provision in the documentation of the Obligations or the Collateral Security;

(v) the recovery of any judgment against Borrower or any action to enforce such judgment or any other circumstance which might, absent the unconditional nature of this Guaranty, constitute a legal or equitable discharge or defense of Guarantor; or

(vi) the amount of the Obligations of the Borrower exceeding the limit on the Bank's right of recovery hereunder.

(b) Bank may at any time, or from time to time as permitted by the Agreements, but otherwise in Bank's sole discretion:

(i) change, alter, renew, continue, extend and/or accelerate the time of payment of, all or any of the Obligations, or any part or parts thereof or any renewal or renewals thereof;

(ii) replace any existing Obligation and the documentation therefor with an amended and restated Obligation and the documentation therefor;

(iii) sell, exchange, release, compromise and/or surrender all or any of the property which is the subject of the Collateral Security (the "*Collateral*"), or any part or parts thereof, with respect to which Bank may now or hereafter have an interest;

(iv) sell and/or purchase any or all of the Collateral at public or private sale, or at any broker's board, and after deducting all costs and expenses of every kind for collection, sale and/or delivery, apply the proceeds of any such sale or sales against any of the Obligations; or

(v) settle or compromise any or all of the Obligations with the Borrower, and/or any other person or persons liable thereon, and/or subordinate the payment of same or any part thereof to the payment of any other debts or claims which may at any time be due or owing to Bank and/or other person; all in such manner and upon such terms as Bank may see fit and without notice to or consent from Guarantor, who hereby agrees to be and remain bound upon this Guaranty, irrespective of the effect upon the existence or status of the Obligations or the Collateral Security and notwithstanding any such change, alteration, renewal, continuance, extension, acceleration, sale, exchange, release, compromise, surrender, application, settlement, subordination or any other action hereinabove mentioned.

(c) The liability of Guarantor will not be discharged except by (i) complete and final payment and performance of the Obligations by the Borrower or (ii) complete and final payment by the Guarantor of $3,500,000 to the Bank hereunder.

(d) Subject to the limit on the Bank's right of recovery hereunder, the liability of Guarantor under this Guaranty shall be reinstated with respect to any amount paid to Bank by Borrower which is thereafter required to be returned to Borrower or any trustee, receiver or other representative of or for Borrower, upon or by reason of the bankruptcy, insolvency, reorganization, or dissolution of Borrower, or for any other reason, all as though such amount had never been paid by Borrower.

(e) This is a guarantee of payment and not merely of collection.

4. *No Subrogation.* The Guarantor will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to the Guarantor against any person liable for payment of the Obligations, or as to any security therefor, unless and until the full amount owing to Bank on the Obligations has been paid and the payment by the Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the Guarantor to any right, title or interest (whether by way of subrogation or otherwise) in and to any of the Obligations or any proceeds thereof or any security therefor unless and until the full amount owing to the Bank on the Obligations has been paid.

5. *Waivers.* Guarantor hereby expressly waives:

(a) notice of the acceptance of this Guaranty;

(b) notice of extensions of credit by Bank to Borrower under the Agreements and of any change in the rate at which any of the Obligations are accruing interest or fees;

(c) diligence, presentment and demand for payment of any of the Obligations;

(d) protest, notice of protest, notice of dishonor and notice of nonpayment or default to Guarantor or to any other person with respect to the Obligations;

(e) filings of claims or proof of claims with a court in the event of any bankruptcy or insolvency proceedings as to which Borrower or any person secondarily or otherwise liable for any of the Obligations is subject;

(f) any right to require a proceeding first against Borrower or any other person;

(g) any demand for payment under this Guaranty;

(h) any defenses available to a surety under law; and

(i) all other legally waivable notices to which Guarantor might otherwise be entitled.

6. *Insolvency of Borrower.* Upon the occurrence of any Event of Default set forth in Section 13(f) of the Consignment Agreement as to Borrower, all Obligations of Borrower shall, for the purpose of this Guaranty, become immediately due and payable.

7. *Financial Condition.* Guarantor covenants and agrees with Bank that, during such time as this Guaranty is in effect Guarantor will not sell, mortgage, pledge or otherwise convey or transfer any substantial or material portion of its real or personal property without fair consideration. In the event of any material breach of said covenants

and agreements, each of the Obligations, regardless of its terms, shall, at Bank's election, be deemed for the purposes of this Guaranty to have matured, and at Bank's election, subject to the terms hereof, Guarantor shall promptly pay to Bank all of said outstanding Obligations and Bank may take any action it deems necessary or advisable to enforce this Guaranty.

8. *Termination of Guaranty.* This Guaranty is a continuing Guaranty and shall remain in full force and effect irrespective of any interruptions in the business relations of Borrower with Bank; provided, however, that Guarantor may, by notice in writing actually received and acknowledged by an officer of Bank, terminate this Guaranty with respect to all new Obligations incurred or contracted by Borrower or acquired by Bank after the date on which such notice is so received, but this Guaranty shall remain in full force and effect as to all Obligations existing or committed to be extended at the date of receipt of such notice and to all renewals and extensions thereof until the full payment thereof and all interest and fees thereon to Bank.

9. *Consent to Jurisdiction; Waiver of Jury.* Guarantor and the Bank hereby submit to the jurisdiction of the courts of the State of New York for New York County and the United States District Court for the Southern District of New York, as well as to the jurisdiction of all courts to which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of any of Guarantor's obligations under or with respect to this Guaranty, and expressly waives any and all objections it may have as to venue in any of such courts. GUARANTOR AND THE BANK EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ON ANY MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this instrument, including but not limited to any assignee or successor of a party, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this instrument, any related instruments, any collateral or the dealings or the relationship between or among the parties, or any of them. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

10. *Miscellaneous.*

(a) *Notices.* All notices, requests, demands or other communications (including telecommunications) to or from Guarantor or Bank shall be in writing and shall be deemed to have been duly given or made when delivered (i) to Bank, at its office at 500 Park Avenue, New York, New York 10022, and (ii) to Guarantor, at its address set next

to its signature below, or as to either party, at such other address as such party may hereafter specify to the party in writing. Written notices if delivered by hand shall be deemed delivered upon receipt acknowledged in written form by the recipient or five (5) business days (business day being defined as a day, other than a Saturday or Sunday, on which the banks in New York City are authorized to be open for business) after mailing, and all mailed notices shall be by registered or certified mail, postage prepaid. Notices provided by any other means shall be deemed delivered upon receipt acknowledged in writing.

(b) *Expenses.* Guarantor agrees that, upon an Event of Default (as defined in that certain Consignment Agreement or Loan Agreement between the Borrower and Bank of even date herewith) or any event which with notice or lapse of time, or both, would constitute an Event of Default, with notice to Borrower or Guarantor, and with or without demand upon Borrower, Guarantor will pay or reimburse Bank (to the extent reimbursement has not already been made by Borrower) for all expenses, including reasonable fees and expenses of its legal counsel, incurred by Bank in connection with any of the Obligations or the collection thereof and the enforcement of any provisions of this Guaranty.

(c) *Continuing Guaranty.* This is a continuing guaranty and shall remain in full force and effect until terminated in accordance with Section 8 hereof and be binding upon Guarantor and its heirs, executors, administrators, successors and assigns until payment in full to Bank of all the Obligations.

(d) *Assignments.* Bank may assign its rights and powers under this Guaranty with respect to all or any of the Obligations and, in the event of such assignment, the assignee of such rights and powers, to the extent of such assignment, shall have the same rights and remedies as if originally named herein in the place of its assignor.

(e) *Waiver of Rights.* No delay on the part of Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on Guarantor shall be deemed to be a waiver of the obligation of Guarantor or of the right of Bank to take other or further action without notice or demand as provided herein. In any event no modification or waiver of the provisions hereof shall be effective unless in writing nor shall any waiver be applicable except with respect to the specific person to whom and in the specific instance or matter for which given.

(f) *Cumulative Remedies.* The obligations of Guarantor hereunder are in addition to and not in substitution for any other obligations or security interests now or hereafter held by Bank and shall not operate as a merger of any contract or debt or suspend the fulfillment of, or affect the rights, remedies or powers of Bank in respect of, any obligation or other security interest held by it for the fulfillment thereof. The rights and remedies provided herein and in any other instrument are cumulative and not exclusive of any other rights or remedies provided by law.

(g) *Governing Law.* This Guaranty shall be governed by, determined and construed in accordance with the laws of the State of New York.

(h) *Severability.* If any part of this Agreement is contrary to, prohibited by or deemed invalid under the applicable law or regulations of any jurisdiction, such provision shall, as to such jurisdiction, be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible, and any such prohibition or invalidity in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(i) *References to Bank and Guarantor.* Each reference herein to Bank shall be deemed to include its successors and assigns, and each reference to Guarantor and any pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter, singular, or plural as the context may require and shall be deemed to include the heirs, executors. administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions hereof.

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the 30th day of June, 2000.

Erwin Pearl

ERWIN PEARL

Address: 115 E 87th St
New York, NY 10128

# UNCONDITIONAL AND CONTINUING GUARANTY

WHEREAS, the undersigned, ERWIN PEARL, an individual who resides at the address set forth below (*"Guarantor"*), seeks to induce ABN AMRO BANK N.V., a bank organized under the laws of The Netherlands acting through its New York Branch, with its main office at 500 Park Avenue, New York, New York 10022 (*"Bank"*), to extend or continue to extend credit and/or consign or continue to consign precious metals to ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (*"Borrower"*); and

WHEREAS, the execution and delivery by Guarantor of this Unconditional and Continuing Guaranty (the *"Guaranty"*) is a condition precedent to the obligation of Bank to extend or continue to extend credit and/or consign or continue to consign precious metals to the Borrower; and

WHEREAS, Guarantor will derive substantial benefits from such extensions of credit and/or consignments to the Borrower;

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt of which is hereby acknowledged, Guarantor hereby represents and agrees as follows:

1. *Guaranty.* Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Bank the full and prompt performance by Borrower of all of its covenants and obligations under a certain Facility Letter, Consignment Agreement and a certain Loan Agreement each between Bank and Borrower and of even date herewith, and the related Security Agreement, all as amended or modified from time to time (collectively, the *"Agreements"*), and the punctual and full payment and performance when due, whether at the stated date or dates for such payment, by acceleration or otherwise, of all indebtedness, liabilities and obligations of the Borrower to Bank thereunder, of every kind and nature whatsoever, whether absolute or contingent, now existing or hereafter arising, secured or unsecured, and whether on open account, or evidenced by a promissory note, check, draft or any other instrument or document related thereto, and including, without limitation, all principal, interest, premiums, fees, cost and expense reimbursements, letter of credit reimbursement obligations, acceptance fees and commissions and all other obligations assumed under the documentation of such indebtedness, liabilities and obligations (all of the foregoing are hereinafter sometimes referred to as the *"Obligations"*). Notwithstanding anything contained herein to the contrary, the Bank's right of recovery against the Guarantor for payment of the Obligations and any expenses in connection with the Obligations shall not exceed the aggregate amount of $5,000,000.

2. *Payment by Guarantor; Set-Off.* In the event of the occurrence of any Event of Default (as defined therein) under the Agreements or a default by Borrower under any of the Obligations and/or the failure of Borrower punctually to pay or perform any of the

Obligations when due, Guarantor hereby agrees to make such payment and/or performance punctually when and as the same shall become due and payable, whether at maturity, by acceleration or otherwise. Each such payment shall be made at the main New York office of Bank (or at such other office as Bank shall specify by written notice to Guarantor), in immediately available and freely transferable funds. While this Guaranty is in effect, all accounts, deposits and property of Guarantor on deposit with or otherwise in the hands of Bank are hereby and shall continue to be and stand pledged and impressed with a lien as collateral security for all Obligations, and Bank shall have the same right of set-off with respect to deposits and credits in favor of Guarantor as it has with respect to deposits and credits of Borrower.

3. *Obligation of Guarantor Unconditional.* Guarantor hereby agrees that:

(a) Its liability hereunder is unconditional, irrespective of:

(i) the legality, validity or enforceability of the Obligations;

(ii) the legality, validity or enforceability of any security interest, mortgage or pledge granted by Borrower as collateral for the Obligations, any guarantee, suretyship, letter of credit or reimbursement agreement issued by any person secondarily or otherwise liable for any of the Obligations, any security interest, mortgage, or pledge granted by any person secondarily or otherwise liable for any of the Obligations, any right of set-off against any deposit account or credit on the Bank's books in favor of Borrower or any person secondarily or otherwise liable for any of the Obligations, or any other device providing collateral security for payment of any of the Obligations, all of the hereinabove referenced devices being referred to herein as the *"Collateral Security"*;

(iii) the absence of any action or effort by Bank to either resort to, enforce or exhaust its remedies under or against the Obligations and/or the Collateral Security;

(iv) the waiver or consent by Bank with respect to any provision in the documentation of the Obligations or the Collateral Security;

(v) the recovery of any judgment against Borrower or any action to enforce such judgment or any other circumstance which might, absent the unconditional nature of this Guaranty, constitute a legal or equitable discharge or defense of Guarantor; or

(vi) the amount of the Obligations of the Borrower exceeding the limit on the Bank's right of recovery hereunder.

(b) Bank may at any time, or from time to time as permitted by the Agreements, but otherwise in Bank's sole discretion:

(i) change, alter, renew, continue, extend and/or accelerate the time of payment of, all or any of the Obligations, or any part or parts thereof or any renewal or renewals thereof;

(ii) replace any existing Obligation and the documentation therefor with an amended and restated Obligation and the documentation therefor;

(iii) sell, exchange, release, compromise and/or surrender all or any of the property which is the subject of the Collateral Security (the "*Collateral*"), or any part or parts thereof, with respect to which Bank may now or hereafter have an interest;

(iv) sell and/or purchase any or all of the Collateral at public or private sale, or at any broker's board, and after deducting all costs and expenses of every kind for collection, sale and/or delivery, apply the proceeds of any such sale or sales against any of the Obligations; or

(v) settle or compromise any or all of the Obligations with the Borrower, and/or any other person or persons liable thereon, and/or subordinate the payment of same or any part thereof to the payment of any other debts or claims which may at any time be due or owing to Bank and/or other person; all in such manner and upon such terms as Bank may see fit and without notice to or consent from Guarantor, who hereby agrees to be and remain bound upon this Guaranty, irrespective of the effect upon the existence or status of the Obligations or the Collateral Security and notwithstanding any such change, alteration, renewal, continuance, extension, acceleration, sale, exchange, release, compromise, surrender, application, settlement, subordination or any other action hereinabove mentioned.

(c) The liability of Guarantor will not be discharged except by (i) complete and final payment and performance of the Obligations by the Borrower or (ii) complete and final payment by the Guarantor of $5,000,000 to the Bank hereunder.

(d) Subject to the limit on the Bank's right of recovery hereunder, the liability of Guarantor under this Guaranty shall be reinstated with respect to any amount paid to Bank by Borrower which is thereafter required to be returned to Borrower or any trustee, receiver or other representative of or for Borrower, upon or by reason of the bankruptcy, insolvency, reorganization, or dissolution of Borrower, or for any other reason, all as though such amount had never been paid by Borrower.

(e) This is a guarantee of payment and not merely of collection.

4. *No Subrogation.* The Guarantor will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to the Guarantor against any person liable for payment of the Obligations, or as to any security therefor, unless and until the full amount owing to Bank on the Obligations has been paid and the payment by the Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the Guarantor to any right, title or interest (whether by way of subrogation or otherwise) in and to any of the Obligations or any proceeds thereof or any security therefor unless and until the full amount owing to the Bank on the Obligations has been paid.

5. *Waivers.* Guarantor hereby expressly waives:

(a) notice of the acceptance of this Guaranty;

(b) notice of extensions of credit by Bank to Borrower under the Agreements and of any change in the rate at which any of the Obligations are accruing interest or fees;

(c) diligence, presentment and demand for payment of any of the Obligations;

(d) protest, notice of protest, notice of dishonor and notice of nonpayment or default to Guarantor or to any other person with respect to the Obligations;

(e) filings of claims or proof of claims with a court in the event of any bankruptcy or insolvency proceedings as to which Borrower or any person secondarily or otherwise liable for any of the Obligations is subject;

(f) any right to require a proceeding first against Borrower or any other person;

(g) any demand for payment under this Guaranty;

(h) any defenses available to a surety under law; and

(i) all other legally waivable notices to which Guarantor might otherwise be entitled.

6. *Insolvency of Borrower.* Upon the occurrence of any Event of Default set forth in Section 13(f) of the Consignment Agreement as to Borrower, all Obligations of Borrower shall, for the purpose of this Guaranty, become immediately due and payable.

7. *Financial Condition.* Guarantor covenants and agrees with Bank that, during such time as this Guaranty is in effect Guarantor will not sell, mortgage, pledge or otherwise convey or transfer any substantial or material portion of its real or personal

property without fair consideration. In the event of any material breach of said covenants and agreements, each of the Obligations, regardless of its terms, shall, at Bank's election, be deemed for the purposes of this Guaranty to have matured, and at Bank's election, subject to the terms hereof, Guarantor shall promptly pay to Bank all of said outstanding Obligations and Bank may take any action it deems necessary or advisable to enforce this Guaranty.

8. *Termination of Guaranty.* This Guaranty is a continuing Guaranty and shall remain in full force and effect irrespective of any interruptions in the business relations of Borrower with Bank; provided, however, that Guarantor may, by notice in writing actually received and acknowledged by an officer of Bank, terminate this Guaranty with respect to all new Obligations incurred or contracted by Borrower or acquired by Bank after the date on which such notice is so received, but this Guaranty shall remain in full force and effect as to all Obligations existing or committed to be extended at the date of receipt of such notice and to all renewals and extensions thereof until the full payment thereof and all interest and fees thereon to Bank.

9. *Consent to Jurisdiction; Waiver of Jury.* Guarantor and the Bank hereby submit to the jurisdiction of the courts of the State of New York for New York County and the United States District Court for the Southern District of New York, as well as to the jurisdiction of all courts to which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of any of Guarantor's obligations under or with respect to this Guaranty, and expressly waives any and all objections it may have as to venue in any of such courts. GUARANTOR AND THE BANK EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ON ANY MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this instrument, including but not limited to any assignee or successor of a party, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this instrument, any related instruments, any collateral or the dealings or the relationship between or among the parties, or any of them. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

10. *Miscellaneous.*

(a) *Notices.* All notices, requests, demands or other communications (including telecommunications) to or from Guarantor or Bank shall be in writing and shall be deemed to have been duly given or made when delivered (i) to Bank, at its office at

680 Fifth Avenue, New York, New York 10019, and (ii) to Guarantor, at its address set next to its signature below, or as to either party, at such other address as such party may hereafter specify to the party in writing. Written notices if delivered by hand shall be deemed delivered upon receipt acknowledged in written form by the recipient or five (5) business days (business day being defined as a day, other than a Saturday or Sunday, on which the banks in New York City are authorized to be open for business) after mailing, and all mailed notices shall be by registered or certified mail, postage prepaid. Notices provided by any other means shall be deemed delivered upon receipt acknowledged in writing.

(b) *Expenses.* Guarantor agrees that, upon an Event of Default (as defined in that certain Consignment Agreement or Loan Agreement between the Borrower and Bank of even date herewith) or any event which with notice or lapse of time, or both, would constitute an Event of Default, with notice to Borrower or Guarantor, and with or without demand upon Borrower, Guarantor will pay or reimburse Bank (to the extent reimbursement has not already been made by Borrower) for all expenses, including reasonable fees and expenses of its legal counsel, incurred by Bank in connection with any of the Obligations or the collection thereof and the enforcement of any provisions of this Guaranty.

(c) *Continuing Guaranty.* This is a continuing guaranty and shall remain in full force and effect until terminated in accordance with Section 8 hereof and be binding upon Guarantor and its heirs, executors, administrators, successors and assigns until payment in full to Bank of all the Obligations.

(d) *Assignments.* Bank may assign its rights and powers under this Guaranty with respect to all or any of the Obligations and, in the event of such assignment, the assignee of such rights and powers, to the extent of such assignment, shall have the same rights and remedies as if originally named herein in the place of its assignor.

(e) *Waiver of Rights.* No delay on the part of Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on Guarantor shall be deemed to be a waiver of the obligation of Guarantor or of the right of Bank to take other or further action without notice or demand as provided herein. In any event no modification or waiver of the provisions hereof shall be effective unless in writing nor shall any waiver be applicable except with respect to the specific person to whom and in the specific instance or matter for which given.

(f) *Cumulative Remedies.* The obligations of Guarantor hereunder are in addition to and not in substitution for any other obligations or security interests now or hereafter held by Bank and shall not operate as a merger of any contract or debt or suspend the fulfillment of, or affect the rights, remedies or powers of Bank in respect of, any obligation or other security interest held by it for the fulfillment thereof. The rights and remedies provided herein and in any other instrument are cumulative and not exclusive of any other rights or remedies provided by law.

(g) *Governing Law:* This Guaranty shall be governed by, determined and construed in accordance with the laws of the State of New York.

(h) *Severability.* If any part of this Agreement is contrary to, prohibited by or deemed invalid under the applicable law or regulations of any jurisdiction, such provision shall, as to such jurisdiction, be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible, and any such prohibition or invalidity in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(i) *References to Bank and Guarantor.* Each reference herein to Bank shall be deemed to include its successors and assigns, and each reference to Guarantor and any pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter, singular, or plural as the context may require and shall be deemed to include the heirs, executors. administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions hereof. This guaranty is issued in replacement of that certain Unconditional and Continuing Guaranty dated June 30, 2000 which shall be deemed cancelled and replaced hereby.

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the 17th day of December, 2002.

[signature]

ERWIN PEARL

Address: 115 E 87th St.

New York, NY 10128

# AMENDMENT TO CONSIGNMENT AGREEMENT AND LOAN AGREEMENT AND AMENDMENT TO SECURITY AGREEMENT, GUARANTY AGREEMENT AND SUBORDINATION AND PLEDGE AGREEMENT

This Amendment to Consignment Agreement and Loan Agreement, and Amendment to Security Agreement, Guaranty Agreement and Subordination and Pledge Agreement (this *"Amendment"*), dated as of November 5, 2004, by and between ABN AMRO BANK N.V., a bank organized under the laws of The Netherlands and acting through its New York office currently located at 565 Fifth Avenue, New York, New York 10017 (the *"Bank"* or *"Consignor"*) and ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation with its principal office at 735 Allens Avenue, Providence, Rhode Island 02905 (the *"Company"* or *"Consignee"*).

## WITNESSETH THAT:

WHEREAS, (i) the Company and the Bank are currently party to the following: (A) that certain Consignment Agreement dated as of June 30, 2000, as amended by Amendment to Consignment Agreement dated November 6, 2003 (together with all of its appendices, exhibits, schedules and attachments thereto, the *"Consignment Agreement"*); (B) that certain Loan Agreement dated as of June 30, 2000, as amended by Amendment to Facility Letter and Loan Agreement dated December 17, 2002 (together with all of its appendices, exhibits, schedules and attachments thereto, the *"Loan Agreement"*); and (C) that certain Security Agreement dated as of June 30, 2000; (ii) Erwin Pearl has delivered that certain Guaranty Agreement dated as of December 17, 2002 (the *"Guaranty Agreement"*); and (iii) Company and Erwin Pearl are currently party to that certain Subordination and Pledge Agreement dated as of June 30, 2000 (the *"Subordination and Pledge Agreement"*) (the Consignment Agreement, the Loan Agreement, the Guaranty Agreements and the Subordination and Pledge Agreement being hereinafter referred to collectively as the *"Agreements"*);

WHEREAS, unless otherwise defined herein or the context otherwise requires, all terms and phrases which are defined in each of the Agreements shall have the same meaning when used herein as that which is ascribed to them in such Agreement; and

WHEREAS, the Company and the Bank desire to amend each Agreement as herein provided;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Consignee and ABN AMRO hereby agree as follows:

1. Upon the satisfaction of the pre-conditions set forth in Section 6 and effective as of the date hereof (the *"Effective Date"*), the Agreements shall each be amended and hereby are amended as follows:

(a) Section 1 of the Consignment Agreement is hereby amended by amending and restating the following definitions appearing therein to read as follows:

*"Borrowing Base"* shall mean the sum of (1) with respect to Precious Metal that is gold, ninety percent (90%) of the Fair Market Value of such Precious metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor, not to exceed 2,000 ounces as to (b), plus (2) with respect to Precious Metal that is silver, ninety percent (90%) of the Fair Market Value of such Precious Metal which is (a) maintained at the Principal Office of the Consignee or (b) located at refiners, fabricators and contractors domiciled in the United States of America and acceptable to the Consignor, not to exceed 45,000 ounces as to (b).

*"Consignment Limit"* shall mean, with respect to Consigned Precious Metal which is gold, the amount equal to the lesser of: (1) such Consigned Precious Metal with a Fair Market Value equal to $7,500,000 and (2) the Gold Borrowing Base minus the sum of (x) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note outstanding under the Loan Agreement between Consignor and Consignee of even date herewith and (y) the Fair Market Value of all Consigned Precious Metal which is Silver. "Consignment Limit" shall mean, with respect to Consigned Precious Metal which is silver, the amount equal to the lesser of: (1) such Consigned Precious Metal with a Fair Market Value equal to $7,500,000 and (2) the Silver Borrowing Base, minus the sum of (x) the unpaid principal amount of all loans made under the revolving credit facility and evidenced by the Revolving Note outstanding under the aforesaid Loan Agreement and (y) the Fair Market Value of all Consigned Precious Metal which is gold.

*"Daily Consignment Fee"* shall mean either the floating consignment fee or fixed consignment fee as set forth in Section 5.

*"Principal Office"* shall mean:

For Consignor:

ABN AMRO Bank N.V.
New York Branch
565 Fifth Avenue
New York, New York 10017
Attention: Mr. Jeff Sarfaty, Vice President
Fax: (212) 649-5149

(b) Section 5 of the Consignment Agreement is hereby amended by deleting the last paragraph thereof and inserting the following paragraph:

> "In addition to all payments required above, Consignee agrees to pay to Consignor a Daily Consignment Fee for Consignor's services under this Agreement during the preceding month on the tenth (10th) Business Day of each calendar month and Consignee expressly authorizes Consignor to charge Consignee's account with Consignor for the amount thereof. The Company may elect to pay either a floating consignment fee or, *provided* that no Event of Default has occurred and is then continuing, a fixed consignment fee with respect to each consignment of Precious Metal under the Consignment Facility, subject to the terms and conditions hereinafter set forth. Upon the occurrence and during the continuance of an Event of Default, all Consignments shall automatically convert to a floating consignment fee at the end of the applicable consignment period. A floating consignment fee shall mean, for each day, the fee mutually agreed on by Consignor and Consignee for that day. A fixed consignment fee for Deliveries of Precious Metal having a Maturity Date (as defined in Section 6) of more than one day, shall be the rate equal to the sum of (i) two and one-half percent (2.5%) and (ii) the cost to the Bank of funding the delivery of such specific amount of Precious Metal for the relevant period as determined pursuant to Appendix I hereto. Once the Company has selected the specific quantity and type of Precious Metal and the specific Maturity Date, such selection shall be irrevocable and binding on the Company and shall obligate the Company to accept the consignment requested in the amount and for the Maturity Date selected. The Consignee shall compensate the Consignor for any loss, cost or expense caused by the failure of the Company to accept delivery of any requested Precious Metal consignment or by any redelivery or purchase by the Consignee of Precious Metal prior to a specific Maturity Date."

(c) Section 11(m) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

> "(m) Maintain, at all times, Net Working Capital in an amount not less than $3,000,000;"

(d) Section 11(n) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

> "(n) Maintain, at all times, minimum Capitalization (being the sum of Tangible Net Worth plus Subordinated Indebtedness) in an amount not less than $4,000,000; and"

(e) Section 12(m) of the Consignment Agreement is hereby amended and restated in its entirety to read as follows:

> "(m) Allow Precious Metal which is silver located at refiners, fabricators or contractors domiciled in the United States of America to exceed forty-five thousand(45,000) ounces."

(f) Section 15(a)(i) of the Consignment Agreement is hereby amended by deleting the present wording of clause (A) and inserting in its place the following:

> "(A) Thomas Baker, Chief Executive Officer, 735 Allens Avenue, Providence, Rhode Island 02905; Telecopy: 401-784-9107."

(g) The second paragraph of the Loan Agreement is hereby amended by adding the following language at the end thereof:

> "The Company may, as to any advance, request that interest thereon be based upon Adjusted LIBOR plus the applicable margin of 2.50%. In such event, the Company shall give the Bank not less than three Business Days' prior written or facsimile notice (which shall be irrevocable once given) of such requested advance and shall be in a minimum amount of $500,000 or such greater amount which is an integral multiple of $100,000. The Company shall also specify the LIBOR Interest Period relating to such Advance.
>
> Subject to all of the terms and conditions hereof, portions of the principal indebtedness evidenced by the Revolving Note (all of the indebtedness evidenced by the Revolving Note bearing interest at the same rate for the same period of time being hereinafter referred to as a *"Portion"*) may, at the option of the Company, bear interest with reference to the Domestic Rate (the *"Domestic Rate Portion"*) or with reference to Adjusted LIBOR (*"LIBOR Portion"*) and Portions may be converted from time to time from one basis to the other. All of the indebtedness evidenced by the Revolving Note which is not part of a LIBOR Portion shall constitute a single Domestic Rate Portion. All of the indebtedness evidenced by the Revolving Note which bears interest with reference to a particular Adjusted LIBOR for a particular Interest Period shall constitute a single LIBOR Portion. Anything contained herein to the contrary notwithstanding, the obligation of the Bank to create, continue or effect by conversion any LIBOR Portion shall be conditioned upon the fact that at the time no Default or Event of Default shall have occurred and be continuing. The Company hereby promises to pay interest on each Portion at the rates and times specified hereunder.

The Domestic Rate Portion of each Note shall bear interest at the rate per annum equal to the Domestic Rate as in effect from time to time, *provided* that if the Domestic Rate Portion or any part thereof is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto from time to time. Interest on the Domestic Rate Portion shall be payable monthly in arrears on the last day of each month in each year and at maturity of the Revolving Note and interest after maturity (whether by lapse of time, acceleration or otherwise) shall be due and payable upon demand. Any change in the interest rate on the Domestic Rate Portion of each Note resulting from a change in the Domestic Rate shall be effective on the date of the relevant change in the Domestic Rate.

Each LIBOR Portion shall bear interest for each Interest Period selected therefor at a rate per annum determined by adding 2.5% to the Adjusted LIBOR for such Interest Period, provided that if any LIBOR Portion is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof through the end of the Interest Period then applicable thereto at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto, and effective at the end of such Interest Period such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion and shall thereafter bear interest at the interest rate applicable to the Domestic Rate Portion after default. Interest on each LIBOR Portion shall be due and payable on the last day of each Interest Period applicable thereto and, with respect to any Interest Period applicable to a LIBOR Portion in excess of 3 months, on the date occurring every 3 months after the date such Interest Period began and at the end of such Interest Period, and interest after maturity (whether by lapse of time, acceleration or otherwise) shall be due and payable upon demand. The Company shall notify the Bank on or before 11:00 a.m. (New York time) on the third Business Day preceding the end of an Interest Period applicable to a LIBOR Portion whether such LIBOR Portion is to continue as a LIBOR Portion, in which event the Company shall notify the Bank of the new Interest Period selected therefor, and in the event the Company shall fail to so notify the Bank, such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion as of and on the last day of such Interest Period.

Each Domestic Rate Portion shall be in an amount equal to $50,000. Each LIBOR Portion shall be in an amount equal to $500,000 or such greater amount which is an integral multiple of $100,000.

The Company shall notify the Bank in writing (via facsimile or otherwise), followed by telephone confirmation by the Company of such notice by (i) no later than 1:30 p.m. (New York time) on the date upon which the Company requests that any Domestic Rate Portion be created and (ii) by no later than 11:00 a.m. (New York time) at least 3 Business Days prior to the date upon which the Company requests that any LIBOR Portion be created or that any part of the Domestic Rate Portion be converted into a LIBOR Portion. If any request is made to convert a LIBOR Portion into another type of Portion available hereunder, such conversion shall only be made so as to become effective as of the last day of the Interest Period applicable thereto. All requests for the creation, continuance and conversion of Portions under this Agreement shall be irrevocable.

The proceeds of borrowings hereunder will be made available to the Company at the Bank's offices in New York City by transferring such proceeds to such account of the Company in the United States as the Company may specify at time of borrowing on the same business day, if the Bank receives your borrowing request by (i) in the case of Domestic Rate Portions, 1:30 p.m., New York City time and (ii) in the case of LIBOR Portions, 11:00 a.m., New York City time, at least 3 Business Days upon which you request a LIBOR Portion hereunder. The proceeds of own note borrowings hereunder will be made available to the Company on the (i) business day following the requested borrowing date, if the Bank shall receive your borrowing request after 1:30 p.m., New York City time and no later than 4:00 p.m. New York City time and (ii) in the case of LIBOR Portions, the 4th Business Day following the date of your borrowing request, if the Bank shall receive your borrowing request after 11:00 a.m., New York City time, and no later than 4:00 p.m. New York City time.

Notwithstanding any other provisions of this Agreement or the Revolving Note, if at any time the Bank shall determine that any change in applicable laws, treaties or regulations or in the interpretation thereof makes it unlawful for the Bank to create or continue to maintain any LIBOR Portion, it shall promptly so notify the Company and the obligation of the Bank to create, continue or maintain any such LIBOR Portion under this Agreement shall terminate until it is no longer unlawful for the Bank to create, continue or maintain such LIBOR Portion. The Company, on

demand, shall, if the continued maintenance of any such LIBOR Portion is unlawful, thereupon prepay the outstanding principal amount of the affected LIBOR Portion, together with all interest accrued thereon and all other amounts payable to the Bank with respect thereto under this Agreement; *provided, however*, that the Company may elect to convert the principal amount of the affected Portion into another type of Portion available hereunder, subject to the terms and conditions of this Agreement.

Notwithstanding any other provision of this Agreement or the Revolving Note, if prior to the commencement of any Interest Period, the Bank shall determine that deposits in the amount of any LIBOR Portion scheduled to be outstanding during such Interest Period are not readily available to the Bank in the relevant market or, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining Adjusted LIBOR, then the Bank shall promptly give notice thereof to the Company and the obligations of the Bank to create, continue or effect by conversion any such LIBOR Portion in such amount and for such Interest Period shall terminate until deposits in such amount and for the Interest Period selected by the Company shall again be readily available in the relevant market and adequate and reasonable means exist for ascertaining Adjusted LIBOR.

With respect to any LIBOR Portion, if the Bank shall determine that any change in any applicable law, treaty, regulation or guideline (including, without limitation, Regulation D of the Board of Governors of the Federal Reserve System) or any new law, treaty, regulation or guideline, or any interpretation of any of the foregoing by any governmental authority charged with the administration thereof or any central bank or other fiscal, monetary or other authority having jurisdiction over the Bank or its lending branch (whether or not having the force of law), shall:

(i) impose, increase, or deem applicable any reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds or disbursements by, the Bank which is not in any instance already accounted for in computing the interest rate applicable to such LIBOR Portion;

(ii) subject the Bank, any LIBOR Portion or the Revolving Note, to the extent it evidences such a LIBOR Portion, to any tax (including, without limitation, any United States interest equalization tax or similar tax however named applicable to the acquisition or holding of debt obligations and any interest or

penalties with respect thereto), duty, charge, stamp tax, fee, deduction or withholding in respect of this Agreement, any LIBOR Portion or the Revolving Note to the extent it evidences such a LIBOR Portion, except such taxes as may be measured by the overall net income or gross receipts of the Bank or its lending branches and imposed by the jurisdiction, or any political subdivision or taxing authority thereof, in which the Bank's principal executive office or its lending branch is located;

(iii) change the basis of taxation of payments of principal and interest due from the Company to the Bank hereunder or under the Revolving Note to the extent it evidences any LIBOR Portion (other than by a change in taxation of the overall net income or gross receipts of the Bank); or

(iv) impose on the Bank any penalty with respect to the foregoing or any other condition regarding this Agreement, any LIBOR Portion, or its disbursement, or the Revolving Note to the extent it evidences any LIBOR Portion;

and the Bank shall determine that the result of any of the foregoing is to increase the cost (whether by incurring a cost or adding to a cost) to the Bank of creating or maintaining any LIBOR Portion hereunder or to reduce the amount of principal or interest received or receivable by the Bank (without benefit of, or credit for, any prorations, exemption, credits or other offsets available under any such laws, treaties, regulations, guidelines or interpretations thereof), then the Company shall either (i) pay on demand to the Bank from time to time as specified by the Bank such additional amounts as the Bank shall reasonably determine are sufficient to compensate and indemnify it for such increased cost or reduced amount or (ii) prepay the outstanding principal amount of the affected LIBOR Portion, together with all interest accrued thereon and all other amounts payable to the Bank with respect thereto under this Agreement; *provided, however*, that the Company may elect to convert the principal amount of the affected Portion into another type of Portion available hereunder, subject to the terms of this Agreement. If the Bank makes such a claim for compensation, it shall provide to the Company a certificate setting forth the computation of the increased cost or reduced amount as a result of any event mentioned herein in reasonable detail.

In the event the Bank shall incur any loss, cost or expense (including, without limitation, any loss (including loss of profit), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired or contracted to be acquired by the Bank to

fund or maintain any LIBOR Portion or the relending or reinvesting of such deposits or other funds or amounts paid or prepaid to the Bank) as a result of:

(i) any payment of a LIBOR Portion on a date other than the last day of the then applicable Interest Period for any reason, whether before or after default, and whether or not such payment is required by any provisions of this Agreement; or

(ii) any failure by the Company to create, borrow, continue or effect by conversion a LIBOR Portion on the date specified in a notice given pursuant to this Agreement;

then upon the demand of the Bank, the Company shall pay to the Bank such amount as will reimburse the Bank for such loss, cost or expense. If the Bank requests such a reimbursement, it shall provide to the Company a certificate setting forth the computation of the loss, cost or expense giving rise to the request for reimbursement in reasonable detail and such certificate shall be conclusive if reasonably determined.

The Bank may, at its option, elect to make, fund or maintain Portions of the advances hereunder at such of its branches or offices as the Bank may from time to time elect.

Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Revolving Note in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if the Bank had actually funded and maintained each LIBOR Portion during each Interest Period applicable thereto through the purchase of deposits in the relevant LIBOR market in the amount of such LIBOR Portion, having a maturity corresponding to such Interest Period, and, bearing an interest rate equal to the LIBOR for such Interest Period.

For purposes hereof, the following terms shall have the meanings ascribed to them as follows:

*"Adjusted LIBOR"* means a rate per annum determined by the Bank in accordance with the following formula:

$$\text{Adjusted LIBOR} = \frac{\text{LIBOR}}{100\%\text{-Reserve Percentage}}$$

*"Reserve Percentage"* means the maximum rate of all reserve requirements from time to time imposed by the Board of Governors of the Federal Reserve System (or any successor) for the applicable Interest Period as of the first day of such Interest Period *"LIBOR"* means, for each Interest Period, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to such Interest Period, which appears on the Telerate Page 3750 as of 11:00 a.m. (London, England time) on the day two (2) Business Days before the commencement of such Interest Period. *"Telerate Page 3750"* means the display designated as *"Page 3750"* on the Telerate Service (or such other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits). Each determination of LIBOR made by the Bank shall be conclusive and binding absent manifest error.

*"Business Day"* means any day other than a Saturday or Sunday on which the Bank is not authorized or required to close in New York, New York and a day on which the Bank is also dealing in United States Dollar deposits in London, England.

*"Domestic Rate"* means the rate per annum from time to time announced by the Bank as its prime commercial rate for U.S. Dollar loans (any change in the interest rate on the Revolving Note resulting from a change in the Domestic Rate shall be and become effective as of and on the date of the relevant change in such Domestic Rate).

*"Interest Period"* means the period commencing on, as the case may be, the creation, continuation or conversion date with respect to a LIBOR Portion and ending 1, 2, 3 or 6 months thereafter as selected by the Company in its notice as provided herein; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day, unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) no Interest Period may extend beyond the final maturity date of the Revolving Note;

(iii) the interest rate to be applicable to each Portion for each Interest Period shall apply from and including the first day of such Interest Period to but excluding the last day thereof; and

(iv) no Interest Period may be selected if after giving effect thereto the Company will be unable to make a principal payment scheduled to be made during such Interest Period without paying part of a LIBOR Portion on a date other than the last day of the Interest Period applicable thereto.

For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding day in the next calendar month, *provided, however*, if an Interest Period begins on the last day of a month or if there is no numerically corresponding day in the month in which an Interest Period is to end, then such Interest Period shall end on the last Business Day of such month."

(h) The fourth paragraph of the Loan Agreement (prior to giving effect hereto) shall be amended by adding the following at the end thereof:

"Unless the Company otherwise directs, principal payments shall be first applied to the Domestic Rate Portion of the Revolving Note until payment in full thereof, with any balance applied to the LIBOR Portions of the Revolving Note in the order in which their Interest Periods expire."

(i) The first sentence of Section 2 of the Loan Agreement shall be amended and restated in its entirety to read as follows:

"The total borrowings at any one time outstanding under this facility shall in no event exceed (x) the lesser of (a) Seven Million Five Hundred Thousand ($7,500,000) and (b) the Borrowing Base, minus the Fair Market Value of all Consigned Precious Metal outstanding under the Consignment Agreement."

(j) Section 9 of the Loan Agreement shall be amended by (i) adding ", *Indemnities and Reimbursement*" to the section heading thereof and (ii) adding the following sentence at the end thereof:

"All indemnities and other provisions relative to reimbursement to the Bank of amounts sufficient to protect the yield of the Bank with respect to the advances shall survive the termination of this Agreement and the payment of the Revolving Note."

(k) Section 13 of the Loan Agreement shall be amended as to the address of the Bank as follows:

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017
Attention: Mr. Jeffery Sarfaty
Telecopy: 212-649-5149

and, in the case of the Company, there shall be deleted, the requirement of a copy to Tillinghast, Licht, etc. and replaced with the requirement of a copy to:

Thomas Baker, Chief Executive Officer
735 Allens Avenue
Providence, Rhode Island 02905
Telecopy: 401-784-9107

(l) Exhibit A, C, D and E to the Loan Agreement shall be amended and restated in its entirety to read as set forth on Exhibit A, C, D and E hereto and Exhibit B to the Loan Agreement shall be deleted in its entirety.

(m) The Bank hereby agrees that so long as the Company shall not be in default under the Agreements, notwithstanding the present wording of Section 3(b) of the Subordination and Pledge Agreement, and, notwithstanding any other Section of the Subordination Agreement, the Creditor may make up to $150,000 in principal payments of the Subordinated Indebtedness in the Company's fiscal year ending June 30, 2005.

2. By their execution hereof, each of the parties hereto agree that, as of the Effective Date, Section 1 and Section 3(c) of the Guaranty Agreement shall be amended by deleting the amount of "$5,000,000" and inserting in its place the amount of "$1,000,000."

3. The Company has heretofore executed and delivered to the Bank that certain Security Agreement dated as of June 30, 2000 (as the same may be amended, modified or supplemented, the *"Security Agreement"*) and the Company hereby acknowledges and agrees that, notwithstanding the execution and delivery of this Amendment, the Security Agreement remains in full force and effect and the rights and remedies of the Bank thereunder, the obligations of the Company thereunder and the liens and security interests created and provided for thereunder remain in full force and effect and shall not be affected, impaired or discharged hereby. Nothing herein contained shall in any manner affect or impair the priority of the liens and security interests created and provided for by the Security Agreement as to the indebtedness which would be secured thereby prior to giving effect to this Amendment.

4. Except as expressly amended hereby, the Agreements and all other documents executed in connection therewith shall remain in full force and effect. Each of the Agreements, as amended hereby, and all rights and powers created thereby and thereunder or under such other documents are in all respects ratified and confirmed. From and after the Effective Date, each of the

Agreements shall be deemed to be amended and modified as herein provided, but, except as so amended and modified, each of the Agreements shall continue in full force and effect and each of the Agreements and this Amendment shall be read, taken and construed as one and the same instrument. On and after the Effective Date, the term *"Agreement"* as used in each of the Agreements and all other references to such agreement therein shall mean such agreement as hereby amended.

5. On and as of the Effective Date, the Company represents and warrants to the Bank that:

(a) its representations and warranties contained in this Amendment and each of the Agreements are true and correct in all material respects, in each case as though made on and as of such date, except to the extent such representations and warranties relate solely to an earlier date (and then as of such earlier date); and

(b) both before and after giving effect to this Amendment, no Event of Default has occurred and is continuing or would result from the execution and delivery of this Amendment or any other document arising in connection with or pursuant to this Amendment; and

(c) the Company is, and will be, in full compliance with all of the material terms, conditions and all other provisions of this Amendment and each of the Agreements; and

(d) this Amendment has been duly authorized, executed and delivered on its behalf, and each of the Agreements, both before being amended and supplemented hereby and as amended and supplemented hereby, and this Amendment constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms, except to the extent that a remedy or default may be determined by a court of competent jurisdiction to constitute a penalty and except to the extent that enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights or by general principles of equity; and

(e) all of the pre-conditions set forth in Section 6 of this Amendment have been and remain satisfied.

6. Section 1 of this Amendment shall become effective on the Effective Date only once all of the pre-conditions set forth in this Section 6 shall have been satisfied:

(a) each of the representations and warranties set forth in Section 5 of this Amendment shall be and remain true, accurate, correct and complete as of the Effective Date, as though made on and as of the as Effective Date, except to the extent such representations and warranties relate solely to an earlier date (and then as of such earlier date); and

(b) ABN AMRO shall have received an executed promissory note of the Company in the form of Exhibit A hereto; and

(c) on the Effective Date, the Company shall be in full compliance with all of the terms and conditions of each of the Agreements and this Amendment; and

(d) on the Effective Date, all legal matters incident to the execution and delivery of this Amendment shall be satisfactory to the Bank.

7. The Company agrees promptly to pay or reimburse all reasonable fees and expenses of Chapman and Cutler LLP, legal counsel for the Bank, relating to the preparation, execution and delivery of this Amendment and any other documents referred to in this Amendment.

8. THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

9. This Amendment may be signed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10. Except as otherwise specified herein, this Amendment embodies the entire agreement and understanding between the Company and the Bank with respect to the subject matter hereof and supersedes all prior agreements, consents and understandings relating to such subject matter.

11. The headings in this Amendment have been inserted for convenience only and shall be given no substantive meaning or significance in construing the terms and provisions of this Amendment.

12. This Amendment shall be binding upon and inure to the benefit of each Consignor and its successors and assigns, the Bank and the Company and its permitted successors and assigns.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Company and the Bank have caused this Amendment to be duly executed as of the date first hereinabove written, effective, however, as herein provided.

ARMBRUST INTERNATIONAL LTD.

By: ______________________

Its: CHIEF EXECUTIVE OFFICER

ABN AMRO BANK N.V.

By: ______________________

Its: VP

By: ______________________

Its: Vice President

The undersigned hereby consents to this Amendment and acknowledges that the Unconditional and Continuing Guaranty, as amended hereby, and Subordination and Pledge Agreement, as amended hereby, to which the undersigned is a party remains in full force and effect.

______________________

Erwin Pearl

# EXHIBIT A

## REVOLVING NOTE

New York, New York
$7,500,000 November 3, 2004

ON the date ninety (90) days after notice from ABN AMRO Bank N.V. (the *"Bank"*) that payment is demanded hereunder for value received, the undersigned, ARMBRUST INTERNATIONAL LTD., a Rhode Island corporation (the *"Company"*), promises to pay to the order of the Bank at its New York office at 565 Fifth Avenue, New York, New York 10017 the principal sum of Seven Million Five Hundred Thousand Dollars ($7,500,000), or such lesser amount as may be advanced under the revolving credit facility by the Bank to the Company hereon pursuant to the Loan Agreement hereinafter identified.

The Company hereby promises to pay interest (computed on the basis of a year of 360 days for the actual number of days elapsed) on the principal amount from time to time remaining unpaid hereon from the date hereof until the maturity thereof at the rate per annum as provided in the Loan Agreement (as hereinafter defined) payable as provided in said Loan Agreement.

On demand, the Company promises to pay interest on any overdue principal hereof (whether by acceleration or otherwise), until paid at the rate per annum as provided in the Loan Agreement.

All loans made by the Bank hereof against this Note, and all payments made by the Company on account of the unpaid principal amount hereof, shall be recorded on the books and records of the holder hereof and endorsed hereon prior to any transfer hereof, and the Company agrees that in any action or proceeding instituted to collect or enforce collection of this Note, the amount shown as owing on this Note on the books and records of the holder hereof shall be deemed prima facie correct.

This Note is issued under the terms and provisions of a letter agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, by and between the Company and the holder hereof (the *"Loan Agreement"*), and this Note and the holder hereof are entitled to all of the benefits provided for by said Loan Agreement or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. This Note shall be immediately due and payable upon the occurrence of any Event of Default as provided in the Loan Agreement. This Note is secured by, among other things, that certain Security Agreement dated as of June 30, 2000 from the Company to the Bank. This Note and the holder hereof are entitled to all of the benefits and security provided for by or referred to in the Security Agreement, to which Security Agreement reference is hereby made for a statement thereof.

This Note shall be construed in accordance with, and governed by, the internal laws of the State of New York.

The Company hereby promises to pay all costs and expenses (including reasonable attorneys' fees) suffered or incurred by the holder hereof in collecting this Note or in enforcing any rights in any collateral therefor. The Company hereby waives presentment for payment and notice of dishonor.

ARMBRUST INTERNATIONAL LTD.

By ______________________________

Its ______________________________

# EXHIBIT B

[INTENTIONALLY DELETED]

# EXHIBIT C

_______________, 200_

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

Re: ADDITIONAL BORROWING UNDER REVOLVING CREDIT

Ladies and Gentlemen:

We refer to our Revolving Note dated November ____, 2004, payable to your order in the face principal sum of $7,500,000 (the *"Revolving Note"*). We hereby request a borrowing from you under our revolving credit in the amount of $_______________, which borrowing shall be made against and evidenced by the Revolving Note. We promise to pay such borrowing in accordance with the Revolving Note or upon termination of the Loan Agreement or acceleration of the advance in accordance with the Loan Agreement.

In order to induce you to make the advance hereby requested, we hereby certify to you that as of the date hereof, each of our representations and warranties in Section 8 of the loan agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, currently in effect between us (the *"Loan Agreement"*) remains true and correct and we are in full compliance with all of the terms and conditions of the Loan Agreement.

We hereby certify that the proceeds of this borrowing will be used solely for general working capital purposes in our business as presently conducted in the ordinary course. Our records indicate that after giving effect to this borrowing, our total outstanding borrowings in respect of the Revolving Note are $_______________.

ARMBRUST INTERNATIONAL LTD.

By ____________________________________
Authorized Signature

# EXHIBIT D

_______________, 200__

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

Re: ADDITIONAL BORROWING UNDER REVOLVING CREDIT

Ladies and Gentlemen:

________________________________ of this company had a telephone conversation with your office today whereby we requested a borrowing from you under our revolving credit in the amount of $______________. In that connection, we refer to our Revolving Note dated November ___, 2004 payable to your order in the face principal sum of $7,500,000 (the *"Revolving Note"*). This letter will serve to confirm our aforesaid request for a borrowing from you under our revolving credit in said amount, which borrowing shall be made against and evidenced by the Note.

In order to induce your continued extension of the advance hereby confirmed, we hereby certify to you that as of the date hereof, each of our representations and warranties in Section 8 of the loan agreement dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, currently in effect between us (the *"Loan Agreement"*) remains true and correct and we are in full compliance with all of the terms and conditions of the Loan Agreement.

We hereby certify that the proceeds of this borrowing will be used solely for general working capital purposes in our business as presently conducted in the ordinary course. Our records indicate that after giving effect to this borrowing, our total outstanding borrowings in respect of the Revolving Note are $________________.

ARMBRUST INTERNATIONAL LTD.

By ____________________________________
Authorized Signature

# EXHIBIT E

## BORROWING BASE CERTIFICATE

---

ABN AMRO Bank N.V.
565 Fifth Avenue
New York, New York 10017

Attention: Jeff Sarfaty, Vice President

This Certificate is delivered pursuant to the Loan Agreement (the *"Loan Agreement"*) dated as of June 30, 2000, as amended by Letter Agreement dated December 17, 2002, between Armbrust International Ltd. (the *"Borrower"*) and ABN AMRO Bank, N.V. (the *"Bank"*). Unless otherwise defined herein, terms used herein have the meaning provided in the Loan Agreement.

The Borrower hereby certifies and warrants that as of ______________, 20__ (the *"Borrowing Base Calculation Date"*):

1. The gross outstanding amount of Eligible Accounts (net of all non-eligible accounts receivable) is $__________. Attached hereto is a detailed breakdown and aging of all non-eligible Accounts.

2. 85% of the amount designated in Item 1 above is $________________.

3. As of the Borrowing Base Calculation Date, the Borrowing Base is $________________.

4. The information contained in this Certificate (including the information upon which the foregoing calculations are based) is materially true and complete in all respects.

5. Except as disclosed in this Certificate, there has been no material adverse change in Eligible Accounts receivable since ______________, 20__.

6. As of the Borrowing Base Calculation Date, the aggregate outstanding principal amount of all loans from the Bank (and, after giving effect to the making of all loans being requested in conjunction with the delivery of such certificate) does not exceed the Borrowing Base.

7. To the best of our knowledge after due inquiry and in good faith, the calculations contained herein are based upon the book value, determined in accordance with generally accepted accounting principles of Eligible Accounts receivable.

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be executed and delivered, at the certification and warranties contained herein to be made, by its ____________________________ this ________ day of ____________, 20__.

ARMBRUST INTERNATIONAL LTD.

By ____________________________________________
Chief Executive Officer/Corporate Comptroller

**APPENDIX I**
**TO**
**AMENDMENT TO**
**CONSIGNMENT AGREEMENT AND LOAN AGREEMENT**
**AND**
**AMENDMENT TO SECURITY AGREEMENT, GUARANTY AGREEMENT AND SUBORDINATION AND PLEDGE AGREEMENT**
**ARMBRUST INTERNATIONAL LTD.**
**DATED NOVEMBER __, 2004**

---

The *"Consignment Fixed Rate"* means, with respect to any Deliveries having a Maturity Date (the *"Interest Period"*) and so long as comparable market funding conditions applicable to the Bank permit, the rate per annum equal to the LIBFR Rate, plus two and one-half percent (2.50%). *"LIBFR"* means, with respect to any Interest Period and so long as comparable market funding conditions applicable to the Bank permit, the rate per annum equal to the greater of (i) LIBOR for such Interest Period minus the GOFO Rate, in the case of gold and minus the SIFO Rate, in the case of silver and (ii) zero. *"GOFO Rate"* means the mean rate per annum (rounded upward, if necessary, to the nearest 1/32 of one percent), for a period of time equal to the applicable Interest Period which appears on the Reuters GOFO page as at 11:00 a.m. local London time on the day that is two London banking days preceding the first day of such interest Period, or, if Reuter's gold screen is unavailable, as set by the Bank for gold forwards for such period. *"SIFO Rate"* means the rate per annum (rounded upward, if necessary, to the nearest 1/32 of one percent), for a period of time equal to the applicable Interest Period which appears on the Reuters SIFO page for the London Interbank silver forwards rate as of 11:00 a.m. local London time on the day that is two London banking days preceding the first day of such Interest Period, or, if Reuter's screen is unavailable, as set by the Bank for such period.